**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| vs. | ) | Criminal No. 11-14 |
| | ) | Judge Nora Barry Fischer |
| GEORGE KUBINI, DOV | ) | |
| RATCHKAUSKAS, SANDRA | ) | |
| SVARANOVIC, AND ARTHUR SMITH, | ) | |
| | ) | |
| Defendants. | ) | |

**AMENDED MEMORANDUM OPINION**

I.  INTRODUCTION

Defendant Arthur J. Smith ("Smith") is charged by way of a Superseding Indictment with allegedly committing thirteen separate criminal offenses, including: one count of wire and bank fraud conspiracy, in violation of 18 U.S.C. § 1349; five counts of wire fraud, in violation of 18 U.S.C. § 1343; three counts of bank fraud, in violation of 18 U.S.C. § 1344(1); one count of money laundering conspiracy, in violation of 18 U.S.C. § 1956(h); and three counts of failure to file income tax returns, in violation of 26 U.S.C. § 7203.  (Docket No. 92).  Presently before the Court are Smith's: Motion to Dismiss the Superseding Indictment; Motion to Sever; and Motion to Compel, (Docket Nos. 133, 151, 153), all of which are opposed by the Government, (Docket No. 180). In short, Smith moves to dismiss the Superseding Indictment based upon alleged prosecutorial misconduct committed by Government counsel; requests that the Court sever the tax counts from the fraud counts if the Superseding Indictment is not dismissed; and, further seeks an order compelling the Government to locate and produce alleged *Brady* materials, including suspicious activity reports ("SAR") which the Government has acquired during its investigation.  (Docket Nos. 133, 151, 153, 191, 250).  The Government strongly denies any allegations that its counsel has committed prosecutorial misconduct and that dismissal of the

Superseding Indictment is appropriate; advocates that the tax and fraud counts are sufficiently related to be joined and tried together; and contends that the alleged *Brady* materials identified by Smith are neither exculpatory nor improperly withheld under the applicable Rules of Criminal Procedure and the SAR regulations. (Docket Nos. 180, 251).

Smith's Motions have been fully and exhaustively briefed by the parties, including responses and replies as to each motion, along with documentary evidence with respect to the Motion to Dismiss and Motion to Compel. (Docket Nos. 133-34; 151-154; 180; 191). The Court also heard oral argument at a motion hearing conducted on December 2, 2013 and the transcript of those proceedings has been filed of record and reviewed by the Court. (Docket No. 248). The parties then filed post-hearing briefs on the applicability of the SAR regulations, (Docket Nos. 245, 247), as well as proposed findings of fact and conclusions of law and responses thereto regarding Defendant's Motion to Dismiss, (Docket Nos. 250, 251, 256, 257).

After reviewing the relevant filings and further consideration of the contested issues concerning the discoverability of the SARs, and whether they constitute *Brady* material, the Court accepted the Government's invitation to conduct an *in camera* review of the SARs to determine if the SARs and/or information contained therein should be produced to Smith. (Docket No. 258). In response to the Court's Order, the Government produced the requested documents *in camera* under a cover letter dated April 4, 2014. *See 4/4/14 Letter from AUSA Conway to Court*. Smith then submitted a second SAR filed by National City Bank regarding the activity in Smith's escrow account and relevant attachments for the Court's examination *in camera*. (Docket No. 259). The Government confirmed in its response to Smith's submission that the SAR filed by National City was previously provided to the Court and thus, asserted no objection to the Court's examination of the materials submitted by Smith. (Docket No. 260).

The Government then filed a Supplement on May 12, 2014, further advising the Court of its discovery production to Defendants. (Docket No. 261).

Having received and reviewed all of the foregoing materials,[1] briefing, and the transcript of oral argument, Smith's Motions are now ripe for disposition. Upon consideration of all of the parties' submissions and for the following reasons, Smith's Motion to Dismiss and Motion to Sever are DENIED and his Motion to Compel is GRANTED, IN PART, and DENIED, IN PART, with the Court reserving its final ruling as to one particular issue on the Motion to Compel.

## II. FACTUAL BACKGROUND

### a. Investigation and Charges

The instant prosecution of Smith and codefendants George Kubini, Dov Ratchauskas, and Sandra Svaranovic, (collectively, "Defendants"), arises out of a wide ranging investigation by the Western Pennsylvania Mortgage Fraud Task Force, which has already resulted in convictions of, among others: real estate brokers: Robert Arakelian, Eric Hall, Rhonda Roscoe, and Rochelle Roscoe; closing attorneys: James Steiner and Daniel Sporrer; closing agent, Karen Atkison; appraisers: Jason Moreno, Joel Reck and Howard Reck; and bank employees: Bartholomew Matto, Cynthia Pielin and Crystal Spreng. *See* Crim. Nos. 09-198 (Arakelian); 09-202 (Spreng); 09-223 (Atkison); 09-311 (Sporrer); 10-106 (Hall); 10-117 (Moreno); 10-232 (Howard Reck); 11-15 (Matto); 11-16 (Rhonda Roscoe); 11-17 (Rochelle Roscoe); 11-221 (Joel Reck); 11-255 (Pielin). This case was initially brought against Kubini and Ratchauskas only on January 18,

---

[1] The Court notes that Smith submitted the entire transcript of his grand jury testimony and filed it on the public docket, and that the parties have made several proffers with respect to other evidence (witness testimony and documents) which were presented to the grand jury. The Court recognizes that such matters are generally secret and placed under seal if submitted to the Court. *See* FED. R. CRIM. P. 6(e). However, in this instance, the parties have freely argued these matters in their various briefings, Smith himself attached his grand jury testimony in support of his Motion to Dismiss, and the parties argued the same points in open court at the Motion Hearing. While the Court identifies certain evidence which has been withheld by the Government under the grand jury rules, there has been no objection to the Court's consideration of the remainder of these matters which are discussed herein.

2011, with the grand jury charging them with a single count of wire fraud conspiracy in violation of 18 U.S.C. § 1349. (Docket No. 1). While the Indictment was pending, the Government's investigation continued and culminated in the filing of a twenty-count Superseding Indictment on March 26, 2013, which includes charges of wire fraud conspiracy, wire fraud, bank fraud, and wire and bank fraud conspiracy against all Defendants, and separate tax counts against Kubini and Smith. (Docket No. 92). In short, the Government alleges that Defendants participated in a mortgage fraud scheme from November 2005 through December 2008, which involved 109 separate fraudulent loan transactions, violating a host of federal laws in the process. (Docket No. 154-7). According to the Government, real estate investors Kubini and Ratchkauskas and entities they controlled were involved as sellers of nearly all of the 109 properties; appraiser Svaranovic provided appraisals overstating the value of forty-nine (49) of the properties; and real estate attorney Smith knowingly participated in the fraud, acting as a closing agent for at least forty-three (43) of the deals.[2] (*Id.*).

### b. *Search/Seizure Warrants and Execution Thereof at Smith's Law Office*

On January 16, 2011, a few days before the grand jury returned its Indictment against Kubini and Ratchkauskas, Special Agent Daniel Fisher of the United States Secret Service obtained a search and seizure warrant for Smith's Law Office in order to obtain evidence of violations of federal law.[3] (Docket No. 154-2). In his supporting affidavit, Special Agent Fisher noted that, among other things, the evidence obtained at Smith's Law Office would likely include: disbursement sheets; copies of checks and wire transfer information; instructions and correspondence with lenders; closing documents; title insurance documents; correspondence

---

[2] The mortgage brokers involved in the 109 transactions include Robert Arakelian and Riverside Mortgage, previously operated by Rochelle and Rhonda Roscoe; all of said individuals have pled guilty to fraud charges arising from their participation in these schemes. (Docket No. 154-7).

[3] The agents simultaneously obtained search warrants for the residences of Kubini and Ratchkauskas based upon the same affidavit. *See* Crim. Nos. 11-mj-23; 11-mj-24.

with mortgage brokers related to transactions; sales agreements; and evidence of payments for the settlement of the transactions. (Docket No. 154-2 at ¶ 119). Exhibit "A" to the affidavit details twenty-five specific transactions which Smith closed for Kubini and Ratchkauskas and the agents believe were fraudulent. (*Id.* at 154-2 at 40-2). The affidavit explains with specificity the general mortgage and bank fraud scheme, advising that the agents had obtained evidence that numerous fraudulent documents were used during the twenty-five listed transactions, including: fake Uniform Residential Loan Applications ("1003s"); false verification of deposit forms ("VODs"); appraisals significantly misrepresenting the value of the properties and the conditions of same; and settlement statements, ("HUD-1s"), which did not properly inform the lenders of the true facts of the transactions. (Docket No. 154-2 at ¶¶ 20-21). In brief summary, Special Agent Fisher averred that the lenders were deceived into believing that they were financing eighty percent (80%) of the values of the properties in question and that buyers were making twenty percent (20%) down payments on each deal. (*Id.* at ¶¶ 24-27). The lenders were also misled to believe that the properties were appropriately valued and in the condition stated on the appraisals and that the buyers were financially qualified for the loans they obtained. (*Id.*). However, the "reality of the transactions," which was not disclosed to the lenders, was that the lenders were financing 100% of the purchases of the properties, many of which were in very poor condition and worth far less than stated on the appraisals and approving loans for buyers who did not have the financial wherewithal to qualify for the loans. (*Id.*).

Special Agent Fisher asserted that because the agents' search of Smith's Law Office necessitated review of an attorney's files, "law enforcement officers will encounter materials that may be covered by the attorney-client privilege or work product doctrine." (*Id.* at ¶ 106). He further advised that the search of any such materials would be conducted by a "Privileged

Review Team" consisting of an attorney and agent "who are not involved in the underlying investigation." (*Id.* at ¶ 107). The affidavit also notes the procedures for dealing with privileged materials which may be uncovered, including that "[a]ll obviously privileged documents will remain at the Office, or if inadvertently seized they will be immediately returned to Smith. Those documents that are not obviously privileged will be seized pursuant to the terms of the search warrant. Those documents which are open to questions as to the applicability of a privilege will be set aside for further review." (*Id.* at ¶ 109). He continued that "materials that appear as if they may be protected by attorney-client privilege or work product doctrine will be immediately segregated without review pursuant to a written protocol," that potentially privileged documents "will be set aside for further review," and "will be shown to counsel for Smith in an attempt to resolve any lingering disputes about whether material is covered by a privilege." (*Id.* at ¶¶ 108-110). The affidavit also states that the agents were not seeking any evidence from Smith's computers. (*Id.* at ¶ 120).

Special Agent Fisher led a team to execute the warrant at Smith's Law Office at 9:00 a.m. on January 19, 2011, which included Special Agent Christopher Watson and Assistant United States Attorney ("AUSA") James Wilson, whom the Government proffers headed the privilege review during the search.[4] (Docket No. 251-7 at 17). After their arrival, Special Agent Fisher spoke to Bonnie Harrison, who identified herself as Smith's paralegal and office manager. Crim. No. 11-mj-33, Docket No. 1-1. Harrison advised Fisher that the types of files which the warrant sought were located in a locked file room outside of the central office and in the hallway of the office building. (*Id.*). Special Agent Fisher then returned to the courthouse and obtained a

---

[4] The inventory return forms filed with the Court indicate that agents Mark Kernan, Brian Morris, William Steen, Deborah Osborne and Matt Davey were also involved in the searches. Their precise titles and agencies are not provided although it is believed that they are either Secret Service or IRS agents as those agencies headed the investigation.

second search and seizure warrant which authorized the specific search of "the file room for the law offices of Arthur J. Smith located on the ninth floor of the office building" and seizure of files located therein. Crim. No. 11-mj-33, Docket No. 1. While Special Agent Fisher was off site, Special Agent Watson approached Smith, advised him that Secret Service agents were executing a warrant to search his office for files related to his closings of properties involving Kubini and Ratchkauskas, provided him with a copy of the initial warrant and permitted him an opportunity to read it. (Docket No. 251-7 at 17). Special Agent Watson also informed Smith that he was not under arrest, was free to leave and that he was under no obligation to speak to the agents. (*Id.*). Despite these instructions, Smith purportedly told Special Agent Watson that he stopped doing business with Kubini and Ratchkauskas because he received too many complaints from buyers, many of the loans they brought to his office did not close and they were too difficult for him and his staff to deal with. (*Id.*). Special Agent Fisher returned after securing the second warrant to search the file room and Smith repeated the same statements in his presence as well. (*Id.*).

The Government proffers that Special Agent Fisher did not directly participate in the search of Smith's Law Office or the file room and lead trial counsel AUSA Conway was not present during the searches. It is also uncontested that AUSA Wilson performed the privilege review during the searches and that he prepared and left two post-it notes on certain of the files which were seized and are now located in the Secret Service's local office. The first note states that "(2) Removed letter + copy of same; see #2 on master list. JRW 19 Jan 2011." (Def. Ex. 3, Docket No. 251-4). The second note states that "(2) see JRW Master list; letter Atty Smith to Kubini and Ratchkauskas." (Def. Ex. 4, Docket No. 251-5). Smith has repeatedly requested that the Government produce the referenced "Master List", any log prepared by AUSA Wilson

denoting the privileged materials encountered during the search, and the referenced letters. (Docket No. 154-5). According to Smith's counsel, AUSA Wilson advised him in a telephone conversation that Wilson "gave any pulled documents to [AUSA Conway] in a sealed envelope or file." (*Id.*). AUSA Conway has responded that AUSA Wilson did not prepare a "Master List" or privilege log, never provided a sealed envelope to him and that any privileged materials which were located by AUSA Wilson during the search were simply left at Smith's Law Office in accordance with the procedures outlined in the affidavit.[5]

Special Agent Fisher filed two inventory return forms which detail the materials seized from Smith's Law Office and file room. Crim. No. 11-mj-22 at Docket No. 6. The inventory return for the search of the office details that the agents' search commenced at 9:05 a.m. and concluded at 12:30 p.m. (*Id.* at 3). The agents seized five boxes of documents from the office which are described as "closing documents"; "misc. documents"; "George Kubini and Dave Ratchkauskas file, Admiral Capital file"; and "policy inventory registers." (*Id.* at 3-4). The inventory return for the file room search states that the agents' search of that area commenced at 10:40 a.m. and concluded at 11:45 a.m. Crim. No. 11-mj-33 at 5. The agents seized nine boxes of documents from the file room which are described as: "Box 2007 Putoti-[R]athkauskas, eleven (11) loan closing files"; "Box 2007 Ratchkauskas-Richter, twenty-four (24) loan closing

---

[5]     The Court notes that these disputes remain unresolved because AUSA Wilson has not presented an affidavit setting forth his version of the facts or testified as to what occurred during the search and privilege review. However, AUSA Wilson was present at the Court's hearing on December 2, 2013 and prepared to offer testimony on these points. (Docket No. 248 at 32-33). The Court did not proceed to an evidentiary hearing after lengthy oral argument was presented and the parties raised numerous objections to their counterpart's presentation, including the affidavit by Attorney Stallings, which the Government asserted would require his testimony, cross-examination by the Government, and possibly result in the Government bringing a motion to disqualify Stallings from continuing to represent Smith. (*Id.* at 88-92). With the agreement of the parties, the Court determined that it would first issue a ruling on whether additional evidence was necessary to resolve the pending motions or if such motions could be decided based on the undisputed facts in the present record. (*Id.*). Further, as the Court fully explains in its discussion below, even if these disputed facts are resolved in Smith's favor, they would not support dismissal of the Superseding Indictment because Smith has not been prejudiced by the Government's execution of the search in the manner he describes. But, the Court will order the Government to procure an affidavit from AUSA Wilson on these issues in its ruling on Smith's motion to compel.

files"; and numerous other boxes of loan closing files without more specific descriptions. (*Id.*). There is no mention of any privileged materials, a privilege log and/or a "Master list" on either inventory return. *See* Crim. No. 11-mj-22 at Docket No. 6; *see also* Crim. No. 11-mj-33 at Docket No. 5. Of note, Smith admits that he has been granted access to search his own files at the Secret Service office both before and after the Superseding Indictment was returned against him. (Docket Nos. 154-5; 251).

### c. *Smith's Interviews with Law Enforcement and Attorney Levenson*

Shortly after the execution of the warrants, Smith retained Attorney Stanton Levenson to represent him. (Docket No. 251-7). Smith voluntarily participated in meetings with AUSA Conway and Special Agent Fisher on February 19, 2011 and February 22, 2011.[6] (*Id.*). Levenson represented Smith at these meetings. (*Id.*). By the time of the meetings, the search warrants, applications and affidavits had all been unsealed and produced to Smith and his counsel. *See* Crim. No. 11-mj-22; *see also* Crim. No. 11-mj-33. Smith agrees that the interviews were "wide-ranging" and "the topics included the transactions that would later form the basis for the fraud counts in the superseding indictment now pending against [him]." (Docket No. 251 at ¶¶ 9, 10).

The Memoranda of Interviews prepared by Special Agent Fisher as well as his notes and the notes of Agent Galson describe Smith's statements to law enforcement during these meetings to include, among other things, all of the following.

- Smith closed approximately 50 deals for Ratchkauskas, Kubini and entities they controlled but there were also 19 cancelled deals. The 50 closings represented 4.5% of Smith's closing business and 3.4% of his net income. His gross earnings on closings for the years in question consisted of: $488,000 from 397 closings in 2007; $734,000 from 341 closings in 2008; and $693,000 in 2009 based

---

[6]    IRS Special Agent Amanda Galson also participated in the February 22, 2011 meeting. (Docket No. 251-7).

on an unspecified number of closings;

- Smith explained that he had worked with Ratchkauskas for 20 years, closing many loans for him when he was working as a mortgage broker rather than as an investor;

- Around 2006 or 2007, Ratchkauskas told Smith that he was going into business with Kubini as real estate investors "flipping foreclosures." Smith informed the agents that Kubini supposedly was doing the repairs and Ratchkauskas was providing the funding for the deals. He added that Kubini and Ratchkauskas would be working with a new brokerage firm, Riverside Mortgage, in their house flipping venture;

- Smith advised the agents that in early 2007, he attended a meeting at Riverside Mortgage with Kubini, Ratchkauskas and Rochelle Roscoe of Riverside where they all discussed the potential of doing business together. Smith stated that someone at the meeting other than he proposed that the deals should be financed by using the seller's "gross proceeds to fund the buyer's down payment as a gift of equity," which Smith advised he felt was "very creative" and he agreed to participate;

- With respect to the transactions, Smith explained that he was told that the down payment would be gifted by the sellers and that a letter must be provided to the lender by the broker. He believed that it was not his responsibility to tell the lender about the gifts of equity or to show this aspect of the transaction on the HUD-1 forms because the gifts of equity were not part of the closing process. He confirmed that he always supplied 1099 forms to the sellers in these deals which showed the entire proceeds of line 603 of the HUD-1 forms. Smith also told the agents that they were wrong in their opinions that the deals as written on the HUD-1 forms – which all stated that cash down payments were made by the buyers – constituted material misrepresentations to the lenders.

- Smith next informed them that he always followed the lenders' closing instructions and always informed the buyers of the gifts of equity at the closings. However, he admitted that he never called the lenders to clarify any issues with the gifts of equity or to inquire with the lenders as to how the gifts of equity should be noted on the HUD-1 forms. He likewise acknowledged that he never researched the propriety of the gifts of equity deals or consulted with his title insurance carrier about same but proceeded to close the deals, as he explained, based on his 29 years of experience as a real estate closing attorney.

