**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| vs. | ) | Criminal No. 11-14 |
| | ) | Judge Nora Barry Fischer |
| GEORGE KUBINI, DOV | ) | |
| RATCHKAUSKAS, SANDRA | ) | |
| SVARANOVIC, AND ARTHUR SMITH, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION**

I.  Introduction/Background

This complex and contentious case involving charges of conspiracy, wire fraud, bank fraud and tax offenses once again returns to the Court with numerous disputes between the parties, most of which relate to the Court's Pretrial Order entered on September 18, 2014. (Docket Nos. 284-294; 298-303).  In short, the Government seeks reconsideration of several aspects of the Court's Pretrial Order, which was entered after a status conference held on August 22, 2014 and provided to counsel, in draft form, thirty-one days before its motions were filed. (Docket Nos. 284, 285).  Through these motions, the Government seeks to preclude the Defendants from presenting any exhibits at the trial scheduled to commence on March 2, 2015, and to have Defendants produce impeachment evidence in advance of trial, among other changes.  (*Id.*).  Aside from an uncontroversial point, Defendants contest these motions.  (Docket Nos. 286-88).  Further, despite the Court's Order instructing the parties to meet and confer on the contested authenticity of the Government's exhibits and file a Joint Status Report by November 21, 2014, the parties provided the Court with competing Status Reports, advising that they have made little progress toward reaching any meaningful agreements on the authenticity of the Government's voluminous exhibits, now described as nearly **5,000 exhibits**, most of which the

Court expects are multiple pages. (Docket Nos. 302, 303). On the last matter, Defendant Smith and the Government have presented a related dispute about the Government's disclosure of certain emails on its computer terminal in the U.S. Attorney's Office which the Government claims are privileged and were inadvertently produced. (Docket Nos. 293-94, 297-98, 301).

After considering all of the parties' submissions, the Court holds that the Government's Motion to Preclude Admission of Defense Exhibits Because of Failure to Comply With Reciprocal Discovery Obligations (Docket No. 284) and Motion for Clarification of Pretrial Order (Docket No. 285) are essentially motions for reconsideration and the Government's Motion to Preclude [284] is denied, and its Motion for Clarification [285] is granted, in part, and denied, in part. The Court will order the parties to return to the table in an effort to conduct meaningful negotiations on the authenticity of the exhibits; otherwise, the Court may need to employ different case management techniques noted below. Finally, with respect to the email disclosure by the Government, the Court concurs with the Government that the materials are non-discoverable internal work product, were produced inadvertently and will order Defendant Smith and his counsel to destroy their notes from the viewing session and to file affidavits with the Court certifying that such destruction has occurred.

II.  Government's Motions (Docket Nos. 284 and 285)

The Court first turns to the Government's Motions filed at Docket Nos. 284 and 285, which the Court believes are properly construed as motions for reconsideration of certain deadlines and directives set forth in the Court's Pretrial Order, including: (1) the deadline for Defendant's production of exhibits to the Government by February 2, 2015; (2) to define the scope of the term "exhibits" in the Order, identifying the type of exhibits needed to be produced by Defendants as of that deadline; and (3) the Government's deadline for submission of its hard

copy exhibits to the Court and its request that it be permitted to maintain the exhibits throughout trial. (Docket Nos. 284, 285). By separate motion, the Government further seeks to preclude Defendants from presenting any exhibits that were not produced as reciprocal discovery or to set a deadline for reciprocal discovery. (*Id.*). In response, Defendants concede point (3) noted above but contest all other matters. (Docket Nos. 286, 288). As (3) is uncontested, the Government's Motion for Clarification is granted on that point. But, the Court will deny the remainder of the Government's requests because it does not believe that reconsideration of the other aspects of the Court's Pretrial Order is warranted.

The purpose of a motion for reconsideration "is to correct manifest errors of law or fact or to present newly discovered evidence." *Kabacinski v. Bostrom Seating, Inc.*, 98 F.App'x 78, 81 (3d Cir. 2004) (quoting *Harsco Corp. v. Zlotnicki*, 779 F.2d 906, 909 (3d Cir. 1985)). Because "federal courts have a strong interest in the finality of judgments," *United States v. Hoey*, Cr. No. 09-200, 2011 WL 748152, at *2 (W.D.Pa. Feb. 15, 2011) (citation omitted), the standard that must be met to prevail on a motion for reconsideration is high, *see Berry v. Jacobs IMC, LLC*, 99 F. App'x 405, 410 (3d Cir. 2004).

The Court may grant a motion for reconsideration if the moving party shows: (1) an intervening change in the controlling law; (2) the availability of new evidence which was not available when the court issued its order; or (3) the need to correct a clear error of law or fact or to prevent a manifest injustice. *United States v. Banks*, Crim No. 03-245, 2008 WL 5429620, at *1 (W.D.Pa. Dec. 31, 2008) (citing *Max's Seafood Café by Lou-Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999)). Motions for reconsideration are not a tool to re-litigate and reargue issues which have already been considered and disposed of by the Court, *see Hoey*, 2011 WL 748152, at *2 (citation omitted), or for addressing arguments that a party should have raised

earlier, *see United States v. Dupree*, 617 F.3d 724, 732-33 (3d Cir. 2010) (quotations omitted). Rather, such a motion is appropriate only where the court misunderstood a party or where there has been a significant change in law or facts since the Court originally ruled on that issue. *Hoey*, 2011 WL 748152, at *2. Finally, the relevant legal standards must be read in conjunction with this Court's Practices and Procedures, which provides that "any motions for reconsideration shall be filed within seven (7) days." *See Practices and Procedures of Judge Nora Barry Fischer*, § II.M., *available at:* http://www.pawd.uscourts.gov/_Documents/Judge/fischer_pp.pdf (effective Feb. 5, 2013).

At the outset, it is the Court's belief that all of the Government's remaining requests should have been raised at the Status Conference and/or at some point during the thirty-one days that all counsel had the draft Pretrial Order before it was formally issued. *See Dupree*, 617 F.3d at 33. Motions for reconsideration are not to be used as vehicles "for addressing arguments that a party should have raised earlier" and likewise do not "empower litigants ... to raise their arguments, piece by piece." *Dupree*, 617 F.3d at 732 (quotations omitted). The procedures utilized by the Court to establish the Pretrial Order issued on September 18, 2014 included: soliciting input from counsel via email on August 18, 2014 prior to the Status Conference; convening a status conference on August 22, 2014 during which the Court reviewed the entire Pretrial Order with counsel; and circulating the draft Pretrial Order via email after the conclusion of the conference. (Docket Nos. 273, 274). Simply put, these procedures were designed to afford the parties and their attorneys with a full and fair opportunity to provide input to the Court regarding case management for what appears will be a long and contentious trial and also to give

everyone an opportunity to understand the Court's expectations of counsel and the parties throughout these proceedings.[1]

Further, it appears to the Court that the Government has styled its Motions as seeking "changes" or "clarification" of the Pretrial Order because its arguments are not sufficient to meet the high burden necessary to demonstrate that reconsideration is warranted. *See Berry*, 99 F. App'x at 410. To this end, the Government has not set forth: any changes in the controlling law since the Court entered its Order; any new evidence which was not previously available; or, any clear errors of fact or law in the Court's Order. (*See* Docket Nos. 284, 285). Instead, the Government relies on a series of non-binding, District Court decisions from outside this Circuit for legal support; repeatedly cites the need for changes based on unspecified "experiences" its counsel has had in prior cases;[2] and points to no actual prejudice which may be sustained by the Government without the requested changes or clarifications. (*Id.*). With that background, the Court turns to the merits of the Government's arguments.

The first issue is reciprocal discovery. To the extent that the Government argues that the Court should preclude four criminal defendants charged with serious felony offenses from presenting any exhibits at trial *months* before the scheduled trial date of March 2, 2015, such motion is clearly denied. No authority has been presented to the Court supporting such an Order.