- Smith articulated that he made a mistake in judgment in dealing with Kubini, Ratchkauskas and Riverside but that he believed he had acted in good faith and without criminal intent. He told the agents at the first meeting that he knew nothing about other fraudulent documents involved in the transactions that they questioned him about, including, VODs, 1003s, 2nd HUD forms or appraisals. At the second meeting, he added that he did not maintain copies of appraisals in his loan files, never read mortgage applications, and believed that gift letters were likely in the broker's files. He stated that he was "naïve" and made a mistake of judgment.

- The agents also inquired about an audit of Smith by his title insurer, Land America Title, and Smith explained that it was a routine audit which uncovered a $93,000 shortfall in his escrow account. He told them this resulted from an accounting error which occurred because his bookkeeper was ill and said error required him to pay $20,000 of his own money to make up the shortfall, close the account and start a new one.

- Smith also recounted conversations and correspondence he had with Alfred Watterson of Land America. He told the agents at the first meeting that a May 2008 letter by Rochelle Roscoe to Mr. Watterson (the "Roscoe Letter") was unprompted and unconnected to the audit. At the second meeting, he admitted that this was incorrect and that the letter was requested by Watterson, explaining that he misspoke and was trying to answer the questions as best he could. According to Smith, the letter was provided to Mr. Watterson to explain the process of the gifts of equity deals. He added that he had repeatedly asked Ms. Roscoe for such a letter throughout their business dealings and admitted that he had received a draft of the letter which he edited for her "because it was poorly written" and she then signed and sent the revised version to Watterson. Smith believed that Watterson was satisfied with the letter but told him to stop doing the deals with Kubini, Ratchkauskas and Riverside. He clarified that Land America was still his title insurer even after the problems with the escrow account and the questioning about the gifts of equity deals.

- The agents' notes reflect that Smith was also asked about a number of particular closings during the meetings. In the first meeting, he was asked about two closings involving Ratchkauskas as the seller and David Kashi as the buyer. Smith reviewed the HUD-1 forms and told the agents that they were related and involved a cash sale of two properties. The agents questioned him why Ratchkauskas

> supplied the buyers' funds and Smith replied that he recalled that Ratchkauskas owed Kashi money and in exchange for the debt he gave him both properties and $60,000. The agents then asked if that was the case, why Ratchkauskas received $55,000 in cash back on the deals and how the transactions did not constitute money laundering. The report notes that Mr. Levenson then reviewed the documents and commented that it "looked like money laundering to him." According to the agents, Smith eventually conceded that he could not explain the deals.

(Docket No. 251-7).

Ultimately, Smith declined to cooperate with law enforcement and their investigation of his conduct and pursuit of criminal charges against him continued. There is no other evidence of record concerning the scope of Attorney Levenson's continuing representation of Smith beyond the February 2011 meetings with law enforcement agents as the present record discloses no subsequent information about any further meetings between Smith and law enforcement. (*See* Docket Nos. 250, 251, 256, 257).

### d. Attorney Levenson's Representation of James Steiner

Around this same time, Attorney Levenson was separately retained by another target of the investigation, James Steiner ("Steiner"), who was also a real estate attorney and had closed six fraudulent transactions for Kubini and Ratchkauskas. (Docket No. 154-7). It is undisputed that Smith and Steiner closed separate transactions and neither worked together nor communicated about their respective dealings with Kubini and Ratchkauskas. (Docket Nos. 154-7; 250; 251; 256; 257). Steiner agreed to cooperate with the Government's investigation and signed a cooperation letter with the United States Attorney for the Western District of Pennsylvania on May 6, 2011. (Docket No. 154-8). Among other things, Steiner agreed to "provide complete and truthful information in connection with an investigation into violations of federal laws related to mortgage fraud by George Kubini, Dov Ratchkauskas, and others during

the period from January 2007 to the present." (*Id.*). Such agreement was executed by Steiner and Levenson, as counsel for Steiner, on May 6, 2011. (*Id.*).

Steiner was debriefed by law enforcement agents concerning his involvement on May 9, 2011. (Docket No. 251 at ¶ 12). According to Smith's current counsel, Stephen Stallings, Esquire,[7] the agents' memoranda and notes from that session include facts that:

- Steiner sent one or more HUD-1s to the lender advising the lender of the fact that these transactions did involve "gifts of equity";

- Steiner possessed email correspondence with Chase showing that he'd sent HUD-1s to them showing the gifts of equity.

- Ratchkauskas told Steiner that everyone, including Riverside Mortgage and Chase, knew what was really going on in these transactions (i.e. the buyer was not bringing the funds to the closing that were represented on the HUD-1 as Cash From Borrower and that these amounts were just being subtracted from the seller's proceeds).

(Docket No. 233-1 at ¶ 9(c)).

It is undisputed that Government counsel brought the potential issue of a conflict arising from Levenson's representation of both Smith and Steiner to his (Levenson's) attention prior to either of the closing attorneys being charged. (Docket Nos. 250; 251). As a result, in June of 2012, Levenson withdrew as counsel for Smith but continued to represent Steiner. (Docket No. 251 at ¶¶ 13). AUSA Conway proffers that he told Levenson that he had a potential conflict of interest if there was a joint trial against Smith, Kubini and Ratchkauskas because if Levenson continued to represent Smith, he could be put in a position where he was forced to cross-examine

---

[7] The referenced memoranda and notes were produced by the Government on a stand-alone computer in the U.S. Attorney's Office along with other Jencks Act and *Giglio* impeachment materials and have not been reviewed by the Court as of this time. (*See* Docket No. 213). The Court denied a prior motion filed by Smith seeking hard copies of these documents, without prejudice, given the Court's finding that the parties had not met and conferred on the issues and that Smith's general assertion that all of the documents constituted *Brady* materials was too broad for meaningful judicial review. (*Id.*).

his other client, Steiner.[8] (Docket No. 250 at ¶¶ 111-115). The factual circumstances surrounding Levenson's withdrawal have not been fully developed as neither Smith nor Levenson have testified as to same. Smith proffers that he was never told that Levenson also represented Steiner or the reasons for Levenson's withdrawal, including the purported conflict with the representation of both Smith and Steiner. Smith further claims that he was unaware that Steiner was cooperating with the Government until after his own indictment and did not waive any conflict of interest by Levenson.

On September 24, 2012, Steiner was charged by Information with one count of bank fraud and aiding and abetting bank fraud, in violation of 18 U.S.C. §§ 1344(a) and 2. *See United States v. Steiner*, Crim. No. 12-242, Docket No. 1. This charge was voluntarily dismissed because a document containing the wrong charge was inadvertently filed by the Government. (Docket Nos. 7, 8). A second Information was filed at a new criminal case number (Crim. No. 12-257) on October 15, 2012, charging Steiner with one count of wire fraud conspiracy, in violation of 18 U.S.C. § 1349. *See United States v. Steiner*, Crim. No. 12-257, Docket No. 1. With Levenson's assistance and counseling, Steiner waived indictment and pled guilty to wire fraud conspiracy on November 13, 2012. (Docket No. 9). The Court recalls that Steiner admitted to closing six fraudulent loans as a part of this scheme and accepted his guilty plea as knowingly and voluntarily made.[9]

> e. *Smith's Retention of Attorney Stallings and Pre-Grand Jury Appearance Activities*

After Attorney Levenson withdrew as Smith's counsel in June of 2012, Smith retained

---

[8] Smith suggests that AUSA Conway has taken inconsistent positions with respect to whether he advised Levenson to withdraw from "both representations" or to remove himself from representing only one of them. The Court does not believe any such discrepancy exists as it understood AUSA Conway to have explained that he had told Attorney Levenson that he should remove himself from the dual role of representing both, not that Attorney Levenson could no longer continue to represent Steiner or Smith.

[9] Steiner's sentencing is presently scheduled for May 23, 2014 at 1:00 p.m. (Docket No. 32). In addition to Attorney Levenson, Steiner is also represented by Alexander H. Lindsay, Jr., Esquire.

his present counsel, Stallings, who was formerly an Assistant United States Attorney in this District and worked alongside both AUSA Wilson and AUSA Conway in the division of the U.S. Attorney's Office for the Western District of Pennsylvania which prosecuted white collar fraud-type cases.[10]    (Docket No. 251-6 at ¶ 6).    Stallings quickly proceeded to actively and aggressively represent his new client, Smith.    On June 19, 2012, Stallings wrote to AUSA Conway, advising him that he now represented Smith and asked for a meeting with AUSA Conway to sit down and discuss the matter with him.  (Docket No. 251-13).    AUSA Conway purportedly responded that unless Smith was interested in pleading guilty, that the requested meeting was better put off until after an indictment was returned and they had the opportunity to review discovery.  (*Id.*).

Stallings separately set up a polygraph examination for Smith with William Barrett[11] of Assured Polygraph Services, Inc., which occurred on June 28, 2012. (Def. Ex. 11, Docket No. 251-11).  A "Privileged & Confidential Polygraph Report" authored by Mr. Barrett sets forth his opinions that Smith demonstrated "no deception" during the polygraph he administered to him including with respect to the following questions and answers:

---

[10]     The Court understands that the name associated with this section of the Criminal Division of the United States Attorney's Office is now the Civil Rights, Exploitation & Fraud and Corruption Section.    *See* http://www.justice.gov/usao/paw/divisions.html#crim (last visited 5/1/14). This section previously had a different name, which was changed when U.S. Attorney David J. Hickton restructured the U.S. Attorney's Office after he was appointed to serve in his current position by President Barack Obama.

[11]     Mr. Barrett's *curricula vitae* discloses that he earned a Bachelor of Science in criminal justice/law enforcement from Point Park University and a Master of Arts in social science from California University of Pennsylvania.  (Def. Ex. 11, Docket No. 251-12).  Mr. Barrett has obtained the following certifications: certified-polygraph examiner from the Maryland Institute of Criminal Justice; certified-post convicted polygraph sexual offender testing / monitoring from the Academy for Scientific Investigative Training; certified-advanced post convicted sex offender testing, American International Institute of Polygraph; advanced certification – certified sex offender treatment and monitoring, American Polygraph Association; and advanced certification – forensic law enforcement examiner from the American Association of Police Polygraphists.  (*Id.*).  He is presently a chief polygraph examiner at Assured Polygraph Services, Inc., a police officer/detective/sergeant with the Ross Township Police Department, a municipal police instructor at the Allegheny County Police Academy and an adjunct professor at Point Park, California University of Pennsylvania and the Community College of Allegheny County.  (*Id.*).  Mr. Barrett touts that he has "over twenty-five years of law enforcement experience; [has conducted] [a]pproximately 3,500 polygraph tests; issues ranging from criminal homicide to personal fidelity; [and has] [i]n excess of 3900 hours of specialized training.  (*Id.*).  Noticeably absent from Mr. Barrett's *curricula vitae* is any list of cases wherein he has testified as a polygraph expert.  (*Id.*).

1. Regarding if you have engaged in fraudulent activities to defraud lenders, do you intend to answer all of these questions truthfully?

ANSWER: Yes

2. Did you ever issue checks from your escrow account to deceive lenders into mistakenly believing that borrowers were providing their own funds as down payments?

ANSWER: No

3. Did you ever conduct a real estate closing knowing that the lenders issued the loan based on fraudulent loan applications?

ANSWER: No

4. Did you ever agree with Dov Ratchkauskas or George Kubini to defraud lenders?

ANSWER: No

(Def. Ex. 10, Docket No. 251-11).

Stallings proceeded to review the materials which were seized from Smith's Law Office and file room while they were being maintained in the Secret Service's office. During these efforts, Stallings located the post-it notes of AUSA Jim Wilson on certain of the files which were seized. On August 27, 2012, Stallings contacted AUSA Conway via email and requested that he locate any documents which were pulled for potential privilege during the search. (Docket No. 154-5). Two days later, Stallings wrote AUSA Conway again, further elaborating on his request for any potentially privileged documents and/or any privilege log related to same. (*Id.*). In this email, Stallings also recounts a telephone conversation that he had with AUSA Jim Wilson wherein Wilson told him that he had given AUSA Conway "any pulled documents … in a sealed envelope or file." (*Id.*). AUSA Conway responded to Stallings twenty minutes later, stating succinctly that he did "not intend to do anything related to this aspect of the case prior to

indictment." (*Id.*). Stallings then asked if there was a date for the return of an indictment "in mind" and advised that Smith would like to have a meeting with AUSA Conway before indictment and that he "may want to request the opportunity to testify before the grand jury as well." (*Id.*).

Stallings recounts that he also submitted a formal written request to AUSA Conway on August 29, 2012 that he "notify us a reasonable time before seeking indictment in order to afford Mr. Smith the opportunity, should he wish to do so, to testify before the Grand Jury." (Docket No. 251-13 at 2). Stallings avers that AUSA Conway responded to him two days later, stating that "I have not focused on that and do not intend to focus on it anytime in the next couple of weeks. I will let you know as we get closer to the date." (*Id.*). Six weeks later, on October 15, 2012, Stallings sent another email to AUSA Conway, reiterating that Smith would like advance notice of the return of an indictment, advising that Smith would like the opportunity to address the grand jury, and noting that "there is information we are preparing to make available to you that you are likely not aware of that goes to his innocence of charges related to [Dov Ratchkauskas] and [George Kubini], including definitive polygraph results." (*Id.*). According to Stallings, seven days later, AUSA Conway responded to this inquiry noting that he received the emails and that Smith "will certainly be invited to provide his side of the story to the grand jury when the time comes." (*Id.*).

There was no additional correspondence between counsel for the parties between October, 2012 and Thursday, February 14, 2013. At 8:42 p.m. on that date, AUSA Conway emailed Stallings, advising that "[i]f he wants to still come into the grand jury, it looks like it will have to be on 2/19. Will that work?" (Docket No. 251-13 at 1). The next day, Friday, February

15, 2013, Stallings drafted a four-page letter to AUSA Conway,[12] alleging that he violated "local custom and practice, not to mention simple common sense and decency" along with Department of Justice Policy which requires that a target of an investigation be given notice "a reasonable time before seeking an indictment in order to afford him or her an opportunity to testify before the grand jury." (Docket No. 251-13 at 3 (quoting U.S. Attorney's Manual, § 9-11.153)). Stallings complained that AUSA Conway's email

> constitute[d] one (1) business day's[13] [sic] notice after nearly eight months of you rebuffing our efforts to discuss this investigation with you, and after nearly six months have elapsed since we requested advance notice of your planned indictment so he [Smith] could testify before the Grand Jury and so we could meet with your office and discuss potential resolutions. Your refusal to discuss this investigation with me and your lack of reasonable notice to Mr. Smith violate the spirit, if not the actual provisions of the United States Attorney's Manual, is contrary to the longstanding practice of the Office of the United States Attorney for the Western District of Pennsylvania, and is inconsistent with common civility and courtesy.

(*Id.*). Stallings then reiterated all of the above correspondence between him and AUSA Conway since he took over the case in June of 2012. (*Id.*).

In his letter, Stallings acknowledges that AUSA Conway previously provided him notice that Smith "faces a potential indictment for bank fraud, wire fraud and conspiracy" and that he would "supersede later on to add failure to file his tax return charges." (*Id.* at 1). Stallings argues that the tax charges are "very different from, and wholly unrelated to, the fraud allegations." (*Id.*). He asserts that Smith was "ready, willing and able" to meet with AUSA Conway to resolve "the tax matters" but that such efforts had been rebuffed by the government.

---

[12] Stallings also provided a copy of his February 15, 2013 letter to AUSA Conway's direct supervisor, AUSA Robert Cessar, Fraud and Corruption Section Chief. (Docket No. 251-13).

[13] Apparently, Stallings' reference to one business day separating the notification and the date of the proposed grand jury appearance accounted for the fact that AUSA Conway's email was sent in the evening on Thursday, February 13, 2013, and the proposed appearance on Tuesday, February 19, 2013 was separated by a holiday weekend for the President's Day observance on Monday, February 18, 2013.

(*Id.*).

With respect to the threatened fraud charges, Stallings writes that Smith proclaims his actual innocence, never intended to deceive lenders, never closed a real estate transaction he believed was funded based upon a fraudulent loan application and never agreed with Ratchkauskas or Kubini to defraud lenders. (*Id.* at 3). He quoted the entirety of Mr. Barrett's findings in the polygraph examination and attached the report and his curricula vitae to his letter, as Exhibits "A" and "B". (*Id.* at 4). Stallings also stated that "Smith is prepared to submit to a polygraph on these same questions administered by a polygrapher of the government's choice at your convenience." (*Id.*). Stallings next stated that Smith did not intend to defraud lenders but believed that the lenders were aware of and approved gifts of equity to the buyers. (*Id.*). He also quoted portions of the May 15, 2008 letter from Roscoe to Watterson as stating that "for each of the above closings a gift of equity was provided by the seller. These loans were approved by the investor [the lender][14] on this basis. Accordingly, the gift of equity was not shown on the settlement sheet, nor is it ever shown on the settlement sheet." Stallings also attached a copy of the Roscoe Letter as Exhibit "C." (*Id.*). Stallings further advocates that the Government had no evidence against his client that he had any involvement in the other aspects of the fraud committed on the lenders, such as elevating the appraisal values, producing false loan applications or engaging in other fraudulent activity. (*Id.*). Stallings concludes stating that the U.S. Attorney should decline to prosecute the fraud charges; meet with them on the tax issues; give Smith reasonable notice to appear before the grand jury; and, permit him to introduce the attachments (i.e., the polygraph examination report, Barrett's c.v. and the Roscoe letter) to the

---

[14]    Stallings repeatedly injects "[the lender]" into his quotations of the contents of this letter throughout his briefs submitted in this case to apparently provide his (and Smith's) belief that "the investor" referenced in Roscoe's letter actually means "the lender". However, there is no evidence before this Court which demonstrates that Roscoe actually intended "the investor" to mean the "the lender," as he suggests. Again, the Court has not been provided nor reviewed Roscoe's grand jury testimony.

grand jury.  (*Id.*).

The attorneys also engaged in correspondence on the morning of Smith's February 19,

2013 grand jury appearance.  (Docket No. 191-6).  Stallings wrote the following at 9:45 a.m.:

> Dear Mr. Conway,
>
> Please let me know if you are able to briefly respond, this morning
> if at all possible, to the following questions:
>
> 1. Do you intend to seek return of an indictment against Arthur Smith
>    today?
> 2. If so, what are the charges you will seek?
> 3. If so, do you intend to seek issuance of a summons or a warrant?
> 4. If you intend to charge fraud and tax issues, is it your intention to
>    charge them in one indictment or two?
> 5. If Mr. Smith chooses to testify, how, logistically, do you anticipate
>    his testimony will be permitted?  In narrative form?  In response
>    only to your questions? Or some combination thereof?
>
> Thank you,
>
> Stephen S. Stallings, Esq.