---

[1]  This is also the fourth time that the Assistant United States Attorney has been before this Court at a similar stage of proceedings and he should be well familiar with the Court's Pretrial Order and trial procedures. *See United States v. Slane*, Crim. No. 11-81; *United States v. Gardner*, Crim. No. 09-180; and *United States v. Moreno*, Crim. No. 10-117. As far as the Court can recall, none of the present defense attorneys have participated as lead trial counsel in a trial before the undersigned, although they have received similar Pretrial Orders in other matters. *See e.g.*, *United States v. Chuong*, Crim. No. 12-81 (Attorney Greenfield); *United States v. Allie*, Crim. No. 12-196 (Attorney Stewart).

[2]  Defendant Smith, through his counsel, similarly makes such assertions throughout the briefs he has filed on his client's behalf. Although unstated, presumably both attorneys are referring to *United States v. Lignelli*, Crim. No. 11-234, which was not tried by this Court. Counsel should not have to be reminded that this is a court of law, where justice is paramount. It not an appropriate forum for counsel to litigate personal grudges and engage in *ad hominem* attacks, through briefing filed with the Court, at oral argument, during proceedings or otherwise. *See Practices and Procedures of Judge Nora Barry Fischer*, § I.E.21 "Conduct of Attorneys", *available at:* http://www.pawd.uscourts.gov/ Documents/Judge/fischer_pp.pdf (effective 2/5/13).

(*See* Docket Nos. 284, 285). The law is well established that the appropriate sanctions for proven violations of Rule 16, if any, are discretionary matters for the Court such that violations may be excused for "good cause." Indeed, the severe sanctions of striking or precluding evidence should only result upon a showing of prejudice to the opposing party. *See e.g.*, *United States v. Jones*, 503 F. App'x 174, 178 (3d Cir. 2012) (quoting *United States v. Lopez*, 271 F.3d 472, 484 (3d Cir. 2001)) ("However, these sanctions are discretionary; 'Rule[16] does not require a district court to do anything.'"); *United States v. Lee*, 573 F.3d 155, 161 (3d Cir. 2009) ("In determining an appropriate remedy [for a Rule 16 violation], a district court should consider the reasons for the party's delay in producing the materials, including whether it acted intentionally or in bad faith, and the degree of prejudice to the opposing party."); *United States v. Rodgers*, No. 2:12-CR-162, 2014 WL 3735585, at *4 (W.D. Pa. July 28, 2014) (McVerry, J.) ("Here, since the trial has been continued until September at Defendants' request, Porter's counsel will have more than enough time to incorporate the alleged post-arrest statements into his trial strategy—notwithstanding the government's delay."). Like the Court's previous holding that there was no prejudice to Defendant Smith by the Government's failure to make full pretrial *Brady* disclosures to him on the "gift of equity" issue, (Docket No. 263), there is simply no prejudice to the Government at this time which would support an Order precluding Defendants from presenting exhibits at trial.

The next issue is whether the Court should establish a deadline for Defendants to make reciprocal discovery available to the Government in advance of the Court's February 2, 2015 deadline for the exchange of exhibits. (Docket No. 284). The Court declines to do so for a host of reasons. Again, until filing the instant motions, the Government never asked for a deadline; hence, there is no deadline for reciprocal discovery in the Court's December, 2, 2013 Order.

(*See* Docket No. 248). There is also no companion deadline set for the Government to produce its discovery to Defendants. (*See Docket Report*). Further, while the Government has made significant amounts of discovery available to Defendants, including producing exhibit lists and nearly 5,000 actual, marked exhibits, and its open file production of voluminous evidence at the U.S. Secret Service Office, it continues to state that more supplementation is forthcoming. (Docket Nos. 284, 285, 302). Additionally, the Court has now established a deadline for the parties to mark and exchange exhibits by February 2, 2015, one month before trial. (Docket No. 283). Thus, all exhibits are due to the respective opponent(s) by that deadline. Failure to abide by such deadline by the Government or the Defendants would necessarily result in the Court having to evaluate any independent objection to any specific evidence not timely disclosed under the legal principles articulated above. Beyond setting forth the applicable legal standard, it would be both impractical and imprudent for the Court to issue a pretrial Order providing essentially an "advisory opinion" of how it will evaluate whether any untimely disclosures or production of trial exhibits will be stricken, or not, as the facts underlying such determination are simply unknown at this juncture. *See Burkey v. Murberry*, 556 F.3d 142, 149 (3d Cir. 2009) (recognizing that a "District Court may not render an advisory opinion").

Moreover, Defendants, through their respective counsel, have all indicated that they intend to comply with their discovery obligations under Rule 16 but have been spending the balance of their time reviewing the Government's voluminous disclosures to them. (Docket Nos. 286, 288). This is not a hollow position as the Government's evidence includes nearly 5,000 marked exhibits, as selected from its much more voluminous production at the U.S. Secret Service Office, and its Jencks Materials, available for review at the U.S. Attorney's Office on the stand-alone computer. As is explained in more detail below, the Government has also demanded

that Defendants now review the exhibits it has produced to them and to stipulate to the authenticity of the documents. (Docket Nos. 302, 303). On the reciprocal disclosures, some have made more progress than others as Defendant Svaranovic has provided the Government with a disk of potential trial exhibits she intends to present. (Docket No. 299). Defendant Smith likewise made some production of materials to the Government and has also outlined the additional exhibits he intends to present. (Docket No. 288). To date, Defendants Kubini and Ratchkauskas have advised that their respective presentations will likely include only exhibits found within the Government's own production. (Docket Nos. 273, 286). The Court agrees that a rolling production of materials by Defendants to the Government is appropriate and does not believe that establishing yet another deadline prior to the February 2, 2015 deadline for the exchange of exhibits in the Pretrial Order will accomplish anything but engender further disputes.[3] Despite this ruling, the Court also believes that those exhibits that Defendants have only identified in pleadings and briefs should be made available to the Government, forthwith, to the extent that they have not already been provided to the Government.

A third issue presented to the Court is the scope of the definition of the term "exhibits" as used by the Court in § 3 of the Pretrial Order. (Docket No. 283). The Government advocates that "exhibits" should be broadly interpreted to include any exhibits that Defendants intend to use during cross-examination of Government witnesses, relying on a theory set forth in District Court cases in *United States v. Hsia*, 2000 WL 195067 (D.D.C. Jan. 21, 2000), and *United States*

---

[3]   The Court also notes that Defendant Svaranovic, through her counsel, has stated in her Sur-Reply that all of the parties should agree to make pretrial disclosures of this material forty-five (45) days before trial, which would be two weeks in advance of the Court's deadline, i.e., January 20, 2015. (Docket No. 299 at 6). The Court agrees that this would be an appropriate time-frame for these disclosures given all of the reasons set forth above, particularly the Government's continuing supplementation of its voluminous exhibits to the individual Defendants. Further, the Government's resources (financial and otherwise) clearly outweigh those of the four individual defendants such that a period of thirty or forty-five days should be more than sufficient for the Government to review any such exhibits proffered by Defendants. The Court is also mindful that the Government is likely to have co-counsel enter an appearance to try this case along with the assigned Assistant United States Attorney, has significant staff support in the U.S. Attorney's Office as well as the team of Secret Service agents to assist, if needed.

*v. Swenson*, 298 F.R.D. 474 (D. Id. Feb. 10, 2014), that presenting such documents represents an extension of their own "cases-in-chief" such that discovery must be permitted. Defendants respond that the Government is not entitled to pre-trial discovery of their impeachment materials and that the decisions relied upon by the Government are non-binding, distinguishable and disfavored. (Docket Nos. 286, 288, 299). Again, the Government did not provide the Court with the precedent it relies on (i.e., *Hsia* and *Swenson*) before the Pretrial Order was entered, despite numerous opportunities for the Government to do so. Hence, the Pretrial Order was issued without the Court contemplating the parties' positions on what appears to be a most contested point of law between these parties. (Docket No. 283). Of course, as trial has not yet commenced, the dispute is framed without reference to the admission of any particular piece of evidence or in the context of how such exhibit is proffered to be used by the proponent at trial. (*See* Docket No. 282 ("The Court thus declines the parties' invitation to make broad rulings on these very general disputes at this stage of the case but will resolve any issues as they arise under the parameters set forth in the Pretrial Order.")). Further, *Hsia* and *Swenson* do not represent settled law and other courts have criticized the approach set forth therein, including the one case that has cited *Swenson* for any purpose. *See e.g.*, *United States v. Harry*, 2014 WL 6065705, at *4-11 (D. N.M. Oct. 14, 2014) (distinguishing *Hsia* and *Swenson* and holding that "the term 'case-in-chief,' as rule 16(b)(1)(A) phrase, refers to evidence that a party presents between the time that the party calls its first witness and the time the party rests.").