(*Id.*).  AUSA Conway promptly responded to this inquiry at 10:19 a.m.:

> Mr. Stallings:
>
> I do not intend to respond to questions one through four.  If Mr.
> Smith wants to testify, he will have to respond to my questions and
> questions from the grand jury.  I will, however, certainly give him
> the chance to explain why he believes he did not act with the intent
> to defraud.  The letter you wrote to me contains mainly extraneous
> information of no relevance to the grand jury and therefore will not
> be admitted.  He will, however, be permitted to relate the relevant
> information from the letter – i.e., his claim that he did not act with
> the intent to defraud.  If he has contemporaneous letters or other
> exhibits that he wants admitted, like, for example, Exhibit C of
> your letter, I would be happy to consider those of [sic] potential
> admission.
>
> Please let me know when you have made a decision about whether
> he will testify.
>
> Best regards,

Brendan Conway

(*Id.*).  AUSA Cessar was copied on both Stallings' email and AUSA Conway's response.  (*Id.*).

### f.  *Smith's Voluntary Appearance before the Grand Jury*

Smith decided to testify before the grand jury as scheduled on February 19, 2013. (Docket No. 154-11).  Later that day, Smith and Stallings met with AUSA Conway along with Special Agents Fisher and Galson in a conference room outside of the grand jury room.  (Docket Nos. 250, 251).  They discussed the parameters of Smith's testimony during this meeting.  (*Id.*). The parties agree that AUSA Conway specifically advised Smith and Stallings that the polygraph report and Mr. Barrett's c.v. would not be marked and admitted as exhibits.  (Docket No. 251 at ¶¶ 18-19).  The parties dispute whether AUSA Conway agreed to admit the Roscoe Letter into evidence during Smith's testimony.  (Docket No. 248 at 41-42).  Stallings states in his affidavit that AUSA Conway "did not […] retract his promise to permit Mr. Smith to admit the May 15, 2008 letter from Roscoe or to testify regarding the other information referenced in our letter to AUSA Conway; rather, he reaffirmed that Mr. Smith could offer the May 15, 2008 letter into evidence."  (Docket No. 251-6 at ¶ 2).  The Government proffers that AUSA Conway never agreed to admit the letter into evidence in his emails, that he made no oral agreement with Smith or his counsel that he would enter the letter into evidence during the meeting, and that Special Agents Fisher and Galson would testify consistent with this position.  (Docket No. 250 at ¶¶ 20-26).  At most, the contested record demonstrates that Stallings and Smith believed that Smith would be permitted to introduce the Roscoe Letter into evidence during his grand jury appearance.  But, the record is also clear that Smith and his counsel were explicitly told by AUSA Conway that Stallings February 15, 2013 letter, the polygraph examination report and Mr. Barrett's c.v. would not be admitted into evidence.  (Docket No. 250 at ¶ 21; 251-6 at 2).

Despite same, Smith entered the grand jury room with a packet of documents, stapled together, consisting of: Stallings' February 15, 2013 letter, the polygraph examination report, Mr. Barret's c.v. and the Roscoe Letter. (Govt. Ex. "D", Docket No. 237-4).

The grand jury examination of Smith commenced at 4:02 p.m. with Smith taking the oath administered by the grand jury foreperson. (Docket No. 154-11 at 1). AUSA Conway proceeded to notify Smith that he was a target of the grand jury's investigation and that the Government intended to ask the grand jury to indict him for a "number of different allegedly fraudulent activities," which Smith acknowledged. (*Id.* at 1-3). Smith confirmed that he had not been subpoenaed to testify and that he was voluntarily appearing before the grand jury. (*Id.* at 4). AUSA Conway next advised Smith of his Fifth Amendment right against self-incrimination, which Smith stated that he understood as he was an attorney and was also represented by counsel. (*Id.*). Smith affirmed that he was "certainly" waiving his Fifth Amendment rights voluntarily, knowingly and intentionally and was willing to answer any questions posed to him. (*Id.* at 4-5). Smith testified that he understood that his counsel was not permitted to be in the grand jury room but that he was permitted to stop the questioning at any time in order to exit the grand jury room and confer with his counsel, and then later return and finish his testimony. (*Id.* at 5). Finally, Smith stated that he "absolutely" understood that he was required to provide truthful and complete information to the members of the grand jury. (*Id.*).

The first portion of Smith's grand jury examination focused on his failure to file income tax returns for the years of 2007 through 2011. After some probing by government counsel,[15] Smith admitted that he has not filed federal, state or local (City of Pittsburgh) income taxes for

---

[15] From the outset of the examination, Smith would not answer yes or no questions posed by the AUSA; instead, he would seek to interject his explanation of his tax "problems" or "situation." (Docket No. 154-11 at 6-9). AUSA Conway was able to focus Smith by asking him to first answer the questions he posed and explaining to Smith that he would be provided an opportunity to "explain away." (*Id.* at 9).

all of those years, either personally or for his S Corporation. (*Id.* at 6-10). Smith confirmed that he has not paid "a dime" toward his income tax liabilities in any of the tax periods in all of these jurisdictions and that no money was withheld from his salary and paid toward his income tax liabilities. (*Id.*). AUSA Conway provided Smith with the opportunity to "explain away" why he had not filed his income tax returns or paid his taxes, despite his acknowledgement of his obligations to do so and the fact that "everybody else" had to pay their taxes. (*Id.* at 11). Smith responded:

> Of course I have an obligation, just like each and every one of you, and Mr. Conway, and this gentleman here to my right, to file tax returns.
>
> And, for a number of months – for a number of months we have been in contact with Mr. Conway, we have told him that we are prepared to file tax returns, and to resolve the tax issues, and his response has been, categorically, without question, without issue, is, "I am not going to discuss your tax issues, unless you plead guilty to fraud," and I can't do that, because I have never committed a fraud, there has been no deception at any time, and I say that under oath, on my – on my – on the hand of my children's head, and my wife's head.
>
> And, these tax problems are prepared to be resolved, there has been correspondence by my counsel to U.S. Attorney's Office for months, and months, saying, "We are prepared to deal with this, and to resolve it, and move on."
>
> But I have received no cooperation from the U.S. Attorney's Office to sit down and discuss it, without me pleading guilty to fraud, which I can't do, which I won't do, which in fact – in fact, would be acknowledging something that is not true.
>
> And not true by the very fact of what I have said, and not true by the very fact that my counsel provided this earlier to Mr. Conway, the U.S. Attorney's Office –
>
> AUSA Conway: Sir, you can stop talking now, that is your explanation is that you attempted to resolve these issues with the United States Attorney's Office --

Smith:     That's correct.

AUSA Conway:  -- and you haven't been able to, because we basically are saying we are not going to let you plead guilty – we are not going to waive our – the right to file fraud charges against you, and have you plead guilty simply to the taxes?

Smith:     No, there has been no discussion at all.  There has been nothing.  There has been – "I don't want to discuss" – and this is my – I am just paraphrasing, "I don't" – I am paraphrasing what we have heard from Mr. Conway's office, and Mr. Conway specifically, is, "I don't want to address the tax issues until Mr. Smith is willing to plead guilty to fraud."

AUSA Conway:  And that explains your failure to file your state tax returns, or failure to make any payments to your state tax returns how?

Smith:     There is no defense.

I want to make this very clear.  There is no defense that I should not have filed those returns.

But again, I am no different, just because I'm an attorney, everyone has an obligation.

All I can say to you is that from the time I began practicing law in 1974, I have faithfully filed my tax returns from 1974 through 2006.

And the fact that I have not during the period of 2006 through 2011, is predicated on the fact that – excuse me, let me take a step back – the fact that I have not filed is no indication that I have no intent to file.

My intention is to file, I want to file, but I have been given a condition, a contingency, and the contingency is, "We will talk to you, but you got to come" – "you got to plead to fraud."

Now, see, what Mr. Conway – well, this is my understanding.  If I went unilaterally, and filed these tax returns today, that may have certain implications to me, to my detriment, and on the advice of counsel, and on –

AUSA Conway:  We are not asking you ---

24

> Smith:  -- advice of counsel –
>
> AUSA Conway:  -- about your –
>
> Smith:  I am just saying ---
>
> AUSA Conway:  -- conversation with counsel.
>
> Smith:  I am saying to you, is I am prepared to resolve any tax issues today, yesterday and tomorrow, but I can't do it with the threat of having to plead to something that I am innocent of, have always been innocent of, and something that I can't say any more strongly than I am right now.

(*Id.* at 11-14).  AUSA Conway next attempted to ask Smith if he admitted that he "willfully" failed to file his federal income tax returns.  (*Id.* at 14-15).  Smith reiterated his same lengthy response and would not admit that he had "willfully" failed to file his tax returns, even upon repeated questioning by AUSA Conway and rephrasing of similar questions as to the federal, state and local taxes.[16]  (*Id.* at 15).

Despite his persistence, AUSA Conway was only able to get Smith to admit that he would not directly answer a question about whether he "willfully" failed to file his returns and moved on to examining Smith about his financial condition during those years.  (*Id.* at 16-18). Smith initially provided the same response to questioning about his financial condition, but after AUSA Conway advised that his purpose in pursuing this line of questioning was because the information "goes more to your motive for committing the fraud," Smith provided information about his finances during the relevant period.  (*Id.*).  Smith admitted that his real estate closing business was not financially strong during this timeframe and that his interests in investment properties in Florida and Myrtle Beach, South Carolina had lost money, although he was unable to provide specific details on the amounts, even after reviewing his 2006 tax returns.  (*Id.* at 19-

---

[16]     Amid this questioning, Smith was granted the opportunity to leave the grand jury room and consult with his counsel, upon his request.  (Docket No. 154-11 at 16).

24).

AUSA Conway then circled back to inquiring about Smith's tax liabilities and Smith testified that he did not blame his accountant for the failure to file his tax returns, and even acknowledged that his accountant had repeatedly told him of his obligation to file the returns. (*Id.* at 25). Smith apologized for not making his filings and added that if he was given the opportunity to file, he "would love to do it." (*Id.*). He again divulged into his explanation that:

> … you are asking me to plead guilty to another charge, or another matter, having nothing to do with the tax situation. In fact, we haven't even talked about the fraud situation, we are just talking about the tax situation. I'm sure you will ask questions about that. And I apologize for being argumentative, but the fact of the matter is, that I cannot, and will not admit to something that I didn't do. I did not file those tax returns for the years 2000, 2011, I admit it openly, I say to you, that I request –

> AUSA Conway: Sir, I am going to instruct you to answer my question.

> Smith: I am.

> AUSA Conway: All right?

> Smith: I ---

> AUSA Conway: Instead of making speeches for every question that is being asked, you have to answer my questions.

(*Id.* at 26). At this point during the examination, the transcript reflects that there was a "knock on the door," AUSA Cessar said "time out" and AUSA Conway asked Smith to exit the grand jury room, to which he obliged. (*Id.*). Smith was outside the grand jury room for 20 minutes and returned. (*Id.*).

AUSA Conway resumed his questioning but moved into Smith's dealings with Ratchkauskas, Kubini and Roscoe. (*Id.*). Smith was asked if he agreed to do some closing work on behalf of them and he responded "yes" and then started to explain his answer. (*Id.* at 27).

AUSA Conway interrupted Smith and told him to just answer the question he was asked, stating "I ask that you respond to my questions, rather than make a speech, and be here until 7:30 tonight. Okay? You understand? And you are in agreement to doing that?" (*Id.*). Smith agreed saying, "as best I can, sir." (*Id.*). The examination proceeded with some back and forth about the number of transactions that Smith closed for these individuals, with Smith contesting initially that it was 50 total transactions but ultimately admitting that it was between 20 and 30 deals where all three of these individuals were involved and that he closed a number of additional "cash" deals for Ratchkauskas and Kubini, which altogether would likely total 50 deals. (*Id.* at 28).

Smith then advised that he was acting as a title insurance agent for Land America when he closed these transactions. (*Id.*). He acknowledged that he had a contract with Land America which granted it the right to audit his closing files. (*Id.* at 29). As such, the files which were subject to audit did not contain any attorney-client privileged information. (*Id.*). Land America also required him to operate a trust account containing third party funds necessary to close the transactions. (*Id.*). Hence, he was obligated to act as a responsible fiduciary to safeguard the funds which were not his. (*Id.*). Smith confirmed that in a typical transaction, he would receive funds from the lender, any down payment from the buyer and then disburse the funds pursuant to the instructions from the lender, ensuring that all of the parties to the transactions and any other vendors were paid accordingly, as noted on the settlement sheet. (*Id.*).

The examination moved on to an audit of Smith's closing files by Land America in March of 2008. (*Id.* at 31). Smith agreed that Land America uncovered a shortage of approximately $93,000 during the audit. (*Id.*). When he was asked what caused the shortage, Smith requested a break to confer with his counsel, which request was granted. (*Id.* at 32). He

returned a few minutes later and the questioning resumed. (*Id.*). AUSA Conway attempted multiple times to ask Smith if, at that time of the audit, he had investigated and learned where the $93,000 "went" and Smith provided various answers that did not directly address the question, such as: "we were short"; "The money was short. The money – it was an accounting problem"; "very simply, we had our bookkeeper was being treated for cancer, she was out –" and "we could not locate the problem." (*Id.* at 33-34). AUSA Conway rephrased the question to ask if Smith "now" knew where the money "went," to which Smith provided very similar responses, again without directly responding to the question. (*Id.* at 34-35). The following exchange then occurred:

> AUSA Conway: Are you telling me you don't know where the $93,000 went?
>
> Smith: I just don't recall. It's been – sorry. It's 2013, I just don't recall.
>
> AUSA Conway: Well, how come I asked that question a minute ago, you got all nervous, and went to talk to counsel?
>
> Smith: Excuse me. Wait a minute. I think – I think I have the right – I don't have the right to have counsel here to represent me, and the fact of the matter is, I am going to be judicious and ask questions, just like you are going to ask questions, because ultimately, I'm going to do ultimately –
>
> AUSA Conway (interrupting): But sir –
>
> Smith: --the best, to do the best I could.
>
> AUSA Conway: Sir, did you not get nervous a minute ago –
>
> Smith: I was –
>
> AUSA Conway: -- when I asked you about the $93,000?
>
> Smith: I was – I -- I wasn't – I was trying to recall what took place, because it's five years ago, and I didn't have the specifics, and I wanted to just consult with counsel, which I am allowed to do.

AUSA Conway: So you weren't nervous at all, when I asked you about that $93,000 shortfall in your account?

Smith: I was only concerned because I didn't remember exactly what all if the specifics were.

But, yes, of course, I would be concerned if one penny was out of the account.

AUSA Conway: The fact is, that the money went to fund your payroll account, and it went to fund your lifestyle during that time frame ---

Smith: Absolutely –

AUSA Conway: -- because you were in such financial affairs?

Smith: Absolutely not.

AUSA Conway: Where did –

Smith: If it –

AUSA Conway: -- it go then?

Smith: -- asked the question – you want to ask the question, you have asked it, the answer is absolutely not.

AUSA Conway: Where did the money go then?

Smith: I tell you what. I tell you what.

AUSA Conway: You don't know. All right. We will move on.

Smith: Please.

(*Id.* 35-36).

Upon additional inquiry, Smith acknowledged that he rebalanced the escrow account and personally paid $20,000 into the account with funds he had separately acquired through a fee he earned in his law practice. (*Id.* at 38-39). He also admitted that he was instructed to close his escrow account at National City by Land America and did as instructed. (*Id.*). He then operated out of other escrow accounts he maintained. (*Id.*). Smith was next asked whether Alfred Watterson at Land America had told him to stop doing deals with Ratchkauskas and Kubini. (*Id.*

at 40-41). In response, Smith propounded lengthy answers explaining that he had discussed the matter with Watterson on several occasions, during which he had informed Watterson of the "gifts of equity" involved in the deals. (*Id.*). Smith added that Watterson had told him that he should be "more conservative" given the lending climate amid the recession such that Smith should "stop doing deals with these folks." (*Id.*). The questioning then progressed into Smith's contractual relationship with Land America, which prompted the following:

> AUSA Conway: And [Alfred Watterson] began proceedings, you were aware, to cut you off, to make sure you were no longer a title insurance agent for Land America; are you aware of that?
>
> Smith: Cut me off?
>
> AUSA Conway: Yes. To terminate your relationship with Land America, so that you could no longer represent them in terms of issuing title
>
> Smith: You will have to speak to Mr. Watterson, I have never been terminated by Lawyer's Title.
>
> AUSA Conway: And he never told you that he was beginning the process of terminating you?
>
> Smith: No, not at all.
>
> And obviously, it never – all I can tell you, I have never been terminated by anybody, I never had a title claim, I have never had a problem.

(*Id.* at 41-42).

Once again, AUSA Conway refocused his questions on other areas, turning to the importance of settlement statements. (*Id.* at 42). Smith concurred with his examiner that settlement statements or HUD-1s are some of the most important documents in a real estate closing. (*Id.* at 42). He agreed that settlement statements are "basically a summary of the ins and outs of the money associated with the transaction." (*Id.*). AUSA Conway asked Smith whether he had previously attended meetings with himself and agents. (*Id.*). Smith responded

"yes" and attempted to further elucidate his answer but was interrupted by AUSA Conway, who again told Smith that the question posed to him was "simple" and counseled him that "[w]e don't need a speech every time you answer a question." (*Id.* at 43). He next probed Smith's recollection of the fact that he had "changed his story" about the origins of the Roscoe Letter between his two meetings with law enforcement. (*Id.* at 44). Smith conceded that he initially told the Government that he had requested the letter from Roscoe independent of any involvement of Watterson at Land America but "clarified" at the second meeting that he was previously incorrect, telling them that Watterson had requested that Smith get the letter from Roscoe. (*Id.* at 44-45). Smith stated that he made a mistake and misspoke due to the passage of time between the interview and the underlying conversations he was recounting. (*Id.* at 46).

Smith was next asked why he told the agents during the interviews that he had filed 1099 forms with the IRS for all of the closings when the IRS had no record of any 1099s being filed for those transactions. (*Id.* at 47). Smith said that he could not explain why the IRS had no record of the 1099s being filed or why he had maintained no records of them in his own closing files because he always filed 1099s with the transactions. (*Id.* at 47-48). Smith continued:

> … [a]ll I can tell you is the paralegals issue the 1099's, I issue them today, I issued them yesterday, I can't answer the question any more than I have already done.
>
> AUSA Conway: Except in connection with these transactions, why is that, Mr. Smith?
>
> Smith: Why is that?
>
> AUSA Conway: Why in connection with all of the other transactions, you issued 1099's, but when it comes to Dov Ratchkauskas, and these deals, you didn't issue 1099's?
>
> Smith: Oh, I am glad you brought it up, it just hit me like a ton of bricks. You don't issue 1099's when the seller is a corporation. Okay? And you can check that out. So whenever a seller is a

31

corporation, or an LLC, or some type of legal entity, there is no 1099's issued.

AUSA Conway: Even if the lender instructions require you to issue a 1099?

Smith: You are not permitted. You are not permitted to do it. And that is your answer.

AUSA Conway: And your legal authority for that, Mr. Smith, is what?

Smith: Is the fact, that is the – I don't have a statute in front of you – in front of me, but I have received bulletins from the title companies, as to when to issue 1099's or not. So if the individual is a seller, the seller is an individual, we issue the 1099's. If there is some legal entity, we do not. I'm sorry, I didn't think of that a little bit earlier, but that's the answer to the question and I certainly challenge you to check that out.