In any event, this Court retains the inherent authority to interpret its own Orders and the Court does not share the Government's broad interpretation of the term "exhibits" used in § 3 of the Pretrial Order entered in this case. *See E.E.O.C. v. U.S. Steel Corp.*, 877 F. Supp. 2d 278, n.5 (W.D. Pa. 2012) (citing *United States v. Spallone*, 399 F.3d 415, 421 (2nd Cir. 2005); *SEC v.*

*Hermil, Inc.*, 838 F.2d 1151, 1153 (11th Cir. 1988) ("Included in a district court's power to administer its decrees is the power to construe and interpret the language of the original order.")). Like a contract, a court order should be "construed consistently with fundamental precepts of contract construction" with reference to the "four corners" of the Order. *Washington Hosp. v. White*, 889 F.2d 1294, 1300 (3d Cir. 1989). In this Court's estimation, the Pretrial Order, interpreted as a whole, does not support the Government's position. (*See* Docket No. 283).

Here, the Court has not specifically ordered Defendants to produce their impeachment or rebuttal exhibits to the Government in advance of trial and the term "exhibits" should not be read to require such production. (*See id.*). Instead, the term "exhibits" utilized throughout § 3 must be interpreted with reference to the other related provisions in the Order, namely, §§ 3.a. and 3.b. referencing the parties' witness disclosures and §4 outlining the Government's required disclosures under the Jencks Act, *Brady/Giglio* impeachment materials and Rule 404(b) evidence. (*Id.*). These provisions, read together, can only be reasonably interpreted to require all of the parties to mark and exchange the exhibits that they intend to present during their own respective cases-in-chief by the established deadline. To this end, pursuant to §§ 3.a. and 3.b., the Court requires the parties to provide witness lists and offers of proof, under seal, listing the witnesses the parties may call if needed "**(other than purely for impeachment or rebuttal)**" which is indicative of the Court's intent to not require that purely impeachment materials be disclosed – even to the Court – before trial. Further, the command to produce "exhibits" to the adversary in §§ 3.a. and 3.b. is used in reference to Defendants and the Government but the Court later distinguishes the Government's obligations in § 4, i.e., the Government must "provide defense counsel with copies of any *Brady/Giglio* impeachment materials not previously

disclosed, and any additional evidence of defendant's uncharged conduct which it intends to introduce at the trial pursuant to Federal Rule of Evidence 404(b) on or before February 2, 2015" and is "encouraged" to provide all Jencks Act materials by the same deadline. (*Id.*). There is no corollary requirement of Defendants to make these types of disclosures in the Pretrial Order. (*Id.*). Therefore, if the phrase "exhibits" is as broadly construed as the Government suggests, it would require the Government to disclose all of its impeachment materials to Defendants without the need for the Court's more specific directives at § 4 and such a broad interpretation would render this subsequent paragraph redundant and/or meaningless.

For these reasons, the Government's motion is denied to the extent that it seeks reconsideration and for the Court to interpret the term "exhibits" in the manner it proposes. Instead, the Court states that "exhibits" means "exhibits (other than purely for impeachment or rebuttal)."[4] *See e.g.*, BLACK'S LAW DICTIONARY (9th ed. 2009), "impeachment", ("2. The act of discrediting a witness, as by catching the witness in a lie or by demonstrating that the witness has been convicted of a criminal offense. 3. The act of challenging the accuracy or authenticity of evidence"); "case-in-chief", ("1. The evidence presented at trial by a party between the time the party calls the first witness and the time the party rests."); "rebuttal", ("2. The time given to a party to present contradictory evidence or arguments.").

III. Competing Status Reports – Other Case Management Issues

As part of its Pretrial Order, the Court ordered the parties and counsel to meet and confer and to file a Joint Status Report with the Court by November 21, 2014. (Docket No. 283). A meeting was held at the U.S. Attorney's Office on November 20, 2014, or one day before the Court's deadline. (Docket Nos. 302, 303). Attendees at the meeting included Government

---

[4]     However, given the nature of the case, time constraints and the litigiousness of counsel, the Court will convene at 8:00 a.m. prior to each trial day in order to address any issues with exhibits that have not been resolved prior to trial.

counsel, his litigation assistant, and counsel for Defendants Ratchkauskas, Svaranovic and Smith.[5] (*Id.*). The subject of the meeting concerned whether the parties and counsel were able to negotiate and reach any resolution on the authenticity of the exhibits to be introduced at trial. (Docket No. 283). The Court has also set deadlines in the Pretrial Order for the submission of objections to exhibits by February 9, 2015, responses to same by February 16, 2015 and noted that oral argument will be heard at the Pretrial Conference scheduled for all day on February 23, 2015 and February 24, 2015. (*Id.*). Rather than a Joint Status Report, the meeting resulted in the parties filing competing status reports outlining the little progress that has been made as to their agreements that certain of the exhibits are authentic business records and detailing the apparent continued impasse on the authentication of others. (Docket Nos. 302, 303). The Court remains concerned, however, that the parties continue to dispute the authenticity of the vast majority of the Government's nearly 5,000 exhibits and what affect such continuing disputes will have on pretrial and trial proceedings, which have been estimated to last nearly six trial weeks.[6] (*Id.*). It is also unclear what substantive objections, if any, the parties will have on the same exhibits; let alone the number and depth of any other disputes regarding motions *in limine*, voir dire, jury instructions, verdict slips and/or factual stipulations, all of which are noted in the Court's Pretrial Order.

---

[5]  The Court notes that counsel for Kubini did not appear at the meeting. Although no explanation has been provided, the Court understands that Kubini's counsel was involved in *United States v. Nicole Murphy*, Crim. No. 14-145, around that time.

[6]  The Court has advised the parties that the trial will be held Monday through Thursday; hence, the parties have estimated that this joint trial of five and one half weeks will take between 20 and 22 days, without accounting for any rebuttal presentations. This truly is an exceptional estimate as the latest statistics show that this District convened 0 trials in the period ending on September 30, 2013 which were 20 days and over. *See* Administrative Office of the U.S. Courts, Statistical Tables, U.S. District Courts, Table T-2, U.S. District Courts—Lengths of Civil and Criminal Trials Completed, by District, During the 12-Month Period Ending on September 30, 2013, *available at:* http://www.uscourts.gov/uscourts/Statistics/JudicialBusiness/2013/ appendices/T02Sep13.pdf (last visited 12/30/14). Only 6 such trials were convened throughout the entire Third Circuit during the same time period. (*Id.*).

The litigants in the *CMU v. Marvell* litigation, Civ. A. No. 09-290, presented the Court with literally thousands of pretrial objections on matters that did not appear to be truly relevant and/or important in that case. Given same, the Court admonished counsel for presenting pretrial objections to exhibits which could not have been practically presented in the normal course of the trial of that case. (*See* Civ. A. No. 09-290, Docket No. 586). Notably, the parties in that case agreed to time limits on their respective presentations prior to the trial, limiting both sides to 20 hours to present their respective cases-in-chief, less time spent in openings and closings. (*Id.*). The Court struck all of the pretrial objections noting that the parties had presented 2,700 exhibits but had only 2,280 minutes to present the exhibits at trial. (*Id.*). They had also raised separate objections to deposition designations and other potential evidence. (*Id.*). The Court held that "the overzealous submission of exhibit lists and deposition designations has caused the Court to be inundated with unnecessary objections. This Court is not in the business of resolving hypothetical disputes as to exhibits and deposition designations that the parties have no real intent to actually offer at trial and in fact could not actually be presented as a practical matter given the time restrictions." (*Id.*). The Court then ordered the parties to meet and confer and further narrow the scope of the exhibits they actually sought to present at trial and to raise only meaningful objections to such exhibits. Ultimately, the parties presented a more reasonable amount of disputes and the Court handled them in due course.