(*Id.* at 48).

AUSA Conway next attempted to ask Smith a question concerning whether he was precluded from issuing checks from his escrow account to borrowers at a closing and not reflecting it on settlement statements but was interrupted by Smith, who commented, "are you asking a question." (*Id.* at 49). Smith then said "[a]ll right. I am going to answer the question, because I can't answer it yes or no," to which AUSA Conway retorted that "I seriously doubt you are going to answer the question." (*Id.*). AUSA Conway then completed his statement/question, "whether this settlement statement is supposed to reflect the reality of the transaction? Or is it supposed to reflect some sort of falsehood made up by you?"

Smith: Okay. Certainly, there is no question that the four corners of the settlement sheet should reflect everything that went on between buyer and seller. However, when you have gifts of equity, and if you would check your – you know, check the regulations, gifts of equity are taken, are never on the settlement sheet, as a matter of standard operating procedure, they are taken care of outside the closing. Now, in this situation, where it was between seller and buyer, there was. There was a gift of equity

from the seller to the buyer, of whatever the number was that they needed at closing.

(*Id.* at 49-50). Smith admitted that the parties to the particular transaction they were discussing were not related. (*Id.* at 50). AUSA Conway then followed up:

> So your understanding of these transactions is somebody completely unrelated to any of these borrowers, would just give these people 15 to 25 thousand dollars out of the kindness of their heart?
>
> Smith: No, not at all.
>
> AUSA Conway: Right?
>
> Smith: Not at all. And this is how it happened. These guys, they bought properties at foreclosure sales, they bought them cheap, they went in and did some renovations, I understand, I don't know for sure, and then they flipped them.
>
> So if they bought a property for $10,000, and now were selling it for $60,000, and they put five or ten thousand, that's just my thought, and could get the property appraised at $60,000, they are willing to give a gift of equity of $20,000, because that would be 40, and they would make $20,000 on the deal.
>
> That's exactly what took place. That's exactly what took place.
>
> And the fact of the matter is, since gift of equities don't appear on the settlement sheet, it was funded at the closing.
>
> If they were related, which they weren't, then it would be funded outside of closing by money being deposited by some relative into the buyer's checking account, or savings account, so they could use it at closing.
>
> The reason they didn't do it, was how did they know if they put five or ten thousand dollars in the buyer's account, that the buyer would ultimately close.
>
> AUSA Conway: When you are done with your speech, let me know, because I have a question here for you on this settlement statement.

> Smith:  Sure.
>
> AUSA Conway:  Are you done with your speech, whatever speech you are saying there?
>
> Smith:  Your question, sir.

(*Id.* at 51-52).

Smith was thereafter presented with an actual HUD-1 form that he had signed for one of the transactions at issue.  (*Id.* at 52).  He admitted that the HUD-1 form indicated on the line on the bottom left hand corner marked "cash from borrower" that the buyer in the deal had paid $18,504.37.  (*Id.* at 53).  He also conceded that there was no "gift of equity" indicated on the settlement sheet.  (*Id.*).  AUSA Conway then asked him to confirm that he had not received $18,504 cash from the borrower when he closed the deal.  Smith responded:

> That's not correct.
>
> I received a check from the buyer, who received a check from the seller, for that amount of money, endorsed over to me, into my escrow account, which was open, notorious and, in fact, your people indicated, in your reports, that it was open and notorious and transparent.
>
> If I wanted to hide something, I would have hid it.  I didn't hide anything, I had no reason to hide it, that's what it was.

(*Id.*).  AUSA Conway next presented Smith with a check that he made out to the buyer in the same transaction and Smith confirmed that he issued the check.  (*Id.* at 56).  AUSA Conway asked why Smith had issued the check to the buyer when the settlement statement set forth that she brought cash to the transaction.  (*Id.*). Smith responded:

> I am not – I am telling – I am going to answer that question in two respects.
>
> Number one, a letter has been given to me, and a letter has been given to the U.S. Attorney's Office, that I received from the lender, that said that these types of gifts of equity were okay.

AUSA:  Show it to me.  Show it to me from the lender.  It is not from the lender, now, is it?

Smith:  Excuse me, I dealt with the broker directly.  Okay?

AUSA Conway:  It is not from the lender.  You just told the grand jury it is from the lender.

Smith:  Okay.

AUSA Conway:  But that's not true, now, is it?

Smith:  Okay.  I – from the broker.  I never – whenever there is a broker –

AUSA Conway:  There is a big difference between the mortgage broker and the lender, now, isn't there?

Smith:  Yeah, there is, absolutely.

And I deal directly with the broker, and the broker made it very clear, I asked the question, "Is the lender aware of this?"

The answer is, "Yes."

I have a letter to that effect from the broker, I relied on that broker letter, which has been delivered to the U.S. Attorney, I don't know whether or not he has shown this to members of the grand jury, I am happy to give them a copy of this, if I can do that.

AUSA Conway:  Well, we will do it at the end.  Now, this – now, this letter ---

Smith:  And also – and also, I submitted voluntarily –

AUSA Conway:  That is not admissible, sir, so we are not going to discuss that.

Smith:  Well, I'm sorry I –

AUSA Conway:  You are instructed not to do that, Your Honor – sir, and you are not permitted to do it.

Smith:  Well, this is –

AUSA Conway: This is not – you are not permitted to go into that.

Smith: Well, there is no deception in this, I have submitted myself to a polygraph test, that specifically says that there was no deception and, of course, these ladies and gentlemen are allowed to ask questions, and ask for documentation.

We have submitted to you, I believe you probably have not shown this to the grand jury members here today, nor the letter, maybe you have, maybe you haven't, but you haven't done the polygraph as well, and the fact of the matter is, that is what it is all about, there is no deception, there is no fraud, there never has been, there never would be, and in their own documentation, it says that these escrow accounts were transparent, it was easy to follow, and that's because there was no deception, there was no intent to -- for there to be deception.

AUSA Conway: And did they ask you in the polygraph examination whether you willingly failed to file your tax returns?

Smith: This had to do with fraud.

AUSA Conway: That wasn't my question, sir.

Did they ask you in the polygraph examination, "Did you willfully fail to file your tax returns?"

Smith: There was [sic] no questions to that effect.

AUSA Conway: And this is all arranged by your defense counsel; right?

Smith: Yes, and from a source that is highly reputed here in Western Pennsylvania, who deals with law enforcement agencies, and the U.S. Attorney's Office and the FBI.

(*Id*. at 56-58).

AUSA Conway continued examining Smith with use of closing documents, returning to the check he had previously shown him. (*Id.* at 59-60). Smith admitted that there was no statement on the settlement sheet that the buyer had received a check issued from his escrow account. (*Id.*). Smith was next presented with closing instructions from Chase Bank on another deal which stated that Chase had verified a down payment of $14,250 and a sales price of

$95,000 and instructed the settlement agent, Smith, that any variances to those figures must be made on the settlement sheet and that he must have written approval from Chase Bank prior to closing the loan if any variances were present. (*Id.* at 61). The instructions further state that if the settlement agent had any knowledge that the source of the funds was other than described in the closing instructions, that he was not authorized to disburse loan proceeds and was required to contact the lender for additional instructions. (*Id.*). Smith confirmed that the language was correct, but expounded:

> See, the – the – what you are not – what you are not telling anybody, is the fact is the investor relies on the broker, and I rely on the broker.
>
> I assumed the broker did her job, set this – all of these, the settlement sheet is sent over to the investor to review, and the fact of the matter is, I have a letter stating how these transactions were to be worked.
>
> I relied on these, and I had every reason to rely on those – on that letter.
>
> AUSA Conway: And that letter is dated May of 2008; right?
>
> Smith: That, I think so, sir. Just – May 15th, 2008.
>
> AUSA Conway: And this transaction is dated 7-24 of 2007?
>
> Smith: That's correct.
>
> AUSA Conway: It is pretty hard to rely on a letter that you haven't received; right?
>
> Smith: I testified earlier that I requested a letter, I had not received a letter, I did very little business with these folks, that was my mistake, but ultimately when push came to shove, I asked for the letter, and I received the letter.

(*Id.* at 62).

AUSA Conway later asked about the lender's instructions to Smith to issue 1099s which

appeared on the same form. In response, Smith told him that "you don't do it, and I – I suggest that you check with your IRS agent, you don't issue them when the seller is a corporation." (*Id.*). AUSA Conway then pointed out that Kubini and Ratchkauskas sold the property in question personally, rather than through one of their many entities and Smith was forced to concede that he did not know why a 1099 was not issued but his paralegal should have done so. (*Id.* at 62-63). He followed up by asking Smith if he did not issue the 1099s in order to hide what was going on from the IRS, which Smith denied. (*Id.*). AUSA Conway immediately retorted that Smith was "not afraid to hide stuff from the IRS by not filing [his] tax returns." (*Id.*). And Smith again told him to "look at the polygraph test, it says specific questions, and it says there is no deception." (*Id.*).

The contentious "back and forth" between examiner and witness continued as they discussed numerous additional exhibits, primarily checks that Smith confirmed he had written from his escrow account to the buyers on the various deals, which were endorsed by the buyer and returned to him and settlement statements which all stated that down payments were made by buyers and did not state that "gifts of equity" were made by the sellers. At times, Smith continued to attempt to provide additional explanations in response to questioning, and was admonished by AUSA Conway to only answer the questions he posed and told "[i]f you want to make speeches, you can do that outside." (*Id.* at 65). When discussing one of the deals wherein Real Estate Choice Investments, Inc. was the seller, AUSA Conway chided Smith, "So on this one you wouldn't have to issue a 1099, according to tax law by Mr. – Mr. Smith; true?" (*Id.*). Smith answered the question without any retort, stating simply, "correct." (*Id.*). During these exchanges, Smith pointed out that the corresponding vouchers to the checks issued to the sellers in these deals all stated "less gift of equity to the buyer" which he explained was to note the "net

proceeds of the settlement statement." (*Id.* at 67). But, Smith also advised that he was rarely ever required to provide the buyer's down payment check to the lender in connection with real estate transactions he closed and that he never provided the lender copies of the checks he issued to sellers. (*Id.* at 68).

Smith testified that his paralegal prepared the settlement sheets for all of the transactions but admitted that he "absolutely" reviewed every one of them and personally participated in 98 to 99 percent of all closings that were completed at his office. (*Id.* at 70). He also conceded that he signed the instructions from the lenders which stated that he complied with all of the instructions and similar forms from his title insurance carrier. (*Id.* at 72-74). Smith recognized that in one of the transactions, a check issued out of his escrow account was deposited into the buyer's account prior to the closing and then a certified check was written out of the buyer's account in order to conform with the lending instructions. (*Id.* at 74). He added:

> That's what the instruction is, and that is why the checks were deposited into the buyer's account, and the buyer then had the checks written out of that account.
>
> You know the answer, Mr. Conway.
>
> I followed the instructions, and I followed the gifts of equity.
>
> Either you buy into the gift of equity, or you don't buy into the gift of equity, and I did what the written instructions were from the broker, which again I'm happy to share that letter with you.
>
> …
>
> You already have seen it, but these folks have not.

(*Id.* at 74). Smith confirmed that the certified check presented by the buyer in that deal was not really her money, again, stating that:

> .. these were all gifts, none of these folks had the moneys, except

> through the gifts of equity from the seller, which was fully
> disclosed to the buyer, before they even signed the agreement of
> sale, and at time of closing, when the check was presented to them,
> to endorse it over, it was all indicated to them.

(*Id.* at 75).  He next conceded that the buyer was not related to the seller but continued to add

that all of the buyers in these deals were thankful for the opportunity to become homeowners.

(*Id.* at 76-77).  AUSA Conway again asked Smith if he was done "making a speech" and further

commented "[d]o you want to be here until midnight, or do you want to answer my questions?"

(*Id.* at 77).  Smith responded that he would be there "as long as it takes."  (*Id.*).

AUSA Conway proceeded to inquire with Smith about two closings he did for the same

property, 657 Jackson Street, on the same day, June 13, 2008.  (*Id.* at 78-82).  Smith explained

that the first deal was a "cash" transaction where Real Estate Choice Investments purchased the

property out of foreclosure and the second deal was a sale by Real Estate Choice Investments to

individual purchasers in a "gift of equity" transaction.  (*Id.*).  Smith advised that he did not

require the buyer on the first deal to present any funds at the initial closing but waited to close

that deal until he had received the loan proceeds for the second deal, after which he disbursed the

funds for the two transactions simultaneously.  (*Id.* at 81).  When questioned about the propriety

of the back-to-back closings conducted in this manner, Smith responded that he "saw no problem

with that at all."  (*Id.*).  Smith confirmed that he closed a few other "gifts of equity" deals after

which a recess was taken as one of the grand jurors needed a break.  (*Id.* at 84).

AUSA Conway resumed his examination of Smith focusing on whether he had closed

any of the "gifts of equity" deals after Watterson had told him to stop.  (*Id.* at 84).  Smith

conceded that this discussion with Watterson and his instruction was a "significant event."  (*Id.*

at 89).  Smith admitted that he had told the agents during the prior interviews that he "hoped he

had stopped" doing such deals after reviewing one of the reports from the interview.  (*Id.* at 85).

Smith then testified that he could not say definitively if he continued to close these types of deals after that conversation. (*Id.*). Smith could not recall specifically when the conversation occurred, although he admitted that the audit was conducted in March of 2008 and that the Roscoe Letter was dated May 15, 2008. (*Id.* at 87). He was unable to confirm or deny if Watterson had independently told the agents that this conversation took place in April of 2008. (*Id.*). Smith reiterated that he was unsure of whether he conducted these types of closings after the discussion with Watterson. (*Id.* at 87). Thus, he was provided with an opportunity to review his own records to determine if he had. (*Id.*). After a "quick look" through his own files, Smith testified that he closed three separate deals for Kubini and Ratchkauskas in July and August of 2008, but that none of them involved "gifts of equity." (*Id.* at 88). Upon further questioning designed to have Smith respond to the previously posed direct question, Smith explained that he "said two things. One, that these type of deals I hoped that I had stopped doing. I then just also said that I did three deals later, after that, that had nothing to do with the structure that took place with Riverside Mortgage." (*Id.* at 90).

AUSA Conway then proceeded to review a series of "gift of equity" transactions that Smith admitted he closed in June and July of 2008. (*Id.* at 90-94). During this questioning, Smith provided another lengthy answer and pointed out that the conversation with Watterson must have occurred after the May 15, 2008 letter from Roscoe. (*Id.* at 93). AUSA Conway concluded his examination with a few questions about deals that he had closed involving Ratchkauskas, David Kashi and Victorian Finance, as the broker. Smith asserted that these were not "gift of equity" deals. (*Id.* at 97). He added that this was a "different loan product" and reiterated that he had no idea that there were fraudulent appraisals, etc. and never would have forwarded Ratchkauskas' deals to a reputable firm like Victorian Finance if he knew they were

fraudulent. (*Id.*). AUSA Conway abruptly ended his questioning, but Smith apparently wanted

to continue and to introduce exhibits, resulting in the following:

> AUSA Conway: All right. Mr. Smith, I have no further questions for you, and you are excused.
>
> Smith: I would also like to submit this.
>
> AUSA Conway: you are excused now, sir.
>
> WITNESS: Well, I am going to leave these documents over here,[17] this has the polygraph test, this has the letter that was sent by the lender and I guess I am not allowed to tell you anything about this. Is that right?
>
> MR. CONWAY: You are excused, sir.
>
> Smith: Okay. If you want to, you have the right to take a look at these documents, each of you, with the exhibits.
>
> I thank you for your time, and sorry it's so late. But, the long and the short of it is, that –
>
> AUSA Conway: Sir, you are excused.
>
> Smith: I am excused. I am.
>
> AUSA Conway: You can stop talking now.
>
> Smith: Well –
>
> AUSA Conway: The ladies and gentleman are ready to go. So you can leave.
>
> Smith: Well, just don't know why you won't share the polygraph information.
>
> AUSA Conway: Sir, there is no question before you, we are asking you to leave.
>
> Smith: I'm leaving, I'm leaving. I'm also going to be outside.
>
> AUSA Conway: Sir, there is no question before you.

---

[17]     As is noted below, the materials that Smith left for the grand jurors included: Stallings' February 15, 2013 Letter, the polygraph report, Mr. Barrett's c.v., and the Roscoe Letter. *See* pp. 46-47, *infra*.

Smith: I know. I am just going to be outside if [sic] case anybody has any questions, the grand jury should have any.

Do they have questions at all? They are allowed to ask questions.

AUSA Conway: I should have asked you, whether members of the grand jury have any questions for Mr. Smith, before we excuse him.

(*Id.* at 98-99).

Despite this exchange, certain grand jurors requested that Smith stay and proceeded to ask him a number of appropriate questions about the propriety of the transactions. (*Id.* at 99). The first grand juror asked Smith how he explained the "gifts of equity" transactions to the buyers at the closings because it appeared that the lender was "out of the loop" and the check endorsement process Smith had explained would likely raise "a red flag" with the buyers. (*Id.* at 99-100). Smith responded that this was an "excellent question" and told the grand jurors that he was informed at the initial meeting with Ratchkauskas, Kubini and Roscoe that all of the buyers were first time home buyers and were advised at the time of the execution of the sales agreement that they did not have to bring any funds to the closing and only a photo ID. (*Id.* at 100). A grand juror politely interrupted Smith and essentially propounded questions about a hypothetical deal to Smith, asking him to explain how he would tell the buyer about the transaction in the hypothetical situation. (*Id.* at 101). Smith obliged, reiterating that the sellers were willing to enter into the "gifts of equity" deals because they had bought the properties so cheap out of foreclosures and were flipping them for substantial profits even without the additional funds which were instead "gifted" to the buyer. (*Id.*). He further advised that all of his closings take about an hour to an hour and fifteen minutes and that he went over every document with the buyers. (*Id.* at 102). Smith demonstrated that he would show the checks payable to the buyers

he had issued out of the escrow account to the buyers and tell them that they needed to endorse it back to him so that he could balance his account. (*Id.*). Smith moved into another lengthy explanation, without any interruptions, and throughout posed questions to himself as follows:

> With regard to the lender, let's talk about the lender, there are two financial arms here, one is the broker, Riverside and one is JP Morgan Chase in most of those deals.
>
> …
>
> So, I have a letter that stated that this was approved by the investor.
>
> Now, this letter, and I never got the opportunity to answer this, or give this to you, but it's right here, this is a letter that's written by Rochelle Roscoe to Mr. Watterson at Lawyer's Title, because he asked for it.
>
> This letter was originally drafted by Miss Roscoe, and she sent it over to me to take a look at, and I helped her revise it, because it was [sic] grammatical mistake, that were typos in there, and I figured, you know, it should be cleaned up.
>
> You will see certain things in there that I, in my --- neither you, nor me, would have ever known to say, other than the fact that it was authorized to do that.
>
> That was a document that was created by the broker.
>
> I relied on the broker.
>
> Why did I rely on the broker? You don't say, "Mr. Smith, weren't there some other intents, some red flags out there?"
>
> Well, look, these guys, these buyers, they got a fixed rate mortgage. It wasn't an adjustable rate loan. It wasn't – they weren't paying five, ten points, they were paying pretty much market rates, so there wasn't anything out there that said that these people were being ripped off.
>
> Did I know that fraudulent loan applications were filed? Did I know that there were fraudulent appraisals, verification of employment, credit reports? Heck no.