This case is admittedly different because the Court has not imposed time limits on the presentations by any of the parties involved, i.e., the Government; Kubini; Ratchkauskas; Svaranovic; and Smith. The Court has, however, elicited trial estimates with the Government advising that its case-in-chief would take around four weeks and Defendants stating that an additional week or week and a half was needed for their collective cases-in-chief. Needless to

say, the Court expects the parties to adhere to such estimates. In past mortgage fraud cases, *United States v. Slane*, Crim. No. 11-81, and *United States v. Moreno*, Crim. No. 10-117, the Government was able to expeditiously present its case well within the time requested, beating its pretrial estimate of the length of its case-in-chief by around a week in both instances. But, these were both single defendant cases where the defendants' role was well defined within an admitted broader conspiracy, a closing agent, Slane and an appraiser, Moreno. The defense attorneys in those cases also worked well with government counsel and raised few objections such that the authenticity of thousands of exhibits was not the type of dispute that the Court was called upon to resolve. Hence, despite the fact that this case involves four defendants with very different roles in the alleged fraud, the Court did not initially believe that time limits would be needed in this case, which involves some of the same transactions that were presented during the Moreno trial.

Setting time limits in a criminal case is not without precedent. In *United States v. Cousar*, 2007 WL 4456798, (W.D. Pa. Dec. 16, 2007), Judge Lancaster established time limits in a complex construction fraud case involving a fifty-three page indictment and thirty-nine criminal charges alleging fraud during three separate construction projects: PNC Park; the Petersen Events Center; and the reconstruction of the Pentagon after the 9/11/01 terrorist attacks. It appears that the parties had estimated a five week presentation by the Government and two-week presentation by three defendants collectively but Judge Lancaster entered an order limiting the Government to forty (40) hours of trial time and Defendants to twelve (12) hours each. *Id.* The Government appealed this decision but the Order was vacated prior to the Court of Appeals deciding the issues when the Government agreed to sever certain counts and focus its case on a number of related alleged fraudulent acts concerning the reconstruction of the Pentagon. (Crim.

No. 06-07, Docket No. 151). The Court also granted the parties additional time in the lead trial of the severed counts, i.e., an additional twenty (20) hours for the Government and five (5) additional hours for each Defendant. (Crim. No. 06-07, Docket No. 168). Each of the defendants then pled guilty to certain charges so it is unclear how those case management techniques would have fared.

Returning to the present matter, the authenticity of exhibits remains an area where the Court believes that the parties should be able to reach agreements, regardless of the Government's threat to withhold Jencks Act material until the time of trial if the Defendants fail to so stipulate. The standard for authenticity of exhibits is not onerous. To this end,

> Federal Rule of Evidence 901(a) requires the authentication of evidence before a district court may admit it. The standard for authenticating evidence is "slight," *McQueeney v. Wilmington Trust Co.*, 779 F.2d 916, 928 (3d Cir. 1985), and may be satisfied by "evidence sufficient to support a finding that the item is what the proponent claims it is." FED. R. EVID. 901(a). This Court does not require conclusive proof of a document's authenticity, but merely a prima facie showing of some competent evidence to support authentication. *McQueeney*, 779 F.2d at 928; *United States v. Goichman*, 547 F.2d 778, 784 (3d Cir.1976) (per curiam). "Once a prima facie case is made, the evidence goes to the jury and it is the jury who will ultimately determine the authenticity of the evidence, not the court." *Goichman*, 547 F.2d at 784. Federal Rule of Evidence 901(b) provides examples of appropriate methods of authentication, including reliance on "[t]he appearance, contents, substance, internal patterns, or other distinctive characteristics of the item." FED. R. EVID. 901(b)(4). This list is not exhaustive, however, and it is clear that the Government may authenticate documents with other types of circumstantial evidence, including the circumstances surrounding the documents' discovery.

*United States v. Turner*, 718 F.3d 226, 232 (3d Cir. 2013). "Business records are admissible as an exception to the hearsay rules if the records were 'made at or near the time by ... a person with knowledge, if kept in the ordinary course of a regularly conducted business activity, and if it was the regular practice of that business activity to make' the records." *United States v. Jimenez*, 513

F.3d 62, 77 (3d Cir. 2008) (quoting FED. R. EVID. 803(6)).  Business records may be authenticated through witness testimony or the use of written certifications that comply with Rule 902(11), including that pretrial notice of the certification and an opportunity to challenge same is provided to the opponent.  *See* FED. R. EVID. 902(11).  Courts that have addressed the issue have held that the admission of such written certifications to authenticate business records does not violate the Confrontation Clause to the extent that the statements contained therein are not testimonial.  *See e.g.*, *United States v. Schwartz*, 315 F. App'x 412 (3d Cir. 2009); *United States v. Ellis*, 460 F.3d 920, 927 (7th Cir. 2006); *United States v. Adefehinti*, 510 F.3d 319 (D.C. Cir. 2007).

The parties' positions on these issues are largely undeveloped but the Court still feels that they should be able to negotiate in good faith and reach more agreements on exhibit authenticity given this standard and what it understands about the scope of the Government's case.  Here, the Government alleges that each of the Defendants was involved in a conspiracy to commit wire and/or bank fraud stemming from their alleged roles in a mortgage fraud conspiracy.  The Government has stated that it plans to focus on around 108 transactions at trial.  (Docket No. 154-7).  According to information provided by the Government during this case, it appears that Defendants Kubini and Ratchkauskas were involved in all of the transactions at issue as buyers and/or sellers of the properties in question while Svaranovic acted as an appraiser on around 50 transactions and Smith acted as a closing attorney for about 43 of the transactions.  (*Id.*).  The Government contends that others acted in the appraiser and closing attorney roles for the transactions in which Svaranovic or Smith did not participate; for example, Platinum Appraisals and/or Absolute (Joel Reck and Jason Moreno) appraised many of the properties while James Steiner of Hergenroeder, Rega & Sommer closed a number of the transactions and James

Sporrer, Denise O'Hare and Karen Atkison closed others operating under Western Pennsylvania Land Conveyance Company and Corestate Settlement Services. (*Id.*). Notably, neither Smith nor Svaranovic were involved in any of the 28 transactions which occurred from November 23, 2005 through July 9, 2007. (*Id.*).

It also seems that most of the objections have been raised to the authenticity of documents resulting from transactions for which Smith and Svaranovic had no apparent involvement, including the aforementioned transactions occurring before July 9, 2007. For example, neither Smith nor Svaranovic will agree to stipulate to authenticity of the records from Pittsburgh Home Loans but they were not involved in any deals where Robert Arakelian was the broker. (Docket Nos. 154-7; 302; 303). Similarly, they have not agreed to stipulate to the authenticity of the records of the financial institutions which only closed matters brokered by Arakelian, (i.e., First Franklin; First Magnus Financial; and One West Bank/Indymac). (*Id.*). Setting aside the merits of these objections by Smith and Svaranovic, their objections are only before the Court because of the fact that the Government joined the cases against Smith and Svaranovic to the earlier case filed against Kubini and Ratchkauskas.[7]

Smith has raised other objections which are curious, to say the least. To this end, Smith intends to object to the authenticity of records from other settlement agents involved in closing real estate transactions he had no part in, including Corestate Settlement Services (Atkison); Western Pennsylvania Land Company (Sporrer/Atkison/O'Hare); and Hergenroeder, Rega & Sommer (Steiner). (Docket No. 303). Likewise, despite the fact that all other parties have

---

[7]     Based on the presentation of the *Slane* case which involved 26 fraudulent transactions and took around one trial week (or four days) for the Government to present its case-in-chief, it is reasonable to estimate that the Government will spend approximately one trial week solely on the Arakelian deals. Smith and Svaranovic should be regulated to mere observers during this portion of the Government's presentation. There are also other documents relevant to Smith only, such as the Land America and PNC Bank documents which appear to relate to the tax case against Smith and his alleged misuse of his escrow accounts.

agreed to stipulate that documents that the Government seized from Kubini and Ratchkauskas under federal search warrants are authentic business records, Smith refuses to do so. (*Id.*). Hence, it appears to the Court that objections have been raised for the sake of objecting.