And, if I would have known – if I would have known, no way would I have put 33 years on the line, for that. No way. It was only approximately four and a half percent of my income from June of 2007 through 2000 of 8. So there is no way I was going to do it.

The other reason that I didn't come up – one second. The other reason why it was – we were getting ready to terminate them. They had become very rude to my personnel. My personnel were being very uncomfortable. They were fighting with everybody, Mr. Ratchkouskas and Kubini, they were fighting with the lender, the – the broker, they were fighting with our office, they were just fighting with everybody, and it was starting to get a little tiresome. And for the few deals that I did, as I said, 25 or 30 over a 12-month period, it wasn't worth it, and when Mr. Watterson said, "You know what, we don't need this any more, wind it down, get done with them," that's what we principally did.

I don't know if that answered your question, but I really tried [to].

(*Id.* at 101-104).

AUSA Conway then asked Smith a series of questions about the loan applications and Smith stated that he did not look at them substantively because the lender had approved the loan, adding that he only instructed the buyers to sign and initial the applications during the closing. (*Id.* at 104-105). Another grand juror questioned Smith about what would happen if one of the buyers in these "gifts of equity" deals had simply taken the check payable to him or her and left Smith's office. (*Id.* at 106-07). Smith articulated that he would have instructed the buyer to stay and if they did not listen, he would have stopped payment on the check. (*Id.*). On follow-up questioning, Smith articulated that the "gift of equity" was a separate contract between the buyer and seller but was handled as part of the closing so as to avoid the buyers attempting to take the funds. (*Id.*). Yet another grand juror asked Smith if the "gifts of equity" were always the same percentage and Smith explained that there were often other closing fees but they were generally twenty-percent, or equivalent to the amount of the required down payment. (*Id.* at 108). He

added that the funds from the "seller assists" on the deals were used to cover closing costs and the "gifts of equity" would cover any remaining closing costs and the down payment. (*Id.*).

One of the other grand jurors asked Smith why he did not think that his client giving $30,000 or so to an unrelated person was "fishy"? (*Id.* at 109). Smith provided another verbose response, pointing out that the buyers often called his office and asked what was needed for the closing and his paralegal would tell them to bring their photo ID. (*Id.*). If there were questions at the closings from the buyers, he would remind them of their earlier conversations with his paralegal. (*Id.*). Smith also added that the buyers were getting fixed rate mortgages, at what he deemed to be good rates, and they were not subprime mortgages or other loan products which would have prompted additional scrutiny from him. (*Id.* at 110). Once again, he reiterated that he was unaware of the other aspects of the alleged fraud. (*Id.*). The same grand juror pointed out that Smith had not answered his question and asked Smith the following more directly, "you are telling me you are selling someone, who doesn't have the funds, a hundred thousand dollar home, and these people are giving them 20 grand to put down; is that what you are saying?" (*Id.* at 111). Smith responded "Yes, through a gift of equity. Yes. Okay." (*Id.*). The grand juror said that Smith had answered his question. (*Id.*).

At this point, AUSA Conway asked if there were any other questions from the grand jury and Smith attempted to interrupt and provide an additional explanation of his last answer. (*Id.*). The grand juror reaffirmed that Smith had answered his question. (*Id.*). AUSA Conway again told Smith he was excused. Smith then asked the grand jurors if they had any more questions. (*Id.* at 112). Hearing no response, he thanked the grand jurors for their time and stated the following "[a]nd again, I encourage you to take one of these documents, because I think they are very – they would be very enlightening to you." (*Id.*). It is undisputed that Smith then exited

the grand jury room, leaving his packet of materials containing Stallings' February 15, 2013 Letter, the polygraph report, Mr. Barrett's c.v., and the Roscoe Letter behind for the grand jurors. However, it appears that Smith's packet of materials was not marked as an exhibit to the proceedings.

g. *Grand Jury's Continuing Investigation and Return of Superseding Indictment Against Smith, et al.*

The grand jury's investigation continued after Smith's appearance on February 19, 2013. According to the parties, the grand jury called a number of additional witnesses, including, James Steiner, Rochelle Roscoe, and Alfred Watterson. (Docket No. 248 at 42-43, 56). Smith has not contested the Government's proffer that the Roscoe Letter was made an official exhibit and provided to the grand jurors during the examinations of these additional witnesses.[18] (Docket No. 251). The grand jury returned its Superseding Indictment against Kubini, Ratchkauskas, Smith and Svranovic on March 26, 2013. (Docket No. 92).

h. *Smith's Discovery Demands, the Government's Responses Thereto and Its Ongoing Production of Discovery Materials to Smith*

At the time of the Superseding Indictment, this Court had presided over the cases of Kubini and Ratchkauskas for nearly two years. *See generally* Crim. No. 11-14. Several status conferences were held and the Court was advised on several different occasions by counsel for these parties about the voluminous evidence in the case, some of which was in electronic form and some in hard copy form which were contained in numerous boxes at the Secret Service's Office. (Docket Nos. 77, 80, 102). Neither counsel for Ratchkauskas nor Kubini lodged any objections to the discovery production by the Government. (*Id.*). Instead, they repeated on each

---

[18] The grand jury testimony of Rochelle Roscoe, James Steiner and Alfred Watterson have not been presented to the Court but Smith (and his codefendants) has had access to these and other materials the Government has identified as Jencks/*Giglio* materials by viewing them on a stand-alone computer in the U.S. Attorney's Office since October of 2013. (*See* Docket No. 213).

occasion before the Court, and in their motions for extensions of time to file pretrial motions, that they needed additional time to complete their review of the Government's voluminous material so that they could make informed decisions as to how to proceed with their cases. (Docket Nos. 26, 35, 39, 41, 43, 45, 47, 51, 53, 55, 57, 59, 61, 63, 65, 67, 69, 71, 73). The Court was also generally informed that the grand jury's investigation was ongoing and that tax charges were likely to be added against one or both of Ratchkauskas and Kubini. (Docket Nos. 77, 80, 102). The Court held a previously scheduled status conference in Ratchkauskas' case two days after the grand jury returned its Superseding Indictment and was informed that the discovery for the additional charges was now available for counsel to review. (Docket No. 102). Again, no objections by anyone were made to the form of production of the discovery materials. (*Id.*).

Arraignments for Rathckauskas and Kubini on the Superseding Indictment were separately held on April 2, 2013 and April 4, 2013.[19] (Docket Nos. 103, 107). Magistrate Judge Eddy reported that discovery was "completed" in her reports on both cases. (*Id.*). Yet, on the morning of April 16, 2013, Smith filed his "Initial Discovery Demands" wherein he set forth all of the materials he was requesting that the Government produce to him, including, among other things, any records of prior statements made by him, all relevant documents in the Government's control, all *Brady* materials, impeachment materials, and any privileged materials seized by the Government during the search of his Law Office and/or a privilege log identifying such materials. (Docket No. 115).

Based on the docket, Magistrate Judge Kelly held a joint arraignment with Smith, his counsel and codefendant Svaranovic and her counsel, William Kaczinski, Esquire. (Docket Nos. 117, 123). AUSA Gregory Melucci substituted for AUSA Conway at these proceedings. (*Id.*).

---

[19]     AUSA Brendan Conway had substitute counsel for him appear at both arraignments given that he was before this Court trying *United States v. Catherine Slane*, Criminal No. 11-81.

Magistrate Judge Kelly's report on Svaranovic's arraignment reflects that discovery was "completed" in her case. (Docket No. 117). The report as to Smith's case, however, noted that discovery was "incomplete," "but to be made available this week to defense counsel." (Docket No. 123). The receipt of Rule 16.1 material[20] filed in Smith's case adds the following Order by Magistrate Judge Kelly, "[t]he government is directed to make available all discovery material to defense counsel on April 16, 17, 18, 19, 2013." (Docket No. 126 at 2).

Stallings and AUSA Conway continued their email correspondence after the Superseding Indictment was returned. To this end, although he was not present at the arraignment, AUSA Conway immediately forwarded Stallings the grand jury exhibits by email at 12:36 p.m. on April 16, 2013. (Docket No. 191-4 at 1). Stallings then proceeded to review the third party discovery which had been made available to him and emailed AUSA Conway and Special Agent Fisher on April 17, 2013 at 5:33 p.m. (Docket No. 191-2 at 3-4). In this email, Stallings states that he was reviewing his notes and was unsure how much of the material he would need copied. (*Id.*). He further comments that a "good initial step" would be to obtain all of the electronically stored materials first which were available. (*Id.*). AUSA Conway responded to counsel for all of the parties, copy to Agents Galson and Fisher, the next morning, advising that they had not scanned all of the documents and had only received some documents electronically. (*Id.* at 3). He continued that the agents were willing to make copies of all of the scanned documents they had.

---

[20]     Stallings executed the Rule 16.1 material receipt, after noting "NOT #4" on the acknowledgement above his signature. (Docket No. 126 at 4). Number 4 on the receipt states that "at a time convenient to all parties, the attorney for the defendant will be permitted to inspect and copy all tangible objects, books, papers, documents … in possession, custody or control of the government and (a) are material to preparation of defendant's defense, (b) are intended for use by the government as evidence in chief at trial, or (c) were obtained from or belong to the defendant." (*Id.*). Underneath this provision, the Government indicates that it had previously provided search warrants, affidavits in support of search warrants and search warrant returns to Smith. (*Id.*). It also referenced that voluminous discovery was available for inspection such as bank records, records from lenders and records from various search warrants and other seizures. (*Id.*). As there is no further objection noted on this form, Stallings apparently agreed that he had previously been provided with all of the following: any written or recorded statements of Smith; his grand jury testimony; a CD containing expert appraisal reviews conducted in connection with the case; and an attached report where Smith had denied that he acted with intent to defraud. (*Id.*).

(*Id.*).  Stallings quickly replied that he wanted all of the scanned documents.  (*Id.* at 2).  AUSA Conway sent another email explaining that not all of the documents were scanned and that certain of the documents would not be made available to Smith, such as Ratchkauskas' tax records, given privacy concerns.  (*Id.*).  He asked Stallings to identify which records he wanted and the agents would make electronic copies for him. (*Id.*).  In his final email, Stallings accuses the government of a "document dump" and that the discovery was not "adequate under law, rule or local practice."  (*Id.* at 1).  He complains that there was no index of what was produced, no bates numbers, and 30-50 boxes of unsorted, unindexed, often mislabeled materials.  (*Id.*).

Despite these complaints, Smith and his counsel continued to review the third party discovery at the Secret Service's Office and during their review located certain documents which they claim constitute *Brady* materials that were not identified by the Government.[21]  To this end, Smith located a SAR filed by JP Morgan Chase on July 11, 2007 with respect to a loan application for a sale of 1135 Pennsylvania Avenue which was not approved.  (Docket No. 191-9).  The SAR notes that the appraisal conducted by Joel Reck of Platinum Appraisal Services, Inc. misrepresented the value of the property by overvaluing the property thirty-two percent (32%) more than a review appraisal which was conducted by a third party.  (*Id.*).  The SAR investigator also noted that he was concerned that he had uncovered a house flipping scheme involving Riverside Mortgage and Platinum Appraisal, among others, and by the fact that the sales agreement identified different sellers than the other documents in the file.  (*Id.*).  No losses were realized by JP Morgan Chase as a result of this particular transaction because the loan was not funded and the deal did not close.  (*Id.*).  However, it is undisputed that JP Morgan Chase funded a loan for the sale of the same property by Kubini and Ratchkauskas to a different

---

[21]     These items were discovered by Smith prior to July 15, 2013, when they were filed with the Court and the defense has had access to them continuously throughout this time period.

borrower, William Brown, a few months later. (Docket No. 154-7). While Riverside remained the broker on this subsequent deal, Svaranovic provided an appraisal which stated that the value of the property was $95,000 and Smith closed the deal. (*Id.*).

Smith also found internal correspondence from Land America, which disclosed the findings of the audit of Smith's accounts, including that:

- Smith had "loaned" money from his escrow account to his operating account at a time when his bookkeeper was out for a few months, his business line of credit was "maxed out" and he was not able to refinance his personal residence or investment properties in Florida and Pittsburgh in order to cover liabilities in his operating account;

- Smith later replenished the escrow account with fees earned through his law practice;

- Smith had not provided a full explanation as to how the "loaned" funds were disbursed from the operating account but assured Watterson that no payments were made to Real Estate Choice Investments outside of the real estate closings;

- Land America's audit found 27 files where Smith closed deals for Real Estate Choice Investments/Dov Ratchkauskas as the seller and Riverside Mortgage Services as the broker;

- The auditors reviewed only two of these files in depth, i.e., the "Osborne file" and the "Carter file."[22] Watterson states that a review of both of these files demonstrated that the HUD settlement statements contained material misrepresentations because they failed to disclose that the seller had contributed funds toward the buyer's down payment;

- Watterson commented that there was "little value" in completing a

---

[22] The Court notes that the corresponding spreadsheet detailing the transactions that the Government intends to demonstrate are fraudulent at trial indicates the following with respect to the "Osborne" and "Carter" files. (Docket No. 154-7). The "Osborne file" relates to the December 3, 2007 transaction wherein Theresa Osborne purchased property at 4561/209 Parnell Street from Ratchkauskas for a sales price of $110,000. (*Id.*). The purchase was funded by a loan obtained by Ms. Osborne from J.P. Morgan Chase in an amount of $99,000 and line 303 indicates that the "cash from borrower" was $22,606.97. (*Id.*). The "Carter file" is a reference to the February 13, 2008 sale of 6527 Jackson Street by Realty Choice Investments to Carter Damara for a sales price of $125,000. (*Id.*). This deal was funded by a loan obtained by Carter from JP Morgan Chase in an amount of $100,000 and it was represented to the lender that the "cash from borrower" was $30,780.77 at the closing. (*Id.*). Riverside Mortgage was the broker listed on both deals and Smith closed the transactions. (*Id.*).

"full review" of the remaining 25 files because they were advised by Smith that each deal followed a "similar pattern"; and,

- In response to a question of whether Smith would remain an officer of Land America, Watterson stated that two other individuals (Bob Spezialetti and Jim Sindoni) would make that decision but that he (Watterson) "would recommend that [Smith] be kept as 30 years of affiliation with very minimal claims over that period."

(Docket Nos. 191-1 at 1-2; 191-7).[23]

The Government's rolling production of materials to the defense has continued throughout these proceedings. Prior to his indictment, Smith was provided with the search warrants and affidavits authorizing the searches at his Office and file room; he was granted access to review the materials seized by the agents during those searches; and he received copies of the agents' reports of his subsequent interviews with law enforcement. (Docket Nos. 154-5; 251-7). Later, the Government produced Smith's grand jury testimony and the exhibits which were admitted during that proceeding. (Docket Nos. 123; 191-4). Since the Superseding Indictment was filed, the Government has made the third party discovery available for inspection at the Secret Service's Office and also provided all Defendants with a spreadsheet detailing 109 loans it intends to prove at trial. (Docket No. 154-7). In October, 2013, the Government disclosed its Jencks Act and *Giglio* impeachment material to all Defendants, making this information available on a stand-alone computer in the U.S. Attorney's Office but has not permitted copying of such materials by Defendants or their counsel to this point. (*See* Docket No. 213). In March of 2014, the Government produced 1,700 marked trial exhibits to Defendants, including a searchable exhibit list and promised to update such information prior to the trial. (Docket Nos. 256-1; 256-2; 256-3). These materials derive from, among other sources,

---

[23] The Court notes that, despite Smith's claims that none of the documents are "bates stamped," the internal Land America emails are marked with bates stamp numbers on the bottom right hand corners. (Docket Nos. 191-1; 191-7).

the exhibits from the search of Smith's Office and file room which the Government plans to introduce at trial. (Docket Nos. 256-2; 256-3). As promised, the Government produced additional exhibits and a revised exhibit list to Defendants on May 9, 2014, detailing additional categories of documents it has marked and will seek to admit in its case at trial. (Docket No. 261-1).

Smith remains the only codefendant in this case to have objected to either the form or method of the Government's discovery production to this point. Indeed, each of Smith's codefendants (Svranovic, Kubini, Ratchkuaskas) filed and/or joined motions for discovery but withdrew them at the Court's Motion Hearing, stating that the Government's production was adequate. (*See* Docket No. 248).

III. MOTION TO DISMISS INDICTMENT

Smith seeks dismissal of the Superseding Indictment based on alleged prosecutorial misconduct which he contends occurred during the grand jury proceedings and in the proceedings before the District Court. (Docket Nos. 153, 191, 251, 257). The Government argues that the record is insufficient to demonstrate prosecutorial misconduct warranting dismissal under either theory. (Docket Nos. 180, 250, 256). The Court turns initially to Smith's claim seeking dismissal of the Superseding Indictment based on the alleged prosecutorial misconduct of the assigned prosecutor before the grand jury.

   *a.  Alleged Prosecutorial Misconduct before the Grand Jury*

      1.  Legal Standard

The Fifth Amendment to the United States Constitution provides that "no person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury . . . ." U.S. CONST. AMD. V. The grand jury serves as a referee or buffer between

the government and the people. *United States v. Williams*, 504 U.S. 36, 47 (1992). It is an accusatory body that sits "not to determine guilt or innocence, but to assess whether there is adequate basis for bringing a criminal charge." *Id.* at 51; *Bracy v. United States*, 435 U.S. 1301, 1302 (1978). In light of "the grand jury's singular role in finding the probable cause necessary to initiate a prosecution," courts generally lack authority "for looking into and revising" the grand jury's judgment. *Kaley v. United States*, __ U.S. __, 134 S. Ct. 1090, 1097–98 (2014) (citing *Costello v. United States*, 350 U.S. 359, 362–63 (1956)).