The Government supports its demands for stipulations on the authenticity of the exhibits by arguing that it would waste time and increase its costs by procuring witnesses to provide foundation testimony supporting the authenticity and admissibility of its exhibits. (Docket Nos. 273, 282, 302). Yet, any complaints about costs to the Government are undermined by the fact that the Government charged the case against all four defendants jointly but now appears to be unwilling to self-limit the scope of its presentation and continues to supplement its nearly 5,000 exhibits, "reserving the right" to do so up until trial. The custodian issue is also interesting given that Government counsel has previously advised that it intends to call certain witnesses at trial, including Robert Arakelian (Pittsburgh Home Loans); Rochelle Roscoe (Riverside Mortgage); and James Steiner (Hergenroeder, Rega & Sommer), each of whom could provide foundation testimony for the allegedly objectionable records. Further, it appears that representatives of many of the other involved entities may be called by the Government.[8] Therefore, any additional cost should be nominal for the authentication of documents by witnesses that will be called by the Government.

It is this Court's duty to follow the dictates of the Federal Rules of Criminal Procedure "to provide for the just determination of every criminal proceeding, to secure simplicity in procedure and fairness in administration, and to eliminate unjustifiable expense and delay." FED.

---

[8]     However, the Government apparently continues to exercise its right to not advise the defendants if representatives of any of these entities will be called as witnesses.   It also has not proceeded to obtain written certifications from such entities to the extent that such costs are a true impediment. *See* FED. R. EVID. 902(11). This posture appears to be thwarting potential negotiations on the stipulations.

R. CRIM. P. 2. Like the *CMU* matter, expending scarce court resources[9] resolving objections to the authenticity of thousands of exhibits which may never be presented at trial and/or using valuable trial time to call custodian after custodian to provide foundation testimony for the authenticity of the records, to which no meaningful objection can be lodged, appears to be unnecessary. Given same, the Court will once again order the parties to meet and confer in an attempt to negotiate stipulations to the authenticity of the exhibits and establish a deadline for another Joint Status Report to be filed. The Court strongly encourages the parties to negotiate in good faith and to reach accords on these issues.

If the above fails, and to the extent that no meaningful progress has been made by the filing of the Joint Status Report, the Court will address whether any additional case management methods will be utilized and may consider whether it is appropriate to: refer the matter to a U.S. Magistrate Judge or a Special Master to help facilitate these negotiations; revisit the present trial schedule and consider establishing time limits on the trial presentations; and/or order briefing on potential severance of charges and/or defendants or bifurcation of the trial. To the extent that objections to exhibits are maintained, formal briefs will be required in addition to the charts set forth in the Pretrial Order.

IV. *In Camera* Review

The last issue for the Court pertains to yet another dispute between Smith and the Government over the disclosures made by the Government on the stand-alone computer and for which the Court conducted an *in camera* review of emails which the Government argues were inadvertently disclosed. (Docket Nos. 293-94, 297-98, 301). The Government has voluntarily made extensive disclosures to Defendants on the stand-alone computer containing materials

---

[9] The U.S. District Court for the Western District of Pennsylvania presently has three (3) District Judge seats that are not filled.

which include Jencks Act statements; *Giglio* impeachment materials; and other materials which government counsel asserts may be helpful to the Defendants' trial preparation. (Docket Nos. 282, 298-1). Defendants have had access to most of this material since <u>October of 2013</u> and supplemental disclosures have been made a various points, all for a trial which is now set to commence on March 2, 2015. (Docket Nos. 282-83). As the Court previously noted, the fact that the Government has made early disclosures of this material to the defendants does not constitute a waiver of the Jencks Act and "does not allow the defendants any rights they would not otherwise have" with respect to the materials. (Docket No. 282 at n.4 (citing *United States v. Bloom*, 78 F.R.D. 591, 603 (E.D. Pa. 1977)); *see also United States v. White*, 2004 WL 2399731, at *7, n.3 (E.D. Pa. Sept. 22, 2004) (noting that by making an intentional conditional disclosure to defendants, "the government had not waived its rights, but had only agreed to suspend Rule 16(a)(2) so long as the defendants did not copy the privileged materials."). With that context in mind, the Court turns to the present dispute.

Based on the parties' submissions, the disputed emails which are dated on October 7, 2013 were added to the stand-alone computer at some point before September 17, 2014 by staff from the U.S. Attorney's Office, apparently unbeknownst to the assigned Assistant United States Attorney. (Docket Nos. 294, 298). On that date, Smith and his counsel went to the U.S. Attorney's Office, were granted access to the stand-alone computer, reviewed the emails and took notes on same. (Docket No. 298). Smith's counsel admits that he believed that the emails were "highly significant" because they related to information he had previously requested about an alleged victim financial institution during these proceedings. (*Id.*). Based on information they had "now learned" through their review of the materials, Smith's counsel demanded additional information from the Government pertaining to this case in his correspondence dated

October 7, 2014.  (Docket No. 298-2).  The next day, Smith directly referenced such information in his Response to the Government's Motion filed with the Court.  (Docket No. 288 at 4).

The Government responded by having its ethics counsel write a letter to Smith's counsel on October 14, 2014, advising him that the information he referenced at page 2, paragraph 6 of his own letter indicated that he had accessed privileged material.  (Docket No. 298-3).  (This portion of the initial letter by Smith's counsel consists of a single, albeit compound, sentence. (Docket No. 298-2)).  Ethics counsel directed him to return any copies of the material, to promptly advise the Government of the source of the information and to not publish the material in any way.  (Docket No. 298-3).  Minutes after receiving this letter, Smith's counsel replied via email:

> [Mr. Eberhardt],[10] if you are seeking to "claw back" any document(s) produced to defendants in this case, please identify the documents you claim were inadvertently produced and when they were produced, and we will promptly segregate such documents for in camera review and prevent any use or dissimulation pending the results of said in camera review.

(Docket No. 298-4).  At some point around this time, the assigned United States Attorney located the email in question on the stand-alone computer and deleted same.  (Docket No. 294).  Smith's counsel then returned to review the stand-alone computer again at 11:00 a.m. on October 15, 2014 and observed that the email had been removed by the Government.  (Docket No. 298). After leaving the U.S. Attorney's Office on Grant Street, downtown, Smith's counsel presumably returned to his office, which was then on the North Shore at Burns White, LLC. (*Id.*).  At 1:59 p.m., Smith's counsel filed a motion for *in camera* review on the Court's CM/ECF System, suggesting impropriety on behalf of the Government based on the contents of the emails. (Docket No. 293).  The Government objected to this procedure, with a lengthy opposition.

---

[10]      This email was directed to Assistant United States Attorney Robert L. Eberhardt.  The Court understands that Mr. Eberhardt has since retired.

(Docket No. 294). Smith replied by filing a lengthy affidavit by his counsel detailing his version of the facts at issue, portions of the affidavit were filed under seal. (Docket Nos. 297, 298). The Court granted the *in camera* review over the Government's objection due to its "inherent authority to supervise the professional conduct of attorneys appearing before it," *United States v. Miller*, 624 F.2d 1198, 1201 (3d Cir. 1980), and the Government's allegations that defense counsel acted unethically and in violation of the Rules of Professional Conduct. (Docket No. 300).

At the outset, the Court has reviewed the disputed emails *in camera* and agrees with the Government that its assertion of privilege is valid.[11] (Docket No. 301). Along with the additional information provided by the Government that all of the individuals on the email chain are attorneys within the Department of Justice,[12] the emails in question constitute internal government work product which is exempted from criminal discovery under Rule 16(a)(2). *See United States v. Armstrong*, 517 U.S. 456, 463, 116 S. Ct. 1480, 1485, 134 L. Ed. 2d 687 (1996) ("under Rule 16(a)(2), [a criminal defendant] may not examine Government work product in connection with his case."); *see also Gov't of Virgin Islands v. Fahie*, 419 F.3d 249, 257 (3d Cir. 2005) ("The exception in Rule 16(a)(2) applies to work product."). This subsection of Rule 16 provides that "this rule [16] does not authorize the discovery or inspection of reports, memoranda, or other internal government documents made by an attorney for the government or other government agent in connection with investigating or prosecuting the case." FED. R. CRIM. P. 16(a)(2). To the extent that the emails are not characterized as reports or memoranda, given

---

[11] Given the privileged nature of the material, the Court will not specifically describe it here.