A defendant who seeks to set aside an indictment bears a heavy burden. *United States v. Fenton*, Crim. No. 98-01J, 1998 WL 356891, *4 (W.D. Pa. June 29, 1998) (Brooks, J.). A district court generally lacks supervisory power over grand jury proceedings. *Williams*, 504 U.S. at 47 ("as a general matter at least, no such 'supervisory' judicial authority exists"). Courts may exercise this narrow degree of authority only "if it is established that the violation substantially influenced the grand jury's decision to indict or if there is grave doubt that the decision to indict was free from the substantial influence of such violations." *Bank of Nova Scotia v. United States*, 487 U.S. 250, 255–56 (1988) (citing *United States v. Mechanik*, 475 U.S. 66 (1986)).[24] Well-developed case law establishes that "only where violations of positive law embodied in a rule of criminal procedure, a statute or the Constitution are raised may a court review an indictment with a view toward possible prejudice in the grand jury proceedings." *Fenton*, 1998 WL 356891, at *6 (citing *In re Grand Jury*, 103 F.3d 1140, 1145 (3d Cir. 1997) ("Judicial supervision and interference with grand jury proceedings should always be kept to a minimum.")). "Whatever

---

[24] The Supreme Court further identified "isolated exceptions" wherein harmless-error analysis is unnecessary because the grand jury's structural protections have been so compromised that that the proceedings are "fundamentally unfair, allowing the presumption of prejudice." *Bank of Nova Scotia*, 487 at 257. The Court identified racial and gender discrimination in grand jury composition as warranting this exception. *Id.* (citing *Vasquez v. Hillery*, 474 U.S. 254 (1986) (racial discrimination in selection of grand jury); *Ballard v. United States*, 329 U.S. 187 (1946) (women excluded from grand jury pool)). These exceptions are not at issue here.

supervisory power does exist, it does not permit judicial review of errors which impact only upon the quality and reliability of the evidence considered by the grand jury." *Id.*

2. Discussion

Smith points to a number of instances of alleged improper behavior by AUSA Conway, including his: refusal to permit Smith to present exculpatory evidence to the grand jury; suggesting that Smith's consultation with his counsel implied guilt; subordination of a known conflict of interest by allowing Steiner to testify before the grand jury while he was represented by his former counsel; repeated interruptions of Smith's testimony and numerous comments that Smith stop making "speeches" rather than directly answering questions; and misleading comments as to the law and facts on the issuance of 1099 forms in connection with closings, whether he was terminated as a title agent by Land America and the admissibility of polygraph evidence in grand jury proceedings. (Docket Nos. 151, 191, 251, 256). While Smith frames his arguments broadly as "prosecutorial misconduct" in an effort to avoid the import of the Supreme Court's decisions in *United States v. Williams* and *Bank of Nova Scotia*, the Court agrees with the Government that Smith's challenges are neither sufficient to warrant the exercise of its supervisory power over the grand jury proceedings nor to dismiss the Superseding Indictment.

At the outset, there is simply no evidence of any prejudice to Smith caused by the grand jury's return of the Superseding Indictment against him because the Court finds that the misconduct allegedly perpetrated by AUSA Conway, even if such misconduct was conclusively proven by Smith, neither "substantially influenced" the grand jury's decision to indict him nor demonstrates that there is "grave doubt that the decision to indict was free from the substantial influence of such violations." *Bank of Nova Scotia*, 487 U.S. at 255–56. Prior to his grand jury appearance, Smith was repeatedly advised, through his counsel, that he was a target of the

Government's investigation and that the Government intended to seek an indictment against him. *See e.g.*, Docket No. 251-13 (June 19, 2012 email from AUSA Conway to Stallings advising that a meeting between the parties was best put off until after an indictment was returned and Smith and his counsel first had the opportunity to review discovery); Docket No. 154-5 (August 27, 2012 email from AUSA Conway to Stallings advising that he did not intend to do anything with Stallings' requests for privileged documents until after indictment was returned); Docket No. 251-13 at 2 (Stallings' February 13, 2013 letter outlining his email communications with AUSA Conway requesting that Smith be notified of the return of an indictment because he may wish to testify before the grand jury, on various dates, including August 29, 2012, October 15, 2012, February 14, 2013, February 15, 2013). Indeed, the Government notified Smith, again through his counsel, that he "face[d] a potential indictment for bank fraud, wire fraud and conspiracy" and "failure to file his tax return charges." (Docket No. 251-13 at 1). AUSA Conway provided a similar warning to Smith at the beginning of his voluntary grand jury appearance, advising him yet another time that the Government intended to ask the grand jury to indict him, which he acknowledged. (Docket No. 154-11 at 3-4).

As far as the Court can tell, the sole purpose of Smith's grand jury appearance was to persuade the grand jury to *not* indict him for charges of bank fraud, wire fraud, conspiracy and failure to file tax returns. "[T]he grand jury returns indictments in the overwhelming majority of cases," *United States v. Budd*, 496 F.3d 517, n.9 (9th Cir. 2007),[25] and District Courts generally lack the authority to review the grand jury's determination that there is probable cause to indict

---

[25]      The latest statistics provided by the Department of Justice indicate that during the period of October 1, 2009 through September 30, 2010, U.S. Attorneys declined to prosecute 30,670 suspects of federal crimes but reported that only **11** suspects were not prosecuted as a result of the grand jury failing to return a true bill against him or her. *See* U.S. Department of Justice, Federal Justice Statistics 2010 – Statistical Tables, at Table 2.3 (Dec. 2013), available at: http://www.bjs.gov/content/pub/pdf/fjs10st.pdf (last visited 5/6/14). It has long been said that an effective prosecutor could convince a grand jury to "indict a ham sandwich." *Budd*, 496 F.3d at n.9.

by reviewing the reliability and competence of the Government's evidence presented to the grand jury, *see Costello*, 350 U.S. at 362–63. Thus, the fact that the grand jury returned an indictment charging Smith with the same offenses the prosecution advised him he would be charged with prior to his grand jury appearance significantly undermines his position that he was prejudiced by what occurred during his actual appearance before the grand jury. *See Bank of Nova Scotia*, 487 U.S. at 255–56. Additionally, the parties do not dispute that Smith was not the only witness who testified before the grand jury; thus, the grand jurors' decision to indict Smith was not premised solely on his own testimony and the grand jury likely would have proceeded to indict him if he had not voluntarily appeared and testified.[26] *Id.* Nevertheless, Smith's challenges to the grand jury proceedings are legally flawed because they are beyond the scope of this Court's narrow supervisory authority over grand jury proceedings, i.e., he asks the Court to fashion and enforce rules of grand jury procedure which do not challenge the structure of the composition of the grand jury and/or complains about the reliability and competence of evidence which was presented to the grand jury by the Government.

Through his Motion, Smith essentially seeks to enforce: certain provisions of the U.S. Attorney's Manual which counsel prosecutors to generally admit evidence favorable to the accused in grand jury proceedings and to permit targets of investigations to testify upon request; an alleged oral agreement by AUSA Conway to allow Smith to introduce exculpatory documents into the proceeding; the Rules of Professional Conduct which he contends prohibit his former counsel from representing a cooperating witness who testified before the grand jury; his right to consult with his counsel during the grand jury proceedings; and, general standards setting forth the appropriate methods of examination of witnesses. (Docket Nos. 151, 191, 251, 256). In this

---

[26]    In fact, Smith concedes that at least Rochelle Roscoe, James Steiner and Alfred Watterson testified during those proceedings.

Court's opinion, the establishment and enforcement of any of these purported rules, agreements or standards vis-à-vis grand jury proceedings would run afoul of clear Supreme Court precedent which limits the Court's supervisory authority over the grand jury and the prosecutor's conduct before it.

On this issue, the Supreme Court of the United States has reasoned that:

> ... any power federal courts may have to fashion, on their own initiative, rules of grand jury procedure is a very limited one, not remotely comparable to the power they maintain over their own proceedings. It certainly would not permit judicial reshaping of the grand jury institution, substantially altering the traditional relationships between the prosecutor, the constitutional court and the grand jury itself.

*Williams*, 504 U.S. at 50. Consistent with this pronouncement, the Supreme Court has declined to permit courts to invoke their supervisory powers to adjudicate challenges to the following well settled constitutional protections which are afforded to defendants in a trial setting:

- the refusal of the government to present substantial exculpatory evidence, *see Williams,* 504 U.S. at 50;

- the introduction of evidence obtained in violation of a defendant's Fourth Amendment rights, *see United States v. Calandra*, 414 U.S. 338, 349 (1974);

- the admission of evidence secured in violation of a defendant's Fifth Amendment rights against self-incrimination, *see id.* at 346; and,

- the return of an indictment predicated on hearsay evidence in violation of the Rules of Evidence, *see Costello*, 350 U.S. at 364.

The Supreme Court has likewise recognized that the Sixth Amendment right to counsel does not attach prior to the grand jury's return of an indictment. *See Williams*, 504 U.S. at 49 (citation omitted). Thus, a person's Sixth Amendment right to counsel cannot be violated during grand jury proceedings. *See Baylson v. Disciplinary Bd. of Supreme Court of Pennsylvania*, 975 F.2d

102, 106 (3d Cir. 1992) ("Though the Board may be correct in arguing that attorney subpoenas raise Sixth Amendment right to counsel concerns, the fact remains that a person does not have a right to counsel prior to indictment by a grand jury.").

Following *Williams* and *Bank of Nova Scotia*, the United States Court of Appeals for the Third Circuit has refused to import and enforce the Rules of Professional Conduct in grand jury proceedings. *See Baylson*, 975 F.3d at 106 ("[T]he district court may not under the guise of its supervisory power or its local rule-making power, impose the sort of substantive restraint on the grand jury that is contemplated by Rule 3.10."). Our Court of Appeals has further recognized that an Assistant United States Attorney "did not have a constitutionally mandated obligation to advise [a grand jury witness] that he could remain silent and that anything he said could be used against him" and rejected a request to invoke the supervisory power to consider such challenge. *United States v. Gomez*, 237 F.3d 238, 241 (3d Cir. 2000) (citation omitted). Additionally, the Third Circuit has cited, with approval, decisions of other courts of appeals which have held that the supervisory power may not be used to enforce purported violations of provisions of the U.S. Attorney's Manual because such provisions do not create any judicially enforceable rights in grand jury proceedings. *See e.g., Gomez,* 237 F.3d at n.1 (noting that any contention that the U.S. Attorney's Manual creates any rights before the grand jury, the violation of which entitles a defendant to dismissal of an indictment is "against the weight of judicial authority"); *United States v. Jarrett*, 447 F.3d 520, 529 (7th Cir. 2006) ("Case law, not internal handbooks, provides the guidance for whether a prosecutor has crossed the line in pursuing an indictment."); *see also United States v. Gross*, 41 F. Supp. 2d 1096, 1098 (C.D. Cal. 1999), *aff'd*, 40 F. App'x 397 (9th Cir. 2002) (U.S. Attorney's Manual did not create enforceable rights). Therefore, this Court's supervisory power over grand jury proceedings is limited and not generally invoked to remedy

the types of activities before the grand jury Smith complains occurred here.

The Court acknowledges that Smith is correct that the pre-*Williams* and *Bank of Nova Scotia* precedent of the Third Circuit generally commented that prosecutorial misconduct before the grand jury may warrant the dismissal of an indictment. (*See* Docket Nos. 152, 191, 251, 256). However, in *United States v. Martino*, the Court of Appeals made clear that even prior to those decisions of the Supreme Court, our Circuit required a showing of prejudice to the defendant before dismissal could be deemed an appropriate sanction for the asserted misconduct. *United States v. Martino*, 825 F.2d 754, 759-60 (3d Cir. 1987). Moreover, the *Martino* decision specifically comments that "in none of the Third Circuit cases in which we found prosecutorial misconduct before the grand jury did we order dismissal of the indictments. … In almost all cases, we determined that the misconduct was harmless error and not prejudicial." *Id.* The Court of Appeals noted that it had "condemned as improper" the following prosecutorial actions: threats to a grand jury witness and descriptions of the witness as a "racketeer" and "thief," *United States v. Bruzgo*, 373 F.2d 383, 386 (3d Cir. 1967); statements to the grand jury that a potential witness was unavailable because the defendants were connected to organized crime and could harm the witness, *United States v. Riccobene*, 451 F.2d 586, 587 (3d Cir. 1971); "a Justice Department special attorney's appearance before the grand jury in the dual role of prosecutor and witness in violation of the American Bar Association's professional standards," *United States v. Birdman*, 602 F.2d 547 (3d Cir. 1979); and "graphic and misleading references associating the defendants with organized crime," *United States v. Serubo*, 604 F.2d 807, 818 (3d Cir. 1979). But, again, the Court of Appeals did not dismiss indictments in any of those cases and although it characterized the misconduct in *Serubo* as "extreme," it merely remanded the matter to the district court for further proceedings. *Martino*, 825 F.2d at 759.

This Court has also reviewed with interest the decision by the United States District Court for the Eastern District of Pennsylvania in *United States v. Breslin*, 916 F. Supp. 438 (E.D. Pa. Jan. 29, 1996), which is cited by Smith, and is an instance where the District Court dismissed an indictment, without prejudice, based upon a finding of both prosecutorial misconduct and prejudice to the defendants. However, *Breslin* is non-binding on this Court and distinguishable. In *Breslin*, the District Court found that the cumulative effect of many instances of prosecutorial misconduct substantially influenced the grand jury's decision to indict. *Id.* at 446. The District Court commented that it was "an unusual case" but believed that the "cumulative unfairness" in the grand jury proceedings was evidenced by, among other things, the prosecutor's:

- provision of donuts to the grand jurors in an effort to "bond" with them;

- repeated comments that he had a limited amount of time to present the case to them;

- insertion of his characterization of the evidence and his opinions on the weight to be given to certain evidence and the credibility of witnesses;

- numerous references which "improperly led the jury to believe that it was not entitled to request live witness testimony or that live testimony was unavailable";

- comments that the statute of limitations was set to run so that an indictment needed returned immediately, with the Government admitting that the grand jury's deliberations lasted 15 minutes; and,

- advice to the grand jurors that they did not need to agree with the entirety of the indictment but only the "critical parts," which the District Court found was counter to the instructions provided to the grand jurors upon their swearing at the outset of their service.

*Id.* at 443-46. Smith asks this Court to follow *Breslin* and take the "cumulative unfairness" approach here, but none of Smith's complaints about AUSA Conway's actions rise to the level of

prosecutorial misconduct committed in *Breslin* or the types of misconduct which involved the prosecutor's improper influence over the grand jurors, subversion of the grand jury procedures and legally flawed instructions as to how the grand jury should conduct its deliberations and reach its probable cause determination. *Id.* The other decisions cited by Smith in support of his requested dismissal of the Superseding Indictment are similarly non-binding and unavailing. (*See generally* Docket Nos. 152, 191, 251, 256).

Although the Court holds that it is without authority to exercise its supervisory power in this case, it will briefly explain why it believes that Smith has failed to meet his burden to warrant the extreme sanction of dismissal of the Superseding Indictment based on the present record. *See Fenton*, 1998 WL 356891, at *7 (holding that the alleged errors were beyond the Court's review but further explaining why "none of the prosecutor's actions constituted misconduct").

First, the prevailing caselaw is clear that the Government was under no obligation to introduce evidence which was exculpatory to Smith or even to invite him to testify before the grand jury as a target of the investigation. *See Williams*, 504 U.S. at 50. While the Department of Justice instructs its assistants to do both and has set guidelines for the grand jury examination of targets in certain provisions of the U.S. Attorney's Manual, those provisions are unenforceable in judicial proceedings and courts properly decline to exercise their supervisory authority over a defendant's challenges to prosecutorial misconduct framed upon asserted violations of the U.S. Attorney's Manual. *See Gomez,* 237 F.3d at n.1. Accordingly, this Court will not exercise its supervisory authority to enforce the cited provisions of the U.S. Attorney's Manual.

Second, Smith testified at length about the exculpatory evidence he complains was

improperly excluded from the grand jury proceedings. With respect to the polygraph results,[27] Smith admits that AUSA Conway expressly told him and his counsel prior to the grand jury appearance that the polygraph report and results would not be discussed during his examination but he proceeded to testify at length about the results of the polygraph over the protestations of AUSA Conway. (Docket Nos. 251 at ¶¶ 18-19; 154-11 *generally*). The Court also finds that AUSA Conway did not commit misconduct by stating that the polygraph report and results were "not admissible" in the grand jury proceedings in light of Smith's acknowledgement that he violated the instructions of his examiner by testifying about the results. (Docket No. 154-11 at 56-58).

Further, Smith's contention that the polygraph results could be properly admitted in a judicial proceeding via expert testimony in light of Rule 702 of the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), has no applicability in the context of his own grand jury examination. (*See* Docket Nos. 152, 191, 251, 256). Again, this Court lacks the authority to enforce the Rules of Evidence in grand jury proceedings, and, even if it was permitted to do so, this Court is aware of no precedential support for the proposition that an individual who is a non-expert and the subject of a polygraph examination should be permitted to testify as to the results of same or be a competent witness to authenticate a third party's expert report. *See e.g., United States v. Lee*, 315 F.3d 206, 213, n.6 (3d Cir. 2003) (stating in dicta that "this Court has not adopted a per se exclusionary rule regarding polygraph evidence" and noting a split of judicial decisions on the issue of whether polygraph evidence could be admitted through expert testimony) (citations omitted). As such, AUSA Conway simply cannot be faulted for instructing Smith that the polygraph examination was inadmissible

---

[27] The Court notes that the U.S. Attorney's Manual expressly states that polygraph results should not be admitted in grand jury proceedings.

in the grand jury proceedings.

Smith also contends that AUSA Conway violated an alleged oral agreement reached with his counsel, Stallings, wherein the Government purportedly agreed to admit the Roscoe Letter into evidence during his grand jury testimony. (Docket Nos. 251, 256). But, the aforementioned precedent makes clear that this Court may not exercise its supervisory authority to enforce the alleged oral agreement, even if the Court assumes that it existed and was breached by AUSA Conway. *See Williams*, 504 U.S. at 50. Again, this Court is unable to "fashion rules of grand jury procedure" which precludes it from enforcing fundamental constitutional rights of the accused and even the Department of Justice's internal operating policies in grand jury matters. *Id.*; *see also Gomez*, 237 F.3d at n.1. Hence, the Court undoubtedly lacks the ability to exercise its supervisory authority to enforce a breach of an oral contract between counsel. *See id.* In any event, it is uncontested that the Roscoe Letter was admitted through the testimony of subsequent witnesses who appeared before the grand jury. (Docket No. 248 at 35-36, 43, 56). Smith also left a copy of same in the grand jury room before he was excused as a witness. (Docket No. 154-11 at 112). Accordingly, there is no prejudice to Smith by the refusal of the Government to admit the letter as an official exhibit during Smith's examination.

Third, AUSA Conway's isolated comment about Smith's nervousness and consultation with his counsel does not implicate any fundamental constitutional right of Smith because the Sixth Amendment right to counsel does not attach until after an indictment is returned. *See Williams*, 504 U.S. at 49. While the Court believes that the comment was unnecessary and would be improper if made during a trial, the appropriate remedy at that stage of the proceedings would be for the Court to grant a motion to strike the question and provide a limiting instruction advising the jurors that the question was improper and should not be considered by the jurors.

*See* FED. R. EVID. 103 (motion to strike). Here, Smith himself challenged AUSA Conway's statement by reminding him of the instructions he was provided at the outset of the grand jury appearance that he was permitted to stop the questioning and meet privately with his counsel. (Docket No. 154-11 at 3, 35-36). The grand jurors presumably heard both the initial instructions by AUSA Conway to Smith authorizing him to consult with his counsel and Smith's subsequent reference to same. Jurors are generally presumed to be able to follow instructions. *See Zafiro v. United States*, 506 U.S. 534, 540-41 (1993). Therefore, Smith was not prejudiced by the offending comment.