[12] The Court notes that its staff was able to put the individual's names into a search on Google and quickly learned the positions of all of the individuals on the email trail, to the extent that they were not obviously known. The email addresses are all of the same form and clearly show that the recipients are DOJ employees. The Court finds curious the assertion of Smith's counsel in his affidavit that one of the individuals was unknown to him, particularly in light of the fact that this assertion is set forth as a fact months after this dispute arose and, again, is quickly discovered with minimal effort via a basic Internet search.

their lack of formality, they certainly qualify as "other internal government documents made by an attorney for the government … in connection with investigating or prosecuting the case." *Id.*; *see United States v. Rigas*, 281 F. Supp. 2d 733, 742 (S.D. N.Y. 2003) ("Defendants were not entitled to the work product contained within [the AUSA's email] account."). Such communications were generated during the course of this litigation as they are dated at or around October 7, 2013 and contain explicit references to the legal strategy employed by government attorneys in the case against Smith as well as noted future steps that may be taken by government attorneys in the course of this litigation. (Docket No. 301). Indeed, the email communications contain a response to a direct question about the Government's position in this litigation from another Department of Justice attorney. (*Id.*). Hence, the information set forth in the emails is within the scope of the traditional work product doctrine given that the "mental impressions, conclusions, opinions or legal theories concerning litigation of an attorney or other representative of a party" are clearly contained within the emails.[13] *Fahie*, 419 F.3d at 257 (quoting *In re Cendant Corp. Sec. Litig.*, 343 F.3d 658, 663 (3d Cir. 2003)). Such information is thus not subject to discovery under Rule 16(a)(2). *See* FED. R. CRIM. P. 16(a)(2).

In the context of civil litigation, this Court has recognized that a disclosure of materials otherwise protected by the attorney-client or work product privilege "does not operate as a waiver ... if: (1) the disclosure is inadvertent; (2) the holder of the privilege or protection took reasonable steps to prevent disclosure; and (3) the holder promptly took reasonable steps to rectify the error." *Wise v. Washington Cnty.*, Civ. A. No. 10-1677, 2013

---

[13] The Court further believes that, even without Rule 16(a)(2), the information contained within the emails would be protected under the attorney-client privilege as the emails also include a summary of legal advice provided by Assistant United States Attorneys to their client, i.e., the United States. *See e.g., Gillard v. AIG Insurance Co.*, 609 Pa. 65, 15 A.3d 44, 59 (Pa. 2011). (in Pennsylvania, "the attorney-client privilege operates in a two-way fashion to protect confidential client-to-attorney or attorney-to-client communications made for the purpose of obtaining or providing professional legal advice."). There is no indication that the United States has expressly waived any privilege and its counsel has advised that it has not waived any privilege.

WL 4829227, at *2 (W.D. Pa. Sept. 10, 2013) (quoting FED. R. EVID. 502(b)). Other factors for consideration include:

> (1) the reasonableness of the precautions taken to prevent inadvertent disclosure in view of the extent of the document production; (2) the number of inadvertent disclosures; (3) the extent of the disclosure; (4) any delay and measures taken to rectify the disclosure; and (5) whether the overriding interests of justice would or would not be serviced by relieving the party of its errors.

*J.N. v. S. W. Sch. Dist.*, No. 1:14-CV-0974, 2014 WL 4792260, at *7 (M.D. Pa. Sept. 24, 2014) (citations omitted). The disclosing party generally has the burden of proving that each of the three elements of Rule 502(b) has been met. *See Wise*, 2013 WL 4829227, at *2. (citations omitted). Applying these legal principles to the instant dispute in this criminal case demonstrates that the asserted privileges were not waived by the Government.

With respect to whether production was inadvertent, courts have held that internal government documents which are exempt from disclosure under Rule 16(a)(2), such as prosecution memos, are presumptively inadvertently produced. *See United States v. Carr*, 2013 WL 3242938, at *1 (N.D. Al. Jun. 24, 2013). The same principle applies here as Defendant Smith never had any right to access such internal documents under the applicable discovery Rule. *See United States v. Rigas*, 281 F. Supp. 2d 733, 742 (S.D. N.Y. 2003) ("Defendants were not entitled to the work product contained within [the AUSA's email] account."); *see also United States v. Hurst*, 185 F. App'x 133, 136 (3d Cir. 2006) ("Hurst also tries to obtain relief from the fact that the government inadvertently disclosed some of its work product to defense counsel during discovery and then removed that material from the items that were made available to defense counsel. The government was properly allowed to withhold certain inadvertently disclosed documents from the defense during discovery because those documents were work

product.").  The Court of Appeals for the Third Circuit has "long held that Rule 16 is not to be used as a tool for general evidence-gathering prior to trial."  *United States v. Maury*, 695 F.3d 227, 254 (3d Cir. 2012) *cert. denied sub nom. Atl. States Cast Iron Pipe Co. v. United States*, 133 S. Ct. 1600, 185 L. Ed. 2d 581 (2013) (citation omitted).  "Rule 16 does not require the prosecution to disclose all the minutia of its evidence, to reveal its trial strategy, and to delineate with total specificity the case it intends to present."  *United States v. Randolph*, 456 F.2d 132, 136 (3d Cir.1972) (internal quotation omitted).  Similarly, Rule 16(a)(2) does not require the Government to divulge its pretrial discovery strategies (precisely the topic of the emails in question here) to a defendant.  *See* FED. R. CRIM. P. 16(a)(2).

Even if the emails are not presumed to be inadvertently produced, there are no facts before this Court undermining Government counsel's assertion that he did not intend to disclose this otherwise undiscoverable document to Smith and his counsel.  (Docket Nos. 293-94, 297-98).  At most, Smith and his counsel argue that they had no "reason to suspect that the production was anything but intentional on the government's part" due to the nature and circumstances surrounding the Government's tight controls on access to the stand-alone computer. (Docket No. 297-1 at ¶ 14).  In essence, they argue that the fact that the document was placed on the stand-alone computer by U.S. Attorney's Office staff demonstrates that it was intentionally disclosed.  The same is plainly not sufficient to overcome the Government's otherwise well-taken assertion that the disclosure was inadvertent.  As one court aptly held,

> Inadvertent disclosure during discovery by no stretch of the imagination shows consent to the disclosure: It merely demonstrates that the poor paralegal or junior associate who was lumbered with the tedious job of going through voluminous files and records in preparation for a document production may have missed something. [Defendant] invites us to adopt a "gotcha" theory of waiver, in which an underling's slip-up in a document production becomes the equivalent of actual consent. We decline.

> The substance of an inadvertent disclosure under such circumstances demonstrates that there was no voluntary release.

*F.D.I.C. v. Fid. & Deposit Co. of Maryland*, 196 F.R.D. 375, 380 (S.D. Cal. 2000) (quoting *O'Mary v. Mitsubishi Elec. Am.*, 59 Cal.App. 4th 563, 577, 69 Cal.Rptr.2d 389, 398–99 (1997)).

Smith's counsel further states in his affidavit that he "assumed" that the emails were intentionally disclosed to him because the nature of the communications were pertinent to discovery requests he had made during this case for the Government to produce disclosures concerning an alleged victim financial institution. (Docket No. 298). He claims that he was unsurprised to see the information contained in email form because there were other emails from government agents on the computer. (*Id.*). However, he makes no effort to explain how or why he believes that the emails do not contain privileged work product. (*Id.*). Indeed, his October 7, 2014 demand letter to the Government specifically recites legal advice and strategy provided from one AUSA to another which he "learned" from the document. (Docket No. 298-2). He also fails to note that the emails expressly described the procedure that the Government intended to use to make any necessary disclosures to him about the victim financial institution – a procedure which involved seeking an *ex parte* Order from the Court prior to any disclosure given the confidential nature of the information. (Docket No. 301). Of course, producing the email in question was not contemplated. In short, the Court gives little weight to these arguments and finds that the documents were inadvertently produced.