Fourth, the purported issue with the Government's calling Steiner as a witness before the grand jury is likewise beyond this Court's reach because Smith seeks to have the Court enforce Rules of Professional Conduct before the grand jury. *See Baylson*, 975 F.2d at 106. Additionally, Smith has not sufficiently established that a conflict of interest even exists in the present circumstances vis-à-vis Attorney Levenson's continued representation of James Steiner and he has cited no conclusive authority demonstrating that the Rules of Professional Conduct have been violated. (Docket Nos. 251, 256). To this end, the cases are legion that an actual conflict of interest arises between a lawyer and a former client when the lawyer is put in a position to cross examine the former client because the lawyer may be forced to reveal confidential information he learned through the representation of the former client during his cross examination of the former client-witness in order to effectively represent the current client. *See e.g., United States v. Moscony*, 927 F.2d 742, 749 (3d Cir. 1991) ("Usually, the various rights and duties of the attorney clash when a defendant seeks to waive his right to conflict-free representation in circumstances in which the counsel of his choice may have divided loyalties due to concurrent or prior representation of … a government witness."). Courts have routinely

disqualified counsel from representing the current client in these situations. *Id.* Many months before Smith was indicted, AUSA Conway advised Attorney Levenson that his continued representation of both Smith and Steiner may result in such a conflict because he intended to file a joint indictment against Smith, Kubini and Ratchkauskas. (Docket No. 250 at ¶ 111). After this discussion, Attorney Levenson promptly withdrew as counsel for Smith, avoiding any such potential conflict years before it could arise. (Docket No. 251 at ¶ 13). Further, Smith has not meaningfully contested the Government's proffer that Steiner and Smith played separate roles in the mortgage/bank fraud schemes because they both acted as closing attorneys on a number of different transactions and Steiner did not provide evidence directly against Smith during his challenged grand jury testimony. (*See* Docket Nos. 154-7; 251, 256). Nor has Smith alleged that Levenson revealed any attorney-client privileged information obtained during his consultations with Smith to the Government but merely advocates that the same may be presumed. (Docket Nos. 152, 191, 251, 256). Hence, there is no demonstrated violation of the Rules of Professional Conduct on this record.

Fifth, this Court is similarly unable to adjudicate Smith's objections to AUSA Conway's interruptions of his testimony and repeated references to his making "speeches" rather than answering direct questioning as well as his challenges to AUSA Conway's alleged misrepresentations of fact and law concerning the filing of 1099 forms and whether Land America had initiated proceedings to terminate his contract. *See Williams*, 504 U.S. at 50. AUSA Conway avers that the methods he employed during his examination of Smith were permissible because Smith failed to follow the ground rules established for the examination by propounding lengthy explanations for his answers rather than succinct responses and further contends that he was merely questioning Smith about inconsistent information he had provided

to the agents during interviews and his grand jury appearance.  (Docket No. 250).   In trial proceedings, the Court controls the mode and order of the examination of witnesses on direct and cross consistent with the Rules of Evidence and may appropriately strike questions and answers and reprimand counsel for questioning which the Court deems improper.  *See e.g.,* FED. R. EVID. 103 (court may strike testimony); 611 ("The court should exercise reasonable control over the mode and order of examining witnesses and presenting evidence so as to: (1) make those procedures effective for determining the truth; (2) avoid wasting time; and (3) protect witnesses from harassment or undue embarrassment.").  But, the Court has no role in fashioning rules for the mode and order of an Assistant United States Attorney's examination of a witness in an investigative grand jury setting, where the Assistant United States Attorney's role is arguably different.  *See Williams*, 504 U.S. at 50.  To this end, the Supreme Court has recognized that:

> Under the pressures and tensions of interrogation, it is not uncommon for the most earnest witnesses to give answers that are not entirely responsive. Sometimes the witness does not understand the question, or may in an excess of caution or apprehension read too much or too little into it.
>
> …
>
> It is the responsibility of the lawyer to probe; testimonial interrogation, and cross-examination in particular, is a probing, prying, pressing form of inquiry. If a witness evades, it is the lawyer's responsibility to recognize the evasion and to bring the witness back to the mark, to flush out the whole truth with the tools of adversary examination.

*Bronston v. United States*, 409 U.S. 352, 358-59 (1973).

Upon review of the grand jury transcript of Smith's testimony in its entirety, (Docket No. 154-11), the Court believes that AUSA Conway's examination of Smith did not rise to the level of prosecutorial misconduct.  In fact, the Court finds that AUSA Conway conducted appropriate cross examination of Smith on the issues of the filing of 1099 forms and whether Land America

had initiated termination proceedings. (*Id.* at 41-42; 47-48). The questioning regarding the 1099 forms merely referenced prior inconsistent statements Smith had made to the agents that he always filed 1099 forms in conjunction with the closing of real estate transactions and challenged Smith with the fact that the IRS had no record of him filing 1099 forms with any of the deals. (Docket Nos. 154-11 at 47-48; 251-7). In addition, the Land America probe referenced other evidence that the Government had obtained during its investigation, including an internal email from Watterson which explicitly states that individuals within Land America would decide whether Smith would be kept on as agent or not, plainly evidencing that proceedings had been initiated to determine if his contract would be terminated. (Docket Nos. 154-11 at 41-42; 191-1; 191-7). AUSA Conway likewise was well within his rights to interrupt Smith's non-responsive and lengthy answers in an effort to bring Smith "back to the mark" and "to flush out the whole truth," *Bronston*, 409 U.S. at 358-59, particularly in light of the fact that Smith and his counsel were explicitly advised by AUSA Conway about the methods of the examination in the emails prior to his appearance. (*See* Docket No. 196-1 ("If Mr. Smith wants to testify, he will have to respond to my questions and questions from the grand jury.")). The Court is also mindful of the fact that Smith is a seasoned lawyer, represented by able criminal defense counsel.

Despite same, this Court does not countenance AUSA Conway's repeated references to Smith's making "speeches" and his condescending remark about whether 1099 forms needed to be filed with the IRS pursuant to the "tax laws according to Mr. Smith." (*See e.g.*, Docket No. 154-11 at 26-27, 51-52, 62, 65). This Court cannot, however, conclude that such remarks were so inappropriate that they constitute acts of prosecutorial misconduct, individually or collectively. *See Martino*, 825 F.2d at 759-60. The alleged offensive comments simply are not of the same degree as those that the Third Circuit has held constituted prosecutorial misconduct,

such as: calling a suspect a "thief" and "racketeer"; implying that a witness was associated with organized crime; and/or suggesting that a witness could not appear and testify because he may be harmed by the suspects. *See e.g., Bruzgo*, 373 F.2d at 386; *Riccobene*, 451 F.2d at 587; *Serubo*, 604 F.2d at 818. AUSA Conway also did not imply that Smith committed unrelated offenses, advocate that the grand jury abandon its sworn oath, or suggest that the grand jury must return the indictment immediately, substantially influencing the length and quality of their deliberations. *See Breslin*, 916 F. Supp. at 446. At most, AUSA Conway's comments were inappropriate and similar statements made at trial would warrant the striking of the questioning and possibly a reprimand from the Court, rather than a more severe sanction such as an acquittal or mistrial. *See United States v. Brennan*, 326 F.3d 176, 182 (3d Cir. 2003) (quoting *United States v. Young*, 470 U.S. 1, 11 (1985)) ("a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial.").

Finally, the Court reiterates that Smith has not been prejudiced by the grand jury's finding of probable cause to indict him for the charges of wire fraud, bank fraud, conspiracy and failure to file his tax returns. *See Bank of Nova Scotia*, 487 U.S. at 255-56. The Court is not permitted to review the sufficiency of the evidence presented by the Government to the grand jury but it appears to the Court that Smith admitted many critical facts concerning the charges during his appearance which significantly narrowed the grand jury's inquiry to determining whether there was probable cause to conclude that he acted with the necessary intent to commit the crimes at issue. (*See* Docket No. 154-11). On these points, Smith stated that there was "no defense" to his failure to file his tax returns, acknowledged that he had the duty to file his tax

returns and his only explanation for failing to file was that he wanted to resolve his tax issues with the Government but was not willing to plead to fraud charges in order to have the tax matters concluded. (*Id.* at 11-14). As to the fraud and conspiracy counts, Smith admitted that: he closed the real estate transactions in dispute; issued checks to borrowers in specific amounts equal to the funds they needed to make down payments on the houses; the borrowers endorsed the checks and returned them to him at the closings; represented on the HUD-1 forms that borrowers had paid "cash" at the closings, without advising the lenders of the "gifts of equity" made by the sellers; and, never personally disclosed to lenders that down payments were not made during any of the transactions he closed. (*Id.* at 28, 47-62). Smith testified that he acted without the intent to defraud, relied on the broker's representation that the lenders were aware that "gifts of equity" were made in all of the deals and that he did not believe it was his role to communicate the "gifts of equity" to the lenders. (*Id.* at 56-58). At one point during his lengthy testimony, Smith even commented that "[e]ither you buy into the gift of equity, or you don't buy into the gift of equity," seemingly acknowledging that his defense that he relied on the broker to communicate the "gifts of equity" to the lender is the central issue in his case. (*Id.* at 74).

Again, the grand jury was not tasked with assessing Smith's guilt or innocence but only with evaluating whether "there is [an] adequate basis for bringing […] criminal charge[s]." *Williams*, 504 U.S. at 47. Having fully considered these matters, this Court cannot find that the grand jury's decision to indict Smith was substantially influenced by the actions of AUSA Conway during the examination. *See Bank of Nova Scotia*, 487 U.S. at 255-56. If he desires to exercise his right to trial, Smith will have the opportunity to present his case to a petit jury, which will be tasked with ultimately deciding whether the Government has proven his guilt beyond a reasonable doubt on all of the charges.

### 3. Conclusion

For these reasons, the Court denies Smith's Motion to Dismiss premised on alleged prosecutorial misconduct during the grand jury proceedings and further holds that an evidentiary hearing is not warranted to more fully develop the record on these issues.

### b. Alleged Prosecutorial Misconduct During District Court Proceedings

The Court next briefly addresses Smith's Motion to Dismiss the Superseding Indictment to the extent that he alleges that prosecutorial misconduct has occurred during proceedings before this Court based upon alleged Due Process violations. (Docket Nos. 154, 191, 251, 256). Once again, the Government argues that no such misconduct has occurred and that dismissal is not an appropriate remedy at this stage of the case. (Docket Nos. 180, 250, 257). The Court agrees with the Government that Smith has failed to meet his burden to demonstrate that the extreme sanction of dismissal of the Superseding Indictment is warranted based on the alleged conduct of AUSA Conway during these proceedings.

### 1. Legal Standard

It is well settled that dismissal of an indictment may only be ordered in narrow circumstances and upon a finding of willful prosecutorial misconduct which violates the Due Process clause and causes prejudice to the defendant. *Gov't of Virgin Islands v. Fahie*, 419 F.3d 249, 255 (3d Cir. 2005); *see also United States v. Lashley*, 524 F. App'x 843, 846 (3d Cir. 2013) *cert. denied*, 134 S. Ct. 307 (2013). Willful prosecutorial misconduct may be demonstrated through "a constitutional violation that results from a reckless disregard for a defendant's constitutional rights," or a pattern of constitutional violations showing recklessness on behalf of the prosecution. *Id.* at 255-56. The Court of Appeals has made clear that "the challenged conduct must be shocking, outrageous, and clearly intolerable … it is clear that this is an

extraordinary defense reserved for only the most egregious circumstances." *United States v. Nolan-Cooper*, 155 F.3d 221, 230-31 (3d Cir. 1998) (internal citations omitted). "[T]his principle is to be invoked only in the face of the most intolerable government conduct, not each time the government acts deceptively or participates in a crime that it is investigating." *United States v. Lakhani*, 480 F.3d 171, 180 (3d Cir. 2007) (internal citations omitted).

      2. <u>Discussion</u>

Smith claims that dismissal of the Superseding Indictment is warranted based on AUSA Conway's: failure to timely produce exculpatory *Brady* information to him; commission of other violations of the discovery rules through the Government's "document dump" of materials on the defense including the fact that the voluminous discovery is unorganized, unsorted, and unindexed in numerous boxes at the Secret Service's Office; alleged misrepresentations to the Court during these proceedings, such as, the factual circumstances surrounding the execution of search and seizure warrants at Smith's Law Office and file room and the alleged handling of privileged materials which were encountered during the search; and, purported lack of candor to the Court on the state of the law on certain legal issues which have been extensively litigated in these matters.   (Docket Nos. 152, 191, 251, 256).   In this Court's opinion, none of these claims are sufficient to demonstrate the type of egregious, willful misconduct which our Court of Appeals has deemed sufficient to warrant the extreme sanction of dismissal of the Superseding Indictment. *See Fahie*, 419 F.3d at 255-56.

The Court more fully describes the parties' alleged *Brady* dispute in connection with its discussion of Smith's Motion to Compel below.   *See* § V, *infra*.   However, the claimed *Brady* violations in this case are generally that Smith and his counsel located materials they deem to be exculpatory during their review of the third party discovery maintained by the Government at the

Secret Service's Office and their later evaluation of the Jencks Act and impeachment materials which were made available to them on the Government's stand-alone computer in the U.S. Attorney's Office. (Docket Nos. 251, 256). From these discoveries, Smith posits that Government counsel misunderstands his *Brady* obligations and that there must be additional *Brady* materials which have been withheld by the Government in the voluminous discovery materials. (*Id.*). The Government argues that the challenged documents do not constitute *Brady* materials and Smith has failed to establish prejudice because he has the challenged documents and/or access to them. (Docket Nos. 250, 257).

The law is firmly established that "[n]o denial of due process occurs if *Brady* material is disclosed to [a criminal defendant] in time for its effective use at trial." *United States v. Higgs*, 713 F.2d 39, 44 (3d Cir. 1983), *cert. denied*, 464 U.S. 1048 (1984). Further, "the government is not obliged under *Brady* to furnish a defendant with information which he already has or, with any reasonable diligence, he can obtain himself." *United States v. Starusko*, 729 F.2d 256, 262 (3d Cir. 1984) (internal quotation omitted). The Court of Appeals has also recognized that it is "unwise to infer the existence of *Brady* material based on speculation alone." *Ramos v. United States*, 27 F.3d 65, 71 (3d Cir. 1994); *see also United States v. Havey*, 227 F. App'x 150, 154 (3d Cir. 2007) (quoting same). Accordingly, this Court cannot dismiss an indictment on the mere possibility that Smith located exculpatory materials within the discovery produced by the Government and his speculation that he believes the Government has withheld additional exculpatory evidence.

In addition, as the Court commented at the motion hearing in this matter, Smith has had the alleged *Brady* information for many months (i.e., he has had the SAR and the Land America emails since July of 2013 and access to the witness statements and grand jury testimony as of

October of 2013),[28] and this Court has not yet even established a deadline for the Government to disclose all *Brady* material to the defense or set a trial date. (Docket No. 248 at 6). As such, there is no established *Brady* violation on this record and certainly not an egregious violation which would warrant dismissal of the Superseding Indictment. *See Fahie*, 419 F.3d at 255.

The Court next holds that Smith's complaints about the form of the discovery do not warrant dismissal of the Superseding Indictment or demonstrate "egregious misconduct" by the Government. *Id.* Again, there is no demonstrated prejudice to Smith given the early stage of these proceedings and his failure to offer anything beyond his bald assertions that the form of the discovery has thwarted his ability to present a defense at trial. (*See* Docket Nos. 251, 257). It is also compelling that none of Smith's codefendants, Ratchkauskas, Kubini and Svaranovic, have complained that the state of the same discovery materials is even deficient.[29] Indeed, counsel for each of these Defendants asserted at the Motion Hearing that they were satisfied with the Government's production of discovery. (Docket No. 248 at 8-9). As such, the Court cannot find egregious government misconduct on this record.[30]

Finally, the issues pertaining to whether AUSA Conway has misrepresented facts and/or the law to the Court in the context of the instant motions practice are woefully insufficient to demonstrate prosecutorial misconduct or a violation of Smith's due process rights. (Docket Nos. 251; 256). The Court has carefully considered all of the parties' arguments, and the evidence

---

[28]     Smith also has the National City SAR and relevant attachments concerning the activity in his escrow account which he has submitted to the Court for its *in camera* review. (Docket No. 259).

[29]     The Court notes that none of the Defendants in the related cases claimed that the state of discovery constituted prosecutorial misconduct. In any event, this Court is aware that issues regarding the state of discovery in complex matters has engendered disputes among the U.S. Attorney's Office, the Public Defender's Office and the private defense bar and recognizes that the costs attendant to the production and review of discovery in such matters can be exceptional. As a consequence, Chief Judge Conti has commissioned a court subcommittee chaired by the undersigned Judge to explore a potential resolution of these issues in the most fair and cost effective manner and Magistrate Judge Cynthia Reed Eddy has been tasked with heading those efforts. The Court is aware that Magistrate Judge Eddy has convened several conferences with representatives from the U.S. Attorney's Office and the Public Defender's Office in order to achieve these mutual goals.

[30]     The Court further notes again that Smith is an attorney. He should be able to work with his counsel to review the necessary documents.

which has been presented and arrived at its rulings based on its evaluation of the relevant precedent cited above. Further, the one issue where the Court believes that some clarification from the Government is needed concerns the alleged privileged documents encountered by AUSA Wilson during the searches of Smith's Law Office and file room and an explanation of the hand written post-it notes which to this point has not been produced. However, as the Court discusses below, the appropriate remedy which results from the inconsistent information provided by the Government is simply to order the Government to produce any such materials rather than to order the extreme sanction of dismissal. Accordingly, there is no basis to dismiss the Superseding Indictment.

3. Conclusion

For these reasons, the Court rejects Smith's contention that the Superseding Indictment should be dismissed based on alleged prosecutorial misconduct committed during the proceedings before this Court.

c. Conclusion

Based on the foregoing, Smith's Motion to Dismiss [153] is DENIED.

IV. MOTION TO SEVER COUNTS

The next issue for the Court to resolve is whether the failure to file tax charges should be severed from the fraud charges. Smith claims that the tax and fraud charges are unrelated and should be tried separately because a joint trial would cause him prejudice. (Docket Nos. 133-134). The Government responds with a detailed proffer setting forth its position as to why the tax charges are related to the fraud counts, i.e., that the tax and fraud charges relate to the same time period and that Smith's failure to file his tax returns, along with evidence of his poor financial condition, provide a motive for his alleged commission of the fraud offenses. (Docket

No. 180).  At the motion hearing, Smith's counsel argued that the information provided in the Government's responsive brief was insufficient because it was not presented in the Superseding Indictment, a Bill of Particulars or a formal proffer.  (Docket No. 248 at 10-11).  However, Smith's counsel largely conceded at oral argument that the facts asserted by the Government in its response would likely suffice to meet the Third Circuit's standard for a joint trial of the charges.[31]  (*Id.* at 11). Having fully considered these matters, the Court will deny Smith's motion to sever because his arguments elevate form over substance and the Government's proffer, along with the substantial evidence the Court has considered as to Smith's Motion to Dismiss and Motion to Compel, clearly demonstrate that joinder of the tax and fraud charges for trial is appropriate in this case and that any prejudice to Smith can be eliminated with an appropriate limiting instruction to the jury to guide their evaluation of such evidence.

    *a.  Legal Standard*

Rule 8(a) sets forth that "[t]he indictment or information may charge a defendant in separate counts with 2 or more offenses if the offenses charged—whether felonies or misdemeanors or both—are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." FED. R. CRIM. P. 8(a). There must be a "transactional nexus" between the counts for them to be properly

---

[31]    Specifically, Defense counsel stated that:

> We concede, Your Honor, that if the government were to formally proffer evidence or attach a bill of particulars to this superseding indictment that make the allegations of evidence that they refer to in their argument in the brief, that the case law of this circuit would say that under the Rule 8 standard, joinder might be appropriate of those tax charges to those fraud charges, but they have not yet done that, Your Honor.
>
>     …
>
> And, Judge, again, we concede that if they are able to proffer that kind of a nexus in an evidentiary way, a bill of particulars or some kind of formal way, that they can join under at least Rule 8, but they have not yet done that.