The Court next turns to its evaluation of the reasonableness of the precautions taken by the Government to prevent disclosures, a factor which includes the extent of the disclosure, the scope of the production, and the number of inadvertent disclosures. *See* FED. R. EVID. 502(b). "The mere fact of an accidental disclosure does not automatically render the precautionary measures unreasonable at the time they were performed." *United States v. Rigas*, 281 F. Supp.

2d 733, 739 (S.D. N.Y. 2003). Here, the undisputed facts demonstrate that the extent of the disclosure was limited as Smith and his counsel were erroneously permitted to view a copy of the emails in question on a stand-alone computer terminal in the U.S. Attorney's Office on a single occasion. (Docket Nos. 293-94, 297-98). At most, they took notes of the material contained within the emails during their viewing session; however, Smith's counsel's notes appear to be essentially a verbatim copy of the material. (*Id.*). The Government has maintained strict control over the computer, limited access to appointment only sessions for the Defendants and their counsel and has forbid them from copying, printing and/or downloading of any of the materials. It also appears that the only materials saved on the terminal are uploaded by the U.S. Attorney's Office staff as directed by the involved prosecutors. (Docket Nos. 282, 298-1). It is undisputed that the scope of the production by the Government on the stand-alone computer is extensive, a point which cannot meaningfully be contested in light of Smith's repeated requests for hard or electronic copies of the materials which he believes are necessary to adequately prepare for trial, despite the very early "view only" disclosures. There have also been no other reported inadvertent disclosures by the Government on the stand-alone computer.[14] Considering all of these facts, the Court believes that the Government has acted reasonably to protect against inadvertent disclosure of the materials it has disclosed on the stand-alone computer.

The undisputed record further shows that the Government took prompt remedial action upon being made aware of the inadvertent disclosure as the assigned Assistant United States Attorney forwarded the matter to ethics counsel, who then drafted and sent a clawback letter to Smith's counsel, advising him that he had obtained privileged information and requesting that he return same. (Docket No. 298-3). The emails were also deleted from the stand-alone computer,

---

[14] The Court notes that it refers here to the production of the materials on the stand-alone computer only. It does not consider the prior inadvertent disclosure of the JP Morgan suspicious activity report within the voluminous evidence which remains in the possession of the U.S. Secret Service.

restricting any further access to the inadvertently disclosed materials. (Docket No. 294). In its correspondence, the Government requested that Smith and his counsel terminate use of the material for any purpose but they have refused, continuing to use the material to advance their discovery position in this case. (Docket No. 298-3). The Government now seeks a protective order from the Court directing Smith and his counsel to destroy their notes. (Docket No. 294). Hence, prompt and effective remedial action has been taken.

Finally, considerations of fairness strongly support the finding that the disclosure of the emails was inadvertent and for the Court to uphold the privilege in light of all of the facts and circumstances. Again, Smith and his counsel gained access to an internal prosecution document to which they otherwise would never have been privy and such document includes explicit references to litigation strategy employed by the U.S. Attorney's Office in the case to be made against Smith while the case is ongoing. (Docket No. 301). The disclosure of such information was inadvertent and was reasonably "clawed back" by the Government. Both Smith[15] and his counsel[16] are trained lawyers, and should be well aware of the Rules of Professional Conduct, to which they are bound.

Where an attorney is in receipt of confidential documents, that attorney "has ethical obligations that may surpass the limitations implicated by the […] privilege and may apply regardless of whether the documents in question retain their privileged status." *Burt Hill, Inc. v. Hassan*, 2010 WL 419433, at *4 (W.D.Pa. Jan. 29, 2010) (Bissoon, J.) (citing *Herman Goldner Co., Inc. v. Cimco Lewis Indus.*, 2002 WL 188733 (Pa.Comm.Pl. Jul. 19, 2002)). Under Rule 4.4(b) of the Pennsylvania Rules of Professional Conduct and the ABA's Model Rule 4.4(b) on

---

[15]     According to the Pennsylvania Disciplinary Board website, Smith's attorney license is on inactive status. It is believed that he has been inactive during all of the events in question which occurred this past fall.
[16]     Smith's counsel is a former Department of Justice attorney. He spent at least seven years of his career, including about four years as an Assistant United States Attorney in this District. He has been in private practice for at least the past six years.

which it is based, "[a] lawyer who receives a document relating to the representation of the lawyer's client and knows or reasonably should know that the document was inadvertently sent shall promptly notify the sender." *Wise v. Washington Cnty.*, No. CIV.A. 10-1677, 2013 WL 4829227, at *3 (W.D. Pa. Sept. 10, 2013). Simply put, Smith's counsel "should have known" that the emails contained privileged internal government work product and were inadvertently disclosed, especially given his prior role as a Government prosecutor.[17]

The Court also believes that Smith's counsel did not act reasonably in light of all of the circumstances. Despite the claim that he found the information in the emails he reviewed on September 17, 2014 to be "highly significant," it appears that he did not conduct any evaluation of the emails in question or any legal research to determine if they were privileged. (Docket No. 298). He also did not seek an opinion from an ethics expert to determine how to proceed consistent with the boundaries of the pertinent ethics Rules. *See e.g.*, *Burt Hill*, 2010 WL 419433, at *6 ("Defense counsel operated under a cloak of ethical propriety, having retained an expert who opined that the retention and review of Plaintiff's privileged and confidential documents was permissible."); *Nesselrotte v. Allegheny Energy, Inc.*, Civ. A. No. 06-1390, 2008 WL 2890832, at *6 (W.D. Pa. Jul. 23, 2008) ("the Court finds no evidence of bad faith on behalf of counsel for the Plaintiffs, especially in light of Plaintiff's counsel's representation that he conducted legal research as to the ethical rules regarding Plaintiff's removal of the Allegheny documents and his decision to retain the same."). Smith's counsel took no action to promptly advise government counsel of the disclosure before using the privileged information he obtained affirmatively in the case at hand. (Docket No. 298). Instead, without conducting any of his own research or obtaining an ethics opinion, Smith's counsel "assumed" that the Government

---

[17]     The Court notes that although Smith was not a litigator and may not have encountered this issue in his transactional practice, he should have been familiar with the Rules of Professional Conduct.

intended to disclose the information he had "now learned" to him; used it to make discovery demands in a letter to government counsel on October 7, 2014; and, referenced it again in a filing with the Court on October 8, 2014 defending a motion brought by the Government. (Docket Nos. 288, 298-2). He also did not refrain from continuing to use and/or to attempt to use the information, *cf., Rigas*, 281 F. Supp. 2d at 742 (noting that "[a]ll defense counsel have refrained from reviewing [the AUSA's] work product pending resolution of this discovery dispute."), as he was instructed to do by Government counsel. Again, Smith's counsel returned to view the materials on the stand-alone computer a second time on October 15, 2014. (Docket No. 298). Only after he saw that the emails were deleted did Smith's counsel seek relief from the Court by filing his motion for *in camera* review. (Docket No. 293). But, through his motion and affidavit, Smith's counsel continues to assert that the *content of the emails* demonstrates impropriety on behalf of Government counsel – again citing to *explicit legal strategy* noted therein to support his position. (Docket Nos. 293, 298). None of these facts evidence reasonableness; frankly, they demonstrate the opposite – a complete lack of respect for the asserted privilege.

The Court's inquiry does not end here as attorneys also owe a duty of candor to the Court to not knowingly: make a false statement of material fact or law to the Court; fail to correct any false statements previously made; or offer evidence that the lawyer knows to be false. Pa. R. Prof. C. 3.3(a)(1), (3). Further, the explanatory notes state that "an assertion purporting to be on the lawyer's own knowledge, as in an affidavit by the lawyer or in a statement in open court, may properly be made only when the lawyer knows the assertion is true or believes it to be true on the basis of a reasonably diligent inquiry. There are circumstances where failure to make a disclosure is the equivalent of an affirmative misrepresentation." *Id.*, at n.2. Here, Smith's counsel has inserted himself directly into these proceedings by presenting the Court with a sworn

statement purportedly setting forth his version of the events in question and has made similar

assertions in his legal briefs. (Docket Nos. 293, 297-298). However, in this Court's estimation,

the candor of several of the assertions in counsel's affidavit and briefs is questionable, at best.