(Docket No. 248 at 11, 13).

joined. *United States v. Riley*, 621 F.3d 312, 334 (3d Cir. 2010). There is a preference in the federal system for joint trials of defendants who are indicted together and for charges set forth in the same indictment. *Zafiro*, 506 U.S. at 537.

Under Rule 14(a), severance of charges may be ordered by the Court if "the joinder of offenses or defendants in an indictment … appears to prejudice a defendant." FED. R. CRIM. P. 14. "Severance should only be granted 'if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence.'" *Riley*, 621 F.3d at 335 (citing *Zafiro*, 506 U.S. at 539. "A defendant must 'pinpoint clear and substantial prejudice resulting in an unfair trial.'" *Riley*, 621 F.3d at 335 (citing *United States v. McGlory*, 968 F.2d 309, 340 (3d Cir. 1992). It is not enough to argue that the jury is unable to compartmentalize a limiting instruction regarding the evidence because juries "are presumed to follow their instruction." *Zafiro*, 506 U.S. at 540-541; *see also Riley*, 621 F.3d at 335 (strict instructions to jury that it "must separately consider the evidence against each defendant on each offense charged, and … must return a separate verdict for each defendant on each offense" removed serious risk of compromising a specific trial right).

b. *Discussion*

The United States Court of Appeals for the Third Circuit has recognized that "joinder of tax and non-tax claims is not unusual," and that "[i]t is appropriate to combine the tax charges against one defendant with fraud charges against that same defendant and other codefendants if the tax [ … ] charges arise directly out of the common illicit enterprise." *Riley*, 621 F.3d at 334 (internal quotations omitted). Here, the tax and fraud charges against Smith are appropriately joined because Smith failed to file his tax returns for the tax periods of 2007, 2008, and 2009,

and the Government alleges that he engaged in the wire and bank fraud conspiracy and schemes during 2007 and 2008. (Docket Nos. 92; 180; 248 at 14-18). In addition, the Government contends that Smith's motive for committing both the fraud and tax crimes was his poor financial condition during 2006-2009. (Docket Nos. 180; 248 at 14-18). For support, the Government points to evidence uncovered during the Land America audit of Smith's closing files and escrow account which it argues shows that Smith allegedly embezzled money (approximately $93,000) from the escrow account and deposited such funds into his operating account, which he used to make his payroll around this time. (*Id.*). The Government further contends that the money from the operating account was later deposited into Smith's personal account and used to pay his personal mortgage obligations. (Docket Nos. 180; 248 at 18). As part of its tax case, the Government will seek to prove that Smith willfully failed to file his tax returns so as to avoid further criminal liability by filing false tax returns which may have resulted if he failed to disclose the income generated by his alleged embezzlement of the funds from his escrow account in 2007. (*Id.*). Such allegations present a "transactional nexus" between the fraud and tax charges and Smith's failure to file his tax returns in the subsequent tax periods of 2008 and 2009 are sufficiently related to these allegations to support joinder. *See Riley*, 621 F.3d at 334. Accordingly, the Court agrees with the Government that the charges are properly joined for trial.

With respect to prejudice, Smith has not pointed to any specific trial right which will be compromised by a joint trial of the tax and fraud charges. (Docket Nos. 134; 248 at 14). Instead, Smith simply claims that the jury will be practically unable to evaluate and compartmentalize the evidence for the tax and fraud counts, a showing which his counsel admits runs directly counter to Third Circuit precedent. (*Id.*). But, juries "are presumed to follow their instructions," *see Riley*, 621 F.3d at 335, and after consulting with the parties, the Court will

provide the jury with appropriate instructions as to how they should evaluate all of the evidence on the various charges in this case and to arrive at their verdict.

### c. Conclusion

For all of these reasons, Smith's Motion to Sever [133] is DENIED.

## V. MOTION TO COMPEL

The Court now addresses the remaining issues as to Smith's Motion to Compel. (Docket No. 151). As filed, Smith's Motion to Compel sought an order compelling the Government to produce a significant amount of information under various caselaw and statutory authority. (*Id.*). At the motion hearing, the Court described its typical trial procedures and deadlines it intends to set forth in its Pretrial Order, including setting deadlines for the production of Rule 404(b), *Brady* materials, *Giglio* materials and impeachment evidence. (Docket No. 248 at 6). Upon consideration of same, Smith's counsel agreed that the Court's procedures were acceptable and significantly limited the materials he now seeks. (Docket No. 248 at 54).[32] In short, the remaining matters for the Court to address are Smith's Motion: (1) to set a deadline in its Pretrial Order for the Government to produce to him all *Brady* evidence consistent with his definition that any evidence as to the "gifts of equity" involved in the instant real estate transaction constitutes *Brady* evidence; (2) to order the Government to produce copies of SARs generated by lenders in connection with any of the properties involved in the instant case; and (3) to compel the Government to produce any privileged documents seized from the search of his Law Office

---

[32] Defense counsel stated the following:

> So, to come full circle, Your Honor, at the beginning of this hearing, I believe you said your traditional practice is to issue a pretrial order that requires production of Brady by a date certain. Frankly, that would satisfy us in response to the motion to compel, at least the Brady portion, so long as we understood that Mr. Conway and the government were really understanding what Brady is.

(Docket No. 248 at 54).

and file room, any privilege log and/or any "Master List." (Docket Nos. 151; 248; 247). The Government responds that the "gifts of equity" information is not exculpatory but actually highly incriminating to Smith; that SARs are properly withheld from criminal discovery by law enforcement under the applicable regulations; and that any potentially privileged materials uncovered from the searches were simply left at Smith's Law Office and no privilege log or Master List was ever created. (Docket Nos. 180; 248; 245).

Smith's first and second requests as described above are related because he has claimed throughout these proceedings that the JP Morgan Chase SAR constitutes *Brady* material. The Court has already decided that the Government has not committed any *Brady* violations because Smith cannot demonstrate prejudice at this early stage of the proceedings, i.e., the Court has neither set a deadline for the disclosure of *Brady* materials nor set the matter for trial. *See United States v. Starusko*, 729 F.2d 256, 262 (3d Cir. 1984) ("There can be no violation of *Brady* unless the government's non-disclosure infringes the defendant's fair trial right."). In essence, the Government still has the opportunity to cure any errors in its withholding of evidence which is later deemed to be within the scope of *Brady* to this point by simply producing the materials to the defense in sufficient time for Smith (and his codefendants) to make use of the information at trial. *See id.* ("No denial of due process occurs if *Brady* material is disclosed in time for its effective use at trial."). For the same reasons, Smith's request for the Court to specifically define *Brady* material in this case remains premature and could be denied, without prejudice. However, as the issues of the scope of *Brady* evidence have now been raised twice by the defense (including the earlier subpoena litigation involving JP Morgan Chase), the Court will provide some preliminary guidance to the parties on its view of the scope of *Brady* material in this case based on the information that has been presented to date.

During these proceedings, Smith has referenced two separate forms of alleged *Brady* evidence. He first raised the JP Morgan Chase SAR, which he deemed to constitute *Brady* evidence as to the elements of materiality on the wire and bank fraud charges because the SAR states that JP Morgan Chase became aware of a scheme to defraud involving Riverside Mortgage, denied a loan application for a borrower seeking to purchase 1135 Pennsylvania Avenue and reported such activity. (*See* Docket No. 218). Smith next argued that the memoranda of interviews of Rochelle Roscoe and James Steiner constitute *Brady* materials, rather than Jencks Act or *Giglio* impeachment materials because the agents reported that both Roscoe and Steiner told agents during interviews that the "gifts of equity" were communicated to lenders, which Smith believes is relevant to his defense that he did not act with intent to defraud in this case. (Docket Nos. 251, 256). The Government continues to maintain its position that neither category of evidence is exculpatory to Smith or subject to immediate disclosure under *Brady*. (Docket Nos. 250, 257).

This Court "has general discretionary authority to order the pretrial disclosure of *Brady* material 'to ensure the effective administration of the criminal justice system.'" *Starusko*, 729 F.2d at 261 (quoting *Higgs*, 713 F.2d at 44, n.6). "Under *Brady*, the government has an obligation to disclose all evidence that is favorable to the accused and material either to guilt or punishment." *United States v. Suastegui*, 529 F. App'x 129, 131-32 (3d Cir. 2013), *cert. denied*, 134 S. Ct. 353 (2013). "Evidence is 'material' if there is a reasonable probability that, 'had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *United States v. Maury*, 695 F.3d 227, 249 (3d Cir. 2012) *cert. denied*, 133 S. Ct. 1600 (2013) (quotation omitted). "Material evidence can include evidence that may be used to impeach a witness." *United States v. Friedman*, 658 F.3d 342, 358 (3d Cir. 2011) (citation omitted).

However, "it is difficult to analyze, prior to trial, whether potential impeachment evidence falls within *Brady* without knowing what role a certain witness will play in the government's case." *Starusko*, 729 F.2d at 261.

The Court first evaluates the materiality of the impeachment evidence from Roscoe and Steiner, which has been made available to Smith (and his codefendants) on the stand-alone computer in the U.S. Attorney's Office. (*See* Docket Nos. 251, 256). At this point of the case, the roles of both Roscoe and Steiner are clear because both have pled guilty to participating in the instant mortgage fraud scheme and will testify as key prosecution witnesses at trial consistent with their admissions that they acted with intent to defraud in conjunction with the real estate transactions. *See Starusko*, 729 F.2d at 260 ("[A]s a key prosecution witness, his credibility may well be determinative of guilt or innocence."). As the Court has already alluded to above, Smith's defense in this case – which he has consistently and repeatedly communicated to Government counsel and law enforcement agents starting at their initial meetings in February of 2011 – is that he did not act with intent to defraud, was unaware of the fraud and was told that the broker (Roscoe and Riverside) advised the lenders of the "gifts of equity." Intent to defraud is explained to jurors as a "means to act knowingly and with the intention or the purpose to deceive or to cheat." *See* Third Circuit Model Criminal Jury Instruction § 6.18.1341-4. The Government will also undoubtedly request that the jury be charged with a willful blindness instruction, through which the Government may prove that Smith acted with the intent to defraud through evidence that he: "actually, subjectively believed that there was a high probability" that the information he supplied to lenders was inaccurate and "consciously took deliberate actions to avoid learning about the existence" of such inaccuracies. *See* Third Circuit Model Criminal Jury Instruction § 5.03; *see also United States v. Tai*, 2014 WL 1687814, at *3-4, --- F.3d ---- (3d Cir.

Apr. 30, 2014) (expressly approving Third Circuit Model Jury Instruction § 5.03 on willful blindness).

Having fully considered these matters, the Court agrees with Smith that the prior statements to the agents by Roscoe and Steiner, which are consistent with Smith's position that he was advised that the lenders were made aware of the "gifts of equity," are material evidence on the central issue of whether he acted with intent to defraud in this case. In this Court's opinion, this information "is particularly solid impeachment evidence because it goes against the thrust of the prosecution's case." *Starusko*, 729 F.2d at 261. Although the Government proffers that Roscoe and Steiner later retracted those statements, the fact that the prior statements may be used to impeach the witnesses does not alter the character of the evidence under *Brady* if it is material to the determination of defendant's guilt or innocence at trial, as is the case here. *See Friedman*, 658 F.3d at 358. To the extent that Smith's counsel's summary of the information in the agents' memoranda is accurate, which the Court has no reason to doubt, the same is the type of information which should be produced under *Brady* in accordance with the Court's deadline for same which will be set in its Pretrial Order.

The next issue is whether the information contained in the JP Morgan Chase SAR is "material" under *Brady* as to whether Smith agreed to and/or participated in a scheme or artifice to defraud under the wire and bank fraud statutes and related conspiracy charges. Both fraud statutes require a "scheme or artifice to defraud" that is achieved "by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. §§ 1343, 1344. The Government must prove beyond a reasonable doubt that the false statement communicated during the scheme was material. *See also Neder v. United States*, 527 U.S. 1, 25 (1999) ("Materiality of falsehood is an element of the federal mail fraud, wire fraud, and bank fraud statutes."). "To be material,

the statement must have a natural tendency to influence, or [be] capable of influencing, the decision making body to which it is addressed." *United States v. McBane*, 433 F.3d 344, 350 (3d Cir. 2005) (internal citations omitted). "It is also clear that a statement may be material even if no agency actually relied on the statement in making a decision." *Id.* "In other words, […] the relevant inquiry [is] whether the falsehood was of a type that one would normally predict would influence the given decisionmaking body." *Id.* at 351.

Although the issues with the JP Morgan Chase SAR were previously argued in the subpoena litigation, they were not decided by the Court at that time. (Docket No. 213). Now that the Court has had an opportunity to further study the matter, the Court does not believe that the SAR which was discovered by Smith and his counsel is "material" to Smith's guilt or innocence under *Brady*. The Government's recitation of the law is entirely correct that its burden at trial is to prove beyond a reasonable doubt that Smith joined a conspiracy to commit bank and/or wire fraud and/or participated in the schemes to defraud. The relevant and critical factors at trial will be the Government's proof of Smith's intent to defraud the lenders, and whether the fraud schemes contained material falsehoods which were "reasonably calculated to deceive persons [i.e., lenders] of ordinary prudence and comprehension." Third Circuit Model Criminal Jury Instruction § 6.18.1341-1.

Smith stretches the facts contained in the JP Morgan Chase SAR beyond their ordinary reach in his advocacy that JP Morgan Chase could not have been defrauded in the transactions he closed after the SAR was prepared because it was fully aware of the scheme to defraud. (Docket Nos. 251, 256). As the Government argues, the SAR simply does not state that much. (Docket Nos. 250, 257). Instead, it only suggests that JP Morgan Chase denied a loan application because the appraisal prepared by Joel Reck overstated the value of the property at 1135

Pennsylvania Avenue, inconsistent information was provided about the sellers in the sales agreement and other documents in the loan file and the SAR investigator was concerned that there may be a "house flipping" scheme involving Riverside Mortgage. (Docket No. 191-9). The SAR does not mention who the closing attorney was on the cancelled deal and there is no mention of Smith on the SAR. (*Id.*). Given same, such evidence is not material to the determination of whether Smith acted with the intent to defraud a few months later when he closed a "gift of equity" deal for the same property involving Kubini and Ratchkauskas as sellers, a different buyer (William Brown), supported with an appraisal produced by Svranovic, and brokered by Riverside. (Docket No. 154-7). The Court reserves any further ruling as to whether the JP Morgan SAR is admissible at trial as direct evidence or can be used for impeachment purposes.

The Court now moves on to the parties' disputes surrounding the discoverability of SARs generally. (Docket Nos. 245; 247). The Government maintains that the SARs are properly withheld from discovery as such documents are not otherwise discoverable under Rule 16, *Brady*, *Giglio* or the Jencks Act and that SARs are also protected from disclosure under the pertinent statutes, 31 U.S.C. § 5318 and regulations, 12 C.F.R. § 563.180. (Docket No. 245). The Government continues that in the event that the SARs contain *Brady* information, the more persuasive caselaw demonstrates that the *Brady* information should be reduced to writing by the Government and forwarded to the defendant rather than producing the SARs themselves. (*Id.*). Although the Government has taken this position, it has not sought to "claw-back" the JP Morgan Chase SAR and/or the National City SAR that Smith has already obtained through discovery, but points to both as further evidence that it has met its discovery obligations in this case. (Docket No. 260). Smith opposes the Government's blanket position that SARs can be

withheld from criminal discovery.  (Docket No. 247).

In an effort to resolve these disputes, the Court ordered the Government to produce the SARs *in camera*.  (Docket No. 258).  The Court has conducted its review of same and agrees with the Government's position that the SARs were properly withheld in this case.  Further, the Court's review demonstrates that the Government has already produced to Smith the only contemporaneous SAR in its possession involving any relevant transactions for the properties at issue in this case during the timeframe of the conspiracies and fraud schemes as well as the only SAR related to his escrow account. In light of the fact that the remaining SARs are not relevant, and contain no *Brady* information as to Smith which has not yet been produced, any discussion of the applicability of the pertinent statutes and regulations would be purely academic. Accordingly, Smith's Motion to Compel will be denied to the extent that he seeks production of the additional SARs, as moot.

The final issue for disposition by the Court is the outstanding matters related to the searches of Smith's Law Office and file room.  (Docket Nos. 250; 251; 256; 257).  The Court has already determined that the facts related to the searches and seizures are not sufficient to demonstrate prosecutorial misconduct warranting dismissal of the Superseding Indictment but the factual issues remain unresolved because AUSA Wilson did not testify at the motion hearing, although he was present and ready to do so, if called as a witness.  *See* § IV, *supra*.

In support of his position seeking the documents, Smith points to handwritten post-it notes which he asserts were produced by AUSA Wilson, who headed the privilege review, and suggest that documents were pulled during the searches, with corresponding references to a "Master List."  (Docket Nos. 251, 256).  Smith also argues that he cannot locate email correspondence and/or facsimile communications between him and Rochelle Roscoe which

precipitated the transmission of the Roscoe Letter to Watterson and believes that these documents may have been seized by the Government. (*Id.*). The Government responds that no privileged materials were seized, no privilege log was produced and there is no "Master List." (Docket Nos. 250, 257).

There is no legal dispute between the parties that the documents, if seized by the Government from Smith's Law Office or file room, should be made available for inspection by Smith under Rule 16. (Docket Nos. 250; 251; 256; 257). The only remaining issues are purely factual and remain outstanding solely because the parties did not present AUSA Wilson's testimony at the hearing to clarify what occurred during the searches. (*Id.*). It also appears that resolution of such facts by the Court would have no bearing on any matters presently in dispute between the parties but further clarification from the Government may be helpful to Smith and his counsel in their trial preparation. Because of same, the Court will order the Government to produce to Smith any privileged materials seized during the searches, any privilege log detailing same and, any "Master List." To the extent that the Government continues to take the position that no such documents, privilege logs or "Master List" exists, the Government shall produce to Smith an affidavit by AUSA Wilson describing what occurred during his privilege review and also explaining the information handwritten on the post-it notes. As AUSA Wilson was prepared to testify at the December, 2013 Hearing, the Court believes that he should be just as willing to provide such an affidavit in order to finally resolve these disputes between the parties and that this procedure is in the interests of judicial economy. Therefore, the Court will reserve its ruling on this final aspect of the Motion to Compel until the affidavit is produced and any objections to same are decided by the Court.

VI. CONCLUSION

Based on the foregoing, Smith's Motion to Dismiss [153] and Motion to Sever [133] are DENIED. Smith's Motion to Compel [151] is GRANTED, IN PART, and DENIED, IN PART, and the Court reserves ruling on the issue outlined above. An appropriate Order follows.

*s/Nora Barry Fischer*
Nora Barry Fischer
U.S. District Judge

Date: May 13, 2014

cc/ecf: All counsel of record.

Arthur Smith c/o Stephen Stallings, Esquire