Among them,

- Counsel's statement that the emails do not contain privileged information and that "neither I nor Mr. Smith had any reason to suspect that the production was anything but intentional on the government's part," (Docket No. 298 at ¶ 14), when, as discussed above, the emails clearly include attorney work product;

- Counsel's statement that "Mr. Eberhardt's letter asserts generally that the government asserts a privilege … but does not identify any inadvertently produced document or material," (Docket No. 298 at ¶ 17), when Mr. Eberhardt's letter specifically cites the page number and paragraph of Smith's counsel's own correspondence wherein he had directly quoted the content of the emails at issue and further explains that the Government does not know how he obtained the information;

- Counsel's statement to AUSA Eberhardt which he then reiterates in his affidavit that he needed the Government to "identify the documents you claim were inadvertently produced and when they were produced" and that he would "prevent any use or [dissemination] pending the results of said in camera review" (Docket No. 298 at ¶ 18), when, again, the information was directly quoted in Smith's counsel's own correspondence and remained in his notes and he has continued to use the privileged information in his subsequent filing;

- Counsel's statement that "there would be nothing to 'claw back' in any event since the government has not permitted me to copy the [material]," (Docket No. 298, n.3), when, counsel maintains notes containing direct quotes from the privileged emails which he has used in his correspondence of October 7, 2014 and the affidavit;

- Counsel's failure to disclose in his affidavit that he also used the privileged information he had obtained in an earlier filing with the Court, i.e., the October 8, 2014 response filed on behalf of his client, (Docket No. 288 at 4);

- Counsel's statement in his affidavit dated October 29, 2014, that the email in question "was addressed to a person named [RTR],

who is unknown to me, and who is not, to my knowledge, involved in any way with the case of *United States v. Kubini et al*," (Docket No. 298 at ¶ 13), which fails to also disclose that the email was copied to AUSAs Steve Kaufman and Brendan Conway and that U.S. Attorney David J. Hickton initiated the email chain. Counsel's statement that [RTR] "is unknown" to him was made after the government stated in its response that all persons on the email communications were Department of Justice attorneys, and noted the similarities in the email addresses for all of the authors and recipients. Such statement was also apparently made by counsel without having conducted any investigation at all into RTR's identity. As noted, a simple Google search revealed in a matter of seconds that RTR was a Department of Justice attorney at the time of the underlying correspondence.

Collectively, the Court interprets these statements as misleading, at best. In many ways the nature of these statements makes them more troubling to the Court then the failure to promptly notify the Government of the access to the privileged communication, as required by Rule 4.4(b).

Most troubling to the Court, however, is that Smith's counsel has continued to use the privileged material – by quoting it verbatim in his correspondence and his affidavit – despite the Government's reasonable request that he terminate any further use of same in the October 14, 2014 letter. (Docket Nos. 297-98). It appears that the redacted versions that have been filed with the Court do not fully protect all of the information disclosed in the emails as they contain repeated references to information that the Government clearly intended to remain confidential. (Docket No. 297). The full versions filed under seal include the entirety of the privileged content. (Docket No. 298). By doing this, Smith's counsel has created further records of the privileged material and what started out as a limited, inadvertent disclosure contained to the information that Smith and his counsel retained from their single viewing session and any information in notes taken therefrom has now expanded to multiple electronic documents that Smith's counsel has created quoting the privileged matters.

The scope of these further disclosures by Smith's counsel is not established on this record but he has clearly generated additional documents containing the privileged information. To this end, Smith's counsel created the documents quoting the privileged information while he remained at Burns White LLC but he has since left that law firm and is now operating a solo law office. (*See* Docket No. 303). Presumably counsel shared a copy of his sealed filing with his client. It is also unclear who else within Burns White assisted in preparation and/or filing of same but others likely had access to such information. (Docket Nos. 298; 298-2). For example, immediately below counsel's signature on his correspondence and affidavit, the documents are marked "SZS/tmb," which appears to be a reference to the paralegal and/or secretary working on the file. (*Id.*). In any event, it is more than likely that electronic copies of this privileged material remain at Burns White in some form despite counsel's departure from the firm.

The Court also considered the apparent purpose of Smith and his counsel disclosing all of this information to the Court, i.e., to yet again point out purported wrongdoing by the Government and allege discovery misconduct.[18] (Docket No. 293). In this Court's estimation, all of Smith's discovery demands for what possibly amounts to Jencks Act and/or *Giglio* impeachment materials remain premature in light of the Court's Pretrial Order setting February 2, 2015 deadlines for the Government's duty to disclose *Brady/Giglio* materials to Defendants and its companion suggestion that Jencks Act statements be produced by the same deadline. (Docket No. 283). The Government has also consistently maintained throughout this litigation

---

[18] The Court notes that Smith summarily suggests that the asserted privileges may have been waived via the "crime-fraud exception" to the attorney-client and work product privileges. "[A] party seeking to apply the crime-fraud exception must demonstrate that there is a reasonable basis to suspect (1) that the privilege holder was committing or intending to commit a crime or fraud, and (2) that the attorney-client communication or attorney work product was used in furtherance of that alleged crime or fraud." *In re Grand Jury*, 705 F.3d 133, 155 (3d Cir. 2012). This Court does not believe that Smith's claims are well-taken. Again, the internal prosecution emails are not subject to discovery under Rule 16(a)(2), relate to the United States' legal strategy in ongoing discovery disputes and there is no evidentiary support for the assertions that agents of the United States committed fraud or a crime or that the internal communications were used in furtherance thereof.

that its counsel was not aware of any prosecutions of the alleged victim financial institution and/or its employees related to the transactions in question and that it is the policy of the Department of Justice to not disclose information concerning ongoing investigations.[19]  Nothing in the privileged communication suggests otherwise.  (*See* Docket No. 301).

For all of these reasons, the Court finds that the Government has demonstrated "good cause" for the requested protective order.  *See* FED. R. CRIM. P. 16(d)(1) ("At any time the court may, for good cause, deny, restrict, or defer discovery or inspection, or grant other appropriate relief.").  Accordingly, Smith and his counsel will be directed to destroy all notes containing the privileged information and any other documents, electronic or otherwise, which also contain the privileged information, including any such documents remaining in the possession of Burns White.  (Docket Nos. 297-98).  They will also be ordered to not use the information they have obtained from the privileged communication for any purpose in this litigation going forward.  To the extent that any disclosures are made by the Government to Defendants in this case concerning the alleged victim financial institution, the Court should be supplied a copy of same so that it can adequately prepare for any trial-time disputes.

## V.  Conclusion

For these reasons, the Government's Motion to Preclude Exhibits [284] is DENIED; its Motion for Clarification of Pretrial Order [285] is GRANTED, IN PART, and DENIED, IN PART, to the extent that the Court will modify the Pretrial Order and permit the Government to maintain its hard copy exhibits during trial and to bring such exhibits to Court on the first day of jury selection, March 2, 2015 at 9:00 a.m. rather than 12:00 p.m. on February 27, 2015; and

---

[19]    The Court notes that it previously quashed a subpoena directed at JP Morgan Chase Bank, NA, holding, among other things, that Smith's requests were overbroad.  (Docket No. 218).  The Court also referenced the fact that it had been widely reported publicly that the Department of Justice settled civil claims with JP Morgan Chase for around $11 billion dollars.  (*Id.*).

Defendant Smith and his counsel are directed to destroy their notes and any other documents (electronic or otherwise) that they have created containing the privileged information they viewed on the stand-alone computer and is the subject of this Memorandum Opinion. An appropriate Order follows.

*s/Nora Barry Fischer*
Nora Barry Fischer
U.S. District Judge

Dated: January 5, 2015

cc/ecf: All counsel of record.

cc:     All Defendants c/o their counsel of record.

cc:     David B. White, Esquire, Burns White, c/o Stephen S. Stallings, Esq.