# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| vs. | ) | Criminal No. 11-14 |
| | ) | Judge Nora Barry Fischer |
| GEORGE KUBINI, DOV | ) | |
| RATCHKAUSKAS, SANDRA | ) | |
| SVARANOVIC, AND ARTHUR SMITH, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

I. Introduction

   Presently before the Court are the Government's Motion in Limine Seeking Preclusion of

Polygraph Examination Results, (Docket No. 307), and Defendant Arthur J. Smith's ("Smith")

Brief in Opposition thereto,[1] (Docket No. 309), related to Smith's proffer of William Barrett as a

potential expert witness regarding the results of a polygraph examination he administered to

Smith in June of 2012.[2]   For the following reasons, the Government's Motion in Limine [307] is

GRANTED. The Court further holds that Smith is precluded from presenting the proffered

testimony of polygraph examiner William Barrett and the polygraph examination results.  To the

extent that Smith testifies at trial, he is likewise precluded from referencing the polygraph

examination by Mr. Barrett in any way during his own testimony, and from testifying as to the

offer that his counsel made to the Assistant United States Attorney for him (Smith) to take a

polygraph examination.  Moreover, no counsel shall allude to this or any other polygraph testing,

---

[1]       Smith argues at the outset that a pretrial ruling on the Government's Motion is premature.  (*See* Docket No.
309).  The Court disagrees.  Jury selection and trial are set to commence on March 2, 2015.
[2]       The Court notes that Defendant Svaranovic has likewise filed a response indicating that she has no intent to
present any polygraph testimony at trial but that she would join Smith's motion in the event that his objections to the
Government's Motion are sustained.  (Docket No. 310).  Accordingly, Defendant Svaranovic's response is denied,
as moot.

in questioning, oral argument and/or in any statements in open Court.

II.  Relevant Facts

The relevant facts concerning the polygraph examination of Smith conducted by Mr. Barrett were set forth in the Court's Memorandum Opinion dated May 13, 2014 holding, among other things, that Smith's Motion to Dismiss the Superseding Indictment for alleged prosecutorial misconduct during grand jury proceedings was denied.  (Docket No. 263).  The facts set forth in that opinion which are pertinent to the present decision are restated here.

It is uncontested that Smith's counsel set up a polygraph examination for Smith with William Barrett of Assured Polygraph Services, Inc., which occurred on June 28, 2012. (Docket Nos. 309-2; 251-11; 154-11 at 58).  Mr. Barrett charged $600.00 for his Polygraph Examination and Report.  (*Id.*).  Mr. Barrett discloses in his curricula vitae, ("c.v."), that he earned a Bachelor of Science in criminal justice/law enforcement from Point Park University and a Master of Arts in social science from California University of Pennsylvania.  (Docket Nos. 309-3; 251-12).  Mr. Barrett has obtained the following certifications: certified-polygraph examiner from the Maryland Institute of Criminal Justice; certified-post convicted polygraph sexual offender testing/monitoring from the Academy for Scientific Investigative Training; certified-advanced post convicted sex offender testing, American International Institute of Polygraph; advanced certification – certified sex offender treatment and monitoring, American Polygraph Association; and advanced certification – forensic law enforcement examiner from the American Association of Police Polygraphists. (*Id.*). He is presently a chief polygraph examiner at Assured Polygraph Services, Inc.; a police officer/detective/sergeant with the Ross Township Police Department; a municipal police instructor at the Allegheny County Police Academy; and an adjunct professor at Point Park, California University of Pennsylvania and the Community College of Allegheny

County.  (*Id.*).  Mr. Barrett touts that he has "over twenty-five years of law enforcement experience; [has conducted] [a]pproximately 3,500 polygraph tests; issues ranging from criminal homicide to personal fidelity; [and has] [i]n excess of 3900 hours of specialized training.  (*Id.*).  Noticeably absent from Mr. Barrett's curricula vitae is any list of cases wherein he has testified as a polygraph expert.  (*Id.*).

A "Privileged & Confidential Polygraph Report" authored by Mr. Barrett sets forth his opinions that Smith demonstrated "no deception indicated" during the polygraph he administered to him. (Docket No. 309-2).  The stated reason for the examination was "alleged fraud" and the issue was "to determine whether the examinee was truthful regarding whether he knowingly and intentionally defrauded lenders and agreed or planed (sic) with Dov RATCHKAUSAS or George KUBINI to do the same." (*Id.*).  The type of polygraph technique that was utilized was a ZCT (Utah).  (*Id.*).  Mr. Barrett recounts that "the above identified individual was administered a polygraph examination utilizing a computerized commercial polygraph instrument which indicated and recorded relative changes in blood pressure, heart rate and strength of pulse, electrodermal response, thoracic and abdominal respiratory patterns. The polygraph system was fully calibrated to published factory standards prior to the examination." (*Id.*).  Mr. Barrett asked a number of unspecified control questions and then posed the following questions to which Smith responded.  (*Id.*).

> 1. Regarding if you have engaged in fraudulent activities to defraud lenders, do you intend to answer all of these questions truthfully?
>
> ANSWER: Yes
>
> 2. Did you ever issue checks from your escrow account to deceive lenders into mistakenly believing that borrowers were providing their own funds as down payments?

ANSWER: No

3. Did you ever conduct a real estate closing knowing that the lenders issued the loan based on fraudulent loan applications?

ANSWER: No

4. Did you ever agree with Dov Ratchkauskas or George Kubini to defraud lenders?

ANSWER: No

(Docket Nos. 309-2; 251-11).

In his "Evaluation and Conclusions," Mr. Barrett states that the examination output produced four (4) charts including a demonstration chart. (*Id.*). From same, he conducted a forensic examination of the examinee's physiological responses by utilizing an approved scoring system. (*Id.*). He notes that this numerical analysis of the examination included "spot totals" of "+7, +1, -1" and a "grand total" of "+7." (*Id.*). He explains that "[a] minimum of +6 for three (3) charts is required before a truthful conclusion can be rendered. A minimum of -6 for three (3) charts is required before a definitive deceptive conclusion can be rendered. Any score between and including -5 and +5 is considered inconclusive." (*Id.*). Mr. Barrett opines that Smith's total score of +7 resulted in a finding of "no deception indicated" regarding the aforementioned "issue" and that the "likelihood of him producing these charts and actually being deceptive is unlikely." (*Id.*). He concludes stating that "[a] quality control check was completed utilizing one or more independent computerized algorithm-scoring program(s), confirming [his] assessment." (*Id.*).

Smith's counsel and the AUSA engaged in lengthy pre-Indictment correspondence, much of which the Court recounted in its prior decision. (*See* Docket No. 263). Smith's counsel first advised the Government that Smith had submitted to a polygraph examination in correspondence

4

dated October of 2012. (Docket No. 251-13 at 2). Of note, in a letter dated February 15, 2013, Smith's counsel stated, among other things, that Smith proclaims his actual innocence to any fraud charges, never intended to deceive lenders, never closed a real estate transaction he believed was funded based upon a fraudulent loan application and never agreed with Ratchkauskas or Kubini to defraud lenders. (Docket No. 251-13 at 3). He quoted the entirety of Mr. Barrett's findings in the polygraph examination and attached the report and his curricula vitae to his letter, as Exhibits "A" and "B". (*Id.* at 4). Smith's counsel also indicated that "Smith is prepared to submit to a polygraph on these same questions administered by a polygrapher of the government's choice at your convenience." (*Id.*). Smith's counsel next noted that Smith did not intend to defraud lenders but believed that the lenders were aware of and approved gifts of equity to the buyers. (*Id.*).

Smith then voluntarily appeared and testified before the Grand Jury on February 19, 2013.[3] (Docket No. 154-11). The parties agree that the AUSA specifically advised Smith and his counsel that the polygraph report and Mr. Barrett's c.v. would not be marked and admitted as exhibits to the grand jury proceedings. (Docket No. 251 at ¶¶ 18-19). Despite this instruction, which was repeated by the AUSA during the questioning, Smith discussed the polygraph examination many times throughout his grand jury appearance and left a copy of same for the grand jurors at the conclusion of his testimony. (*See e.g.*, Docket No. 154-11 at 56-58 ("Well, there is no deception in this, I have submitted myself to a polygraph test, that specifically says that there was no deception"; at 63 ("look at the polygraph test, it says specific questions, and it says there is no deception."); at 98 ("Well, I am going to leave these documents over here, this has the polygraph test, this has the letter that was sent by the lender and I guess I am not allowed

---

[3]     As the Court noted in its prior Memorandum Opinion, (*see* Docket No. 263 at n.1), the parties have filed these materials on the public docket and made no objection to the Court's consideration of same.

to tell you anything about this.  Is that right"); at 99 ("Well, just don't know why you won't

share the polygraph information."")).

In the context of Smith's Motion to dismiss, which was denied by the Court, the Court

did not rule on the admissibility of the polygraph examination or results at trial.  (Docket No.

263).  Instead, the Court held as follows:

> Smith's contention that the polygraph results could be properly
> admitted in a judicial proceeding via expert testimony in light of
> Rule 702 of the Federal Rules of Evidence and *Daubert v. Merrell
> Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), has no
> applicability in the context of his own grand jury examination.
> (*See* Docket Nos. 152, 191, 251, 256).  Again, this Court lacks the
> authority to enforce the Rules of Evidence in grand jury
> proceedings, and, even if it was permitted to do so, this Court is
> aware of no precedential support for the proposition that an
> individual who is a non-expert and the subject of a polygraph
> examination should be permitted to testify as to the results of same
> or be a competent witness to authenticate a third party's expert
> report.  *See e.g.*, *United States v. Lee*, 315 F.3d 206, 213, n.6 (3d
> Cir. 2003) (stating in dicta that "this Court has not adopted a per se
> exclusionary rule regarding polygraph evidence" and noting a split
> of judicial decisions on the issue of whether polygraph evidence
> could be admitted through expert testimony) (citations omitted).
> As such, AUSA Conway simply cannot be faulted for instructing
> Smith that the polygraph examination was inadmissible in the
> grand jury proceedings.

(*Id.*).

Returning to the present dispute, the Government argues that the polygraph report by Mr.

Barrett and any testimony related thereto should be excluded as inadmissible for the following

reasons: (1) hearsay without any cited exception; (2) under Rule 403 as the probative value of

such evidence is substantially outweighed by the other considerations of the Rule; (3) under Rule

608(b); (4) under Rule 702 and *Daubert*; and, (5) as expert opinion evidence regarding a

defendant's mental state violating Rule 704(b).  (Docket No. 307).  In response, Defendant does

not address all of the Government's arguments and, in particular, presents no opposition to the

Government's positions that the proffered testimony of Mr. Barrett recounting Smith's responses is hearsay, outside any recognized exception; that the nature of the questions set forth in the polygraph examination violate Rule 704(b); and that any testimony concerning the polygraph results should be excluded under Rule 403 as the probative value of such evidence substantially outweighs the likelihood of confusion to the jury in this complex matter. (Docket No. 309). Smith focuses on the fact that the Third Circuit has not adopted a *per se* rule of inadmissibility of polygraph evidence and argues that such evidence is reliable, as noted in reports he has attached to his motion; suggests that a *Daubert* hearing must be held prior to excluding the polygraph evidence under Rule 702 for a lack of reliability; continues that the results of the polygraph may be introduced to corroborate the truthfulness of Smith's testimony or rebut the Government's challenges to his truthful character; and maintains that if Smith testifies, he may be permitted to testify that he offered to submit to a polygraph by the Government but such overture was declined. (Docket No. 309).

III. Discussion

Having fully considered the parties' briefs on these issues, (Docket Nos. 307, 309), as well as their prior arguments in the context of the Motion to Dismiss, (*see* Docket No. 263), the expert report of Mr. Barrett and his curricula vitae, which were presented to the Court initially on July 15, 2013, (*see* Docket No. 154-8; 154-9), and the other reports submitted by the defense regarding the reliability of polygraph results, (*see* Docket No. 309), the Court agrees with the Government that such evidence should be excluded from this trial because such evidence violates the rule against hearsay; the proffered expert testimony violates Rule 704(b); and alternatively, all such evidence is excludible after a careful balancing of the factors set forth in Rule 403. To this end, the Court rules that all of the following are inadmissible: Mr. Barrett's

proffered testimony, including his credentials, examination and report; the results of his polygraph examination of Smith; any testimony about Smith taking a polygraph examination; and his counsel's offer for Smith to submit to another polygraph examination by the Government. Concurrently, any argument related to same is barred.

### A. District Court's Gatekeeper Role/Discretion in Holding Daubert Hearing

Prior to addressing the merits of the Government's Motion, the Court will briefly discuss Smith's request that the Court convene a *Daubert* hearing at which he has offered to produce Mr. Barrett to testify so that the factual record can be more fully developed in support of the reliability of his proffered opinion testimony. (Docket No. 309). The Government opposes the request for a hearing, arguing that the proffered testimony is otherwise inadmissible under several other Rules of Evidence such that the hearing would serve no purpose. (Docket No. 307).

This Court understands its important gatekeeper duty to fully evaluate proffered expert opinions to ensure that they are both relevant and reliable before permitting such opinions to be presented to a jury, *see Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 806 (3d Cir. 1997) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993)), and has excluded proffered experts from testifying in cases where the Court found that the three requirements set forth in Rule 702 were not met, i.e., "qualifications," "reliability" and "fit," *see Pritchard v. Dow Agro Sciences*, 705 F. Supp. 2d 471 (W.D. Pa. Mar. 11, 2010), *aff'd*, 430 F. App'x 102 (3d Cir. 2011).

> District courts have considerable latitude in deciding how to perform their *Daubert* gatekeeping function. [*Kumho Tire v. Carmichael*, 536 U.S. 137, 152 (1999)]. Trial judges have "the discretionary authority needed both to avoid unnecessary 'reliability' proceedings in ordinary cases where the reliability of an expert's methods is properly taken for granted, and to require

> appropriate proceedings in the less usual or more complex cases
> where cause for questioning the expert's reliability arises." *Id.* The
> Third Circuit has held that district courts are not required to hold
> *Daubert* hearings, but may follow the course they see fit to
> determine the reliability of expert testimony. *Oddi v. Ford Motor
> Company*, 234 F.3d 136, 154 (3d Cir. 2000) (citing *United States v.
> Downing*, 753 F.2d 1224, 1241 (3d Cir. 1985)).

*United States v. Phung*, 127 F. App'x 594, 597 (3d Cir. 2005); *see also Downing*, 753 F.2d at

1241 ("we will not prescribe mandatory procedures that district courts must follow in every case

involving proffers of scientific evidence."). A *Daubert* hearing is not necessary if the Court

determines, in an exercise of its broad discretion to make evidentiary rulings, that the record on

file including expert reports, curricula vitae and any other submissions provide a sufficient

factual foundation upon which to make a ruling on the admissibility of the proffered opinion

evidence. *See id.* Further, a *Daubert* hearing is not necessary where the proffered expert

evidence is deemed to be inadmissible by the Court under a separate Rule of Evidence. *See

United States v. Booth*, 309 F.3d 566, 573 (9th Cir. 2002) ("Having excluded the testimony under

Rule 704(b), the district court was not required to pursue the admissibility of the testimony under

*Daubert*"); *see also United States v. Korbe*, 2010 WL 4639042 (W.D. Pa. Nov. 8, 2010)

(McVerry, J.) (precluding proffered expert testimony concerning reasonableness of defendant's

actions under Rule 704(b) without conducting hearing). Indeed, even reliable expert evidence

meeting all other requirements of Rule 702 and *Daubert* must still comport with Rule 704(b),

which expressly limits the admissibility of expert opinion evidence in criminal cases, and Rule

403. *See United States v. Watson*, 260 F.3d 301, 308 (3d Cir. 2001) (precluding expert testimony

under Rule 704(b)); *see also United States v. Bennett*, 161 F.3d 171, 182 (3d Cir. 1998) ("the

trial judge has broad discretion to admit or exclude expert testimony, based upon whether it is

helpful to the trier of fact.").

In short, while it is true that expert opinion testimony should not be admitted by the Court in a criminal trial without the Court first determining that the scientific theory passes muster and also that the proffered expert opinion surmounts the reliability hurdle required under *Daubert* and Rule 702, the Court always retains the discretion to determine when deeper inquiries into scientific theory and the reliability of methods utilized by the challenged expert are necessary. *See e.g.*, *Pritchard*, 705 F. Supp. 2d 471, *aff'd*, 430 F. App'x 102. The Court is also directed to "provide for the just determination of every criminal proceeding, to secure simplicity in procedure and fairness in administration, and to eliminate unjustifiable expense and delay." Fed. R. Crim. P. 2. As is discussed below, the Court believes that there are ample reasons why the proffered expert testimony of Mr. Barrett should not be admitted into evidence in the upcoming criminal trial, all of which are fully supported by persuasive caselaw analyzing similar issues. It is also this Court's opinion that exclusion of the proffered evidence is inevitable and would be ordered regardless if a *Daubert* hearing was convened. Accordingly, the Court exercises its discretion and denies the request for a *Daubert* hearing in this case because it would cause unjustifiable expense and delay in these proceedings.

With that said, the general reliability of polygraph evidence is reasonably questioned by the Government. "The common form of polygraph test measures a variety of physiological responses to a set of questions asked by the examiner, who then interprets these physiological correlates of anxiety and offers an opinion to the jury about whether the witness—often, as in this case, the accused—was deceptive in answering questions." *United States v. Scheffer*, 523 U.S. 303, 313 (1998). Law enforcement has long recognized the utility of polygraph examinations for investigative and other administrative purposes, such as personnel screening. *Id.* at n.6; *see also* Docket No. 309-5, U.S. Department of Justice Office of the Inspector General

Evaluation and Inspections Division, *Use of Polygraph Examinations in the Department of Justice* (Sept. 2006). Similarly, courts have approved the use of polygraph examinations for the purpose of ensuring compliance with court ordered conditions to the extent that probationers and supervised releasees are often ordered to submit to a polygraph examination as a condition of release. *See e.g., Lee*, 315 F.3d at 209. For example, polygraph conditions are typically ordered in cases of sex offenders. *Id.*

A few courts have admitted polygraph evidence at trial under *Daubert* but those cases are rare and non-binding on this Court. *See e.g., United States v. Galbreth*, 908 F. Supp. 877 (D.N.M. Oct. 4, 1995) (admitting polygraph evidence in tax evasion trial). Post-*Daubert*, the Supreme Court has held that Military Rule of Evidence 707, which makes polygraph evidence inadmissible in court-martial proceedings does not unconstitutionally abridge the right of accused members of the military to present a defense. *Scheffer*, 523 U.S. at 305. The Court of Appeals for the Third Circuit has not adopted a *per se* rule of exclusion of polygraph examination evidence at trial but has recognized the split in authority among courts about whether polygraph evidence could be properly admitted. *See Lee*, 315 F.3d at n.6 (citing cases). It is not debatable that a survey of the relevant caselaw results in a finding that the vast majority of cases preclude the admission of polygraph examination results and some circuits continue to maintain a *per se* rule against the admission of such evidence.[4]

The parties have not pointed the Court to any case within the Third Circuit which

---

[4] *See e.g., United States v. Mare*, 668 F.3d 35 (1st Cir. 2012) ("This is the latest in a growing line of cases that ought to suggest, if not a *per se* rule, then at least a code of best practice for the virtuous prosecutor: polygraph evidence, even that dealing with matters other than the actual results of an examination, is usually more trouble than it is worth."); *United States v. Johnson*, 446 F.3d 272, 278 (2nd Cir. 2006) ("polygraph tests are inadmissible as evidence"); *United States v. Prince-Oyibo*, 320 F.3d 494, 500-01 (4th Cir. 2003) (noting that *Daubert* requires "nuanced evaluation" of evidence, but upholding per se ban in limited context of polygraph evidence); *United States v. Gardiner*, 463 F.3d 445, 469 (6th Cir. 2006) (quoting *United States v. Barger*, 931 F.3d 359, 370 (6th Cir. 1991)) ("'[g]enerally, the results of polygraph examinations are inadmissible into evidence.'"). Additional decisions excluding polygraph evidence are discussed in the body of this Memorandum Opinion.

admitted polygraph evidence in a criminal trial and the Court has not located any reported decisions in this Circuit where such evidence was admitted. (Docket Nos. 307, 309). In *United States v. Johnson*, 816 F.2d 918, 923 (3d Cir. 1987), the Court of Appeals held that the District Court did not impermissibly restrict the defendant's ability to cross-examine witnesses concerning the voluntariness of his confession by advising defense counsel that such challenges may open the door to the admission into evidence of the fact that he had made the confession during a polygraph examination. But, during the trial of the *Johnson* case, defense counsel avoided cross-examining witnesses about the voluntariness of the confession and the defendant did not testify. *Id.* Hence, the polygraph evidence was not admitted, although the Court of Appeals recognized that the circumstances of the confession, including that it was made during a polygraph examination, could be admitted to rebut any claim that the confession was not voluntary. *Id.*

As the parties both recognize, the late Chief Judge Gary L. Lancaster ruled that an attorney did not provide ineffective assistance of counsel to his client by failing to pursue the admissibility of polygraph evidence in a criminal trial. *Jackson v. United States*, 2010 WL 3419452, at *8-9 (W.D. Pa. Aug. 30, 2010). Chief Judge Lancaster commented that "it is doubtful whether the results [of the requested polygraph test] would have been admissible at trial" in light of the considerable disagreement among courts as to the reliability of polygraph techniques. *Id.* at *8-9. Further, this Court precluded the proposed admission of polygraph evidence by the defendant in the criminal trial of *United States v. Kenneth Taylor*, Crim. No. 06-234. (*See United States v. Taylor*, Crim. No. 06-234, Text Order 5/30/07). There, the dispute surrounded the admissibility of the fact that another suspect interviewed for a robbery was deemed untruthful during a polygraph examination administered by a law enforcement officer

concerning the robbery.[5] *Id.*

It appears that the Defendant through the requested *Daubert* hearing seeks to support the reliability of the methods utilized by Mr. Barrett when he conducted the examination of Smith on June 28, 2012. (Docket No. 309-2). Mr. Barrett describes the polygraph examination as including:

- utilization of the "ZCT (Utah)" or Zone Comparison Technique;

- the equipment consisted of "a computerized commercial polygraph instrument which indicated and recorded relative changes in blood pressure, heart rate and strength of pulse, electrodermal response, thoracic and abdominal respiratory patterns" which he calibrated prior to the exam;

- a series of "control questions" were posed to Smith at the outset which are not described in the report;

- after confirming the accuracy of the "control questions", he asked Smith the four questions quoted in the exam;

- the results were outputted on a series of charts;

- such charts were then scored using an approved scoring system he describes in his report; and,

- a quality control test was performed to confirm the results.

(Docket No. 309-2). Smith suggests that Barrett's testimony would persuade the Court that: the ZCT (Utah) technique was properly administered; he correctly calibrated the commercial polygraph instrument; he properly attached the equipment to Smith's person; and the output on the charts was appropriately analyzed and confirmed leading to his conclusion that "no deception [was] indicated." (*Id.*). Even assuming that this foundation could be sufficiently laid at the requested *Daubert* hearing, "[t]he validity of polygraph evidence is highly dependent on the

---

[5] This ruling was not appealed because the trial ended in a mixed verdict and a declaration of a mistrial and was later resolved via a plea agreement between the parties. (*See United States v. Taylor*, Crim. No. 06-234, Docket Report).

questions put to the subject by the examiner." *United States v. Bellomo*, 944 F. Supp. 1160, 1164 (S.D.N.Y. 1996). As such, this Court "must examine the questions posed with great care," *id.*, and, as the Court explains below, the questions posed to Smith by Mr. Barrett – whether they were crafted by defense counsel or Barrett himself – serve as the primary basis for exclusion of the evidence. Since the questions themselves remain unchanged, there is no reason to overly complicate matters by convening a *Daubert* hearing.

The Court now turns to its reasons for concluding that the proffered evidence is inadmissible in these proceedings.

### B. Hearsay

It is indisputable that Mr. Barrett's proffered testimony concerning Smith's physiological responses to the four questions quoted above (only three of which are substantive) that Mr. Barrett posed to him on June 28, 2012 are only relevant if he is also permitted to first testify as to Smith's out-of-court statements made to him on that date. (Docket No. 309-2). The entire purpose of the proffered testimony is to prove that Smith provided truthful responses to such questions. Hence, Mr. Barrett's proffered testimony regarding Smith's underlying responses is "classic hearsay," i.e., "a statement that: (1) the declarant does not make while testifying at the current trial or hearing, and (2) a party offers in evidence to prove the matter asserted in the statement." FED. R. EVID. 801(c).

"It is the proponent of evidence that would otherwise be barred by the hearsay rule that carries the burden of proving the applicability of an exception." *United States v. McClinton*, 432 F. App'x 166, 168 (3d Cir. 2011) (citing *Idaho v. Wright*, 497 U.S. 805, 816 (1990) ("[T]he proponent of evidence presumptively barred by the hearsay rule ... carri[es the] burden of proving that" the statements bear "sufficient indicia of reliability" to be admitted); and *United*

*States v. Paulino*, 445 F.3d 211, 220 (2d Cir. 2006) ("The burden is on the proponent of 804(b)(3) evidence to demonstrate sufficient corroboration.")); *see also United States v. Flemming*, 223 F. App'x 117, 125-26 (3d Cir. 2007) (citing *Taylor v. Illinois*, 484 U.S. 400, 410-11 (1988) (holding that "[t]he accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence")). Here, Smith has not raised any particular exception to the hearsay rule in his response; thus, he has failed to meet his burden to demonstrate the admissibility of the challenged evidence.[6]   (*See* Docket No. 309).

The Court further concludes that none of the exclusions to the hearsay rule set forth in Rule 801(d) appear to apply in this case.   To this end, the Government is seeking an Order precluding all parties (including the United States) from presenting any evidence concerning polygraph examinations at trial, making Rule 801(d)(2) governing prior inconsistent statements inapplicable in the context of this challenged polygraph examination of Defendant.  *See* FED. R. EVID. 801(d)(2) ("A statement that meets the following conditions is not hearsay … The statement is offered against an opposing party").   In addition, the exclusions set forth in Rule 801(d)(1)(B) for prior consistent statements would only apply if Smith:

> testifies and is subject to cross-examination about a prior statement, and the statement:
>
> …
>
> (B) is consistent with the declarant's testimony and is offered:

---

[6]      Smith does suggest that Mr. Barrett should be able to provide opinion testimony about his (Smith's) character for truthfulness in the event that his credibility is attacked and/or he is impeached.  (Docket No. 309).  But, Mr. Barrett conducted a single examination of Smith such that he cannot offer reputation or opinion evidence concerning his general character traits and specific instances of conduct are not generally admissible to support the character for truthfulness of a defendant.  *See* FED. R. EVID. 405(b); 608(b); *see also United States v. Manfredi*, 2009 WL 3762966, at * (W.D. Pa. Nov. 9, 2009) (discussing the admissibility of reputation and opinion evidence of the defendants in a tax case).  In either event, for the reasons set forth herein, the proposed polygraph evidence is excluded for all purposes under Rule 403.

> (i) to rebut an express or implied charge that the declarant recently fabricated it or acted from a recent improper influence or motive in so testifying; or
>
> (ii) to rehabilitate the declarant's credibility as a witness when attacked on another ground;

FED. R. EVID. 801(d)(1)(B). Accordingly, such exclusions would only apply to Smith's *responses* to the questions posed by Mr. Barrett and not Barrett's opinions that Smith's physiological profile indicated "no deception" at the time of his responses. Again, the Court has already held that Smith is not an appropriate witness to testify regarding the results of the polygraph examination because such results would be hearsay if Smith testified about them and he is not qualified to offer an opinion about polygraph examinations. (Docket No. 263).

Further, "Rule [801(d)(1)(B)(i)] permits the introduction of a declarant's consistent out-of-court statements to rebut a charge of recent fabrication or improper influence or motive only when those statements were made *before* the charged recent fabrication or improper influence or motive." *Tome v. United States*, 513 U.S. 150, 167 (1995) (emphasis added). Here, the statements by Smith to the polygraph examiner were made in 2012 or *after* he was aware that he was under investigation for fraud and tax offenses, had engaged counsel and was disputing the prospective charges. Thus, he clearly had a motive to avoid the charges at the time he made the statements to Mr. Barrett, rendering this subsection inapplicable.

Moreover, Rule 801(d)(1)(B)(ii) is a recent addition to the 2014 Amendments to the Federal Rules of Evidence. Although the caselaw has not been fully developed, the commentary notes the following:

> The amendment retains the requirement set forth in *Tome v. United States*, 513 U.S. 150 (1995): that under Rule 801(d)(1)(B), a consistent statement offered to rebut a charge of recent fabrication of improper influence or motive must have been made before the alleged fabrication or improper inference or motive arose. The

intent of the amendment is to extend substantive effect to consistent statements that rebut other attacks on a witness -- such as the charges of inconsistency or faulty memory.

The amendment does not change the traditional and well-accepted limits on bringing prior consistent statements before the factfinder for credibility purposes. It does not allow impermissible bolstering of a witness. As before, prior consistent statements under the amendment may be brought before the factfinder only if they properly rehabilitate a witness whose credibility has been attacked. As before, to be admissible for rehabilitation, a prior consistent statement must satisfy the strictures of Rule 403. As before, the trial court has ample discretion to exclude prior consistent statements that are cumulative accounts of an event. The amendment does not make any consistent statement admissible that was not admissible previously -- the only difference is that prior consistent statements otherwise admissible for rehabilitation are now admissible substantively as well.

*Id.* at cmt., 2014 Amendments (internal footnote omitted).  So, the polygraph examination results still would not be admissible under this theory or to the extent that Smith seeks its admissibility solely to bolster his credibility.  *Id.*

For the same reasons, any testimony by Smith concerning his counsel's offer to Government counsel that he would submit to a polygraph examination is also hearsay.  (*See* Docket No. 251-13 at 4 (counsel advising the AUSA that "Smith is prepared to submit to a polygraph on these same questions administered by a polygrapher of the government's choice at your convenience.")).  Again, such statements are set forth in correspondence between the attorneys for Smith and the Government and there is no record evidence indicating that Smith, himself, ever made such an offer to anyone other than to his counsel.  Smith has cited no exception to the hearsay rule which would permit him to testify as to such out-of-court statements made by his counsel.  Additionally, the Government has advocated that the Court enter an order precluding it from also referencing polygraph examinations such that the Court sees no basis for its admissibility.

For these reasons, the proffered evidence is properly excluded under Rule 801(c).

*C. Rule 704(b)*

The Government also seeks preclusion of the evidence under Rule 704(b), an argument to which Smith has not specifically responded. (*See* Docket Nos. 307, 309). Rule 704(b) provides that "[i]n a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense. Those matters are for the trier of fact alone." FED. R. EVID. 704(b). "Rule 704(b) applies to all instances in which expert testimony is offered as to mental state or a condition constituting an element of the crime charged or defense thereto." *United States v. Watson*, 260 F.3d 301, 308 (3d Cir. 2001) (citation omitted). Further,

> Expert testimony is admissible if it merely "support[s] an inference or conclusion that the defendant did or did not have the requisite mens rea, so long as the expert does not draw the ultimate inference or conclusion for the jury and the ultimate inference or conclusion does not necessarily follow from the testimony." *United States v. Bennett*, 161 F.3d 171, 183 (3d Cir. 1998) (quoting *United States v. Morales*, 108 F.3d 1031, 1038 (9th Cir. 1997)). "It is only as to the last step in the inferential process-a conclusion as to the defendant's mental state-that Rule 704(b) commands the expert to be silent." *United States v. Dunn*, 846 F.2d 761, 762 (D.C. Cir. 1988).
>
> Rule 704(b) may be violated when the prosecutor's question is plainly designed to elicit the expert's testimony about the mental state of the defendant, *Boyd*, 55 F.3d at 672, or when the expert triggers the application of Rule 704(b) by directly referring to the defendant's intent, mental state, or mens rea, *United States v. Lipscomb*, 14 F.3d 1236, 1240 (7th Cir. 1994). Rule 704 prohibits "testimony from which it necessarily follows, if the testimony is credited, that the defendant did or did not possess the requisite mens rea." *Bennett*, 161 F.3d at 182 (quoting *Morales*, 108 F.3d at 1037).

*Id.* at 309.

As the Government points out in its response and the Court's independent research has

revealed, several courts have excluded polygraph examination results and expert testimony related thereto under Rule 704(b) in situations where the questions posed by the polygraph examiner to the accused ask if he had the requisite mens rea at the time of the offense. *See, e.g.,* *United States v. Campos*, 217 F.3d 707 (9th Cir. 2000) (district court did not abuse its discretion by precluding polygraph testimony regarding drug defendant's responses to questions asking "did you know there were drugs in the van" on the date in question where the requisite mens rea for the charge of possession with intent to deliver was knowledge); *United States v. Booth*, 309 F.3d 566, 573 (9th Cir. 2002); *United States v. Arthur*, 2011 WL 3844090 (S.D. Fla. Aug. 29, 2011). In *Booth*, the Court of Appeals for the Ninth Circuit held that the District Court did not abuse its discretion by excluding testimony of a "polygraph[er] [who] would have testified that a polygraph test he conducted on Bories indicated that Bories was being truthful when he denied intent to defraud or knowledge of fraud" under Rule 704(b) without first conducting a *Daubert* hearing. *Booth*, 309 F.3d at 573. Similarly, in *United States v. Arthur*, 2011 WL 3844090 (S.D. Fla. 2011), the District Court for the Southern District of Florida precluded polygraph evidence under Rule 704(b) and such decision was affirmed by the Court of Appeals for the Eleventh Circuit, *see United States v. Fagan, et al.,* 518 F. App'x 749 (11th Cir. 2013). Akin to this case, the defendant in *Arthur* was charged with participating in a mortgage fraud scheme involving the submission of false HUD mortgage applications to lenders. *See id.* The District Court recounts that the questions posed by the polygraph examiner were the following:

> 2. Did you have any idea that there may be something illegal with the paper work for the purchase of either condo? Answer—NO
>
> 3. Are you telling the truth, you had no idea of anything illegal in signing the HUD application documents for either condo? Answer—YES.

*Arthur*, 2011 WL 3844090, at *3. The District Court then reasoned that:

> [w]hile the questions use the words "did you have any idea" and "you had no idea," rather than "know," they go directly to the issue of Defendant's knowledge or mental state and not to conduct. Moreover, even though they wear the thin veil of opinion as to Defendant's truthfulness when answering these questions about her knowledge, rather than Dr. Palmatier's blunt statement as a psychologist that in his opinion she did not have knowledge, it is too close to the type of testimony Rule 704(b) prohibits.

*Id.*

Although the Court of Appeals for the Third Circuit has not addressed the admissibility of a polygraph examination procured by a defendant in a fraud case, it has analyzed the admissibility of other types of expert opinions in fraud cases. For example, in *United States v. Bennett*, 161 F.3d 171, 183 (3d Cir. 1998), the Court of Appeals held that:

> the District Court properly excluded the questions asking whether Bennett's mental disorders (1) "precluded him from forming the intent to defraud"; (2) made it "highly unlikely that he could form the intent to defraud"; (3) made it "unlikely that he would have engaged in conduct designed to defraud"; (4) precluded him "from forming the specific intent to defraud individuals"; (5) made it "unlikely that he could defraud the individuals and entities"; (6) "affect[ed] his ability to knowingly and willfully submit false statements to the I.R.S."; and (7) made "it unlikely that he would knowingly and willfully submit false statements to the I.R.S." These questions go beyond merely assisting the jury, explaining the nature of Bennett's mental disease, or describing the typical effect of Bennett's disorders on his mental state. Instead, they require the expert witness to state expressly whether Bennett possessed the requisite intent to commit the crimes charged in the indictment.

*Id.*

This Court previously wrote, at length, concerning the applicable mens rea in this case, *i.e.*:

> Smith's defense in this case—which he has consistently and repeatedly communicated to Government counsel and law enforcement agents starting at their initial meetings in February of 2011—is that he did not act with intent to defraud, was unaware of

the fraud and was told that the broker (Roscoe and Riverside) advised the lenders of the "gifts of equity." Intent to defraud is explained to jurors as a "means to act knowingly and with the intention or the purpose to deceive or to cheat." *See* Third Circuit Model Criminal Jury Instruction § 6.18.1341–4. The Government will also undoubtedly request that the jury be charged with a willful blindness instruction, through which the Government may prove that Smith acted with the intent to defraud through evidence that he: "actually, subjectively believed that there was a high probability" that the information he supplied to lenders was inaccurate and "consciously took deliberate actions to avoid learning about the existence" of such inaccuracies. *See* Third Circuit Model Criminal Jury Instruction § 5.03; *see also United States v. Tai*, 2014 WL 1687814, at *3–4, 750 F.3d 309, 314–16 (3d Cir. 2014) (expressly approving Third Circuit Model Jury Instruction § 5.03 on willful blindness).

(Docket No. 263).  Again, the three questions at issue in the instant polygraph include:

2. Did you ever issue checks from your escrow account to deceive lenders into mistakenly believing that borrowers were providing their own funds as down payments?

ANSWER: No

3. Did you ever conduct a real estate closing knowing that the lenders issued the loan based on fraudulent loan applications?

ANSWER: No

4. Did you ever agree with Dov Ratchkauskas or George Kubini to defraud lenders?

ANSWER: No

(Docket No. 309-2).

In this Court's opinion, the proffered expert testimony concerning whether Smith responded truthfully to the questions posed by the polygraph examiner constitutes "testimony from which it necessarily follows, if the testimony is credited, that the defendant […] did not possess the requisite mens rea." *Watson*, 260 F.3d at 309. Indeed, each of the questions utilizes important legal terms of art, the definitions for which the Court will instruct the jury and from

which the jurors will reach their verdicts, (i.e., "did you ever [take actions to]… deceive … lenders"; "did you ever … knowing[ly]" submit "fraudulent loan applications" to lenders; "did you ever agree with Dov Ratchkauskas or George Kubini to defraud lenders?").   Simply put, if permitted, the only reasonable inference from such testimony is that Mr. Barrett's opinion is that Smith was being truthful when he responded that he did not act with the requisite mens rea to commit the fraud and conspiracy offenses.  *See Watson*, 260 F.3d at 309.  Again, Mr. Barrett is proffered as an expert witness and Rule 704(b) <u>expressly</u> prohibits such testimony by an expert witness in a criminal case, reserving these credibility matters "for the trier of fact alone."   FED. R. EVID. 704(b).

Accordingly, the Court concurs with the Government that the polygraph evidence must also be excluded under Rule 704(b).

### D.  Rule 403

The Court further concludes that even if such expert testimony were deemed relevant, admissible under Rule 702 and did not violate Rule 704(b), the Court would alternatively exclude the evidence under Rule 403 of the Federal Rules of Evidence.  Rule 403 provides that the "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."   FED. R. EVID. 403.  "Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses." *Daubert*, 509 U.S. at 595.  A careful weighing of the interests at stake here counsels the Court to preclude the proffered evidence as the probative value of such evidence is

substantially outweighed by the other considerations set forth in Rule 403. The Court reaches this conclusion for a number of reasons.

First, setting aside the legitimate questions as to the reliability of polygraph evidence, the Court believes that probative value of the proffered polygraph evidence by Mr. Barrett is not great. The polygraph examination was administered to Smith on June 28, 2012 or at least three and a half years after he closed the last of the allegedly fraudulent real estate transactions which took place between July 2007 and December 2008. (*See* Docket Nos. 309-2; 154-7). Such examination also took place around 18 months after he became aware that he was being investigated in February of 2011. (*See* Docket No. 263). At most, the polygraph examination proves that it is Mr. Barrett's opinion that Smith answered three questions without exhibiting physiological signs of deception that he was monitoring at the time of the examination. (Docket No. 309-2). Further, Smith was not asked any questions regarding any specific transaction (including any of the 40+ transactions he closed in this case) but responded to the three general questions posed by Mr. Barrett. (*Id.*).

Second, the probative value of the polygraph examination is also diminished because it was set up by defense counsel without any invitation to the Government to participate or requesting any input from the Government as to how the questions were framed. Instead, the Government was notified a few months after the examination, in October of 2012, that Smith's counsel had information he was "preparing to make available to [the AUSA] that you are likely not aware of that goes to his innocence of charges related to [Dov Ratchkauskas] and [George Kubini], including definitive polygraph results." (Docket No. 251-13 at 2). The Courts of Appeals for the Fifth and Eleventh Circuits have upheld the exclusion of polygraph evidence in similar circumstances where a defendant procured a polygraph examination without notice to the

Government or an opportunity to participate. In *United States v. Pettigrew*, 77 F.3d 1500, 1515 (5th Cir. 1996), the Court of Appeals for the Fifth Circuit recounts that:

> [t]he polygraph examination was administered by an expert selected by the defense apparently without the participation of the government, and the defense wished to present this evidence before the jury. While these factors may not always be conclusive, the absence of these or other similar safeguards certainly weighs most heavily against the admission of polygraph evidence.

*Id*. The Court of Appeals for the Eleventh Circuit has similarly reasoned that "[a]lthough a party is not required to give an adverse party advance notice of, and the opportunity to be present at, a polygraph examination, the absence of such notice and opportunity may be a factor in determining whether admission of the polygraph evidence would unduly prejudice the adverse party," potentially making trial-time cross-examination more difficult. *United States v. Gilliard*, 133 F.3d 809, 816 (11th Cir. 1998). Without notice, the Government was unable to observe the examination and ensure the integrity of the procedures utilized by the examiner, Mr. Barrett. *United States v. Canter*, 338 F. Supp. 2d 460, 464 (S.D.N.Y. Oct. 5, 2004) ("As discussed above, Zambouros never notified the Government of the polygraph examination, and thus, it could not witness the examination and ensure the integrity of the procedure. Moreover, with the Government unaware of the examination at the time that it was performed, Zambouros essentially had nothing to lose—had he failed the examination, it is highly improbable that he would have revealed that result to the Government.").

Third, to the extent that Rule 704(b) does not preclude the opinions of Mr. Barrett, the questions posed to Smith are clearly misleading and will confuse the jurors in what is expected to be a lengthy, complex and contentious case. *See Bellomo*, 944 F.Supp. at 1164 ("[t]he validity of polygraph evidence is highly dependent on the questions put to the subject by the examiner.... In examining polygraph evidence, therefore, courts must examine the questions posed with great

care.").  In this Court's estimation, these are not straightforward, black and white, questions about underlying facts relevant to the case such as "were you at a certain place on a specific date?" or "were you wearing certain clothing on that occasion?"  Rather, each question is framed around Smith's criminal intent to undertake certain acts, very closely referencing legal terms of art such as "defraud," "deceive" and "knowingly," all of which will be explained to the jury by the Court.  (Docket No. 309-2).  For example, as to question 2, Mr. Barrett's opinion is that Smith physiologically exhibited "no <u>deception</u>" when responding to the question about whether he acted in a manner to "<u>deceive</u>" lenders.  (*Id.* (emphasis added)).  Such opinion testimony is sought to be introduced at a criminal trial where the defendant stands charged with alleged wire and bank fraud offenses involving a mens rea defined as a "means to act knowingly and with the intention or the purpose to <u>deceive</u> or to cheat."  *See* Third Circuit Model Criminal Jury Instruction § 6.18.1341–4 (emphasis added).  So, the standard of the polygraph examination, the question posed and the legal standard all embrace some form of the same verb, i.e., deceive.  Reasonable jurors will undoubtedly be confused by such evidence and potentially misled by an expert witness opining that Smith showed "no deception."  This point is fully illustrated in one of the exchanges during Smith's Grand Jury testimony where he told the jurors "[w]ell, there is no deception in this, I have submitted myself to a polygraph test, that specifically says that there was no deception."  (Docket No. 154-11 at 56-58).

Fourth, aside from Smith's initial assertion that he would tell the truth, there is no record about what his (Smith's) understanding of the chosen legal terms of art meant at the time of the examination.  (Docket No. 309-2).  Because Smith himself is a lawyer, the jurors may expect that he fully understood the legal terms of art and give undue weight to the polygraph evidence.  In this regard, question 3 asks whether Smith had ever closed a loan "knowing" that false loan

applications were submitted to lenders. (*Id.*). But, that does not answer the question that the jurors will be required to deliberate on in this case of whether he was willfully blind to the fraudulent nature of the loan applications. *See Pettigrew*, 77 F.3d at 1515 (emphasis added) ("Nor can we say that the district court abused its discretion in excluding the third response which, while arguably more relevant, suggests only that Pettigrew did not know that the letters would not be disclosed. <u>The fact that he did not know that the letters would be disclosed to regulators does not mean that he did not at least think that it was highly unlikely.</u>"). As is pointed out by the Government, it intends to prove that at trial not only the fraudulent nature of the loan applications but also of, among other things: the appraisals; settlement statements; and Smith's misuse of his escrow account. (*See* Docket Nos. 92; 307). While recognizing that these remain allegations, the probative value of question 3 is limited when viewed in the context of the expected evidence at trial and is substantially outweighed by the likelihood of confusion to the jurors and the misleading nature of the questioning.

Fifth, the last question directly asks Smith if he ever agreed with Kubini and Rathckauskas to defraud lenders – again, closely mirroring the mens rea of the conspiracy to commit wire and back fraud charge set forth in Count One of the Superseding Indictment. (Docket No. 92). Yet, the Government alleges that the coconspirators involved in this crime include a host of other individuals such as codefendant Svranovic; Rochelle Roscoe; Rhonda Roscoe; and "other persons known to the grand jury." (*Id.*). Hence, the probative value of Mr. Barrett's opinion as to Smith's truthful response to such question would not foreclose his having agreed with others to defraud lenders. Once again, the danger of unfair prejudice, confusion of the issues and the misleading nature of the question substantially outweighs what limited probative value the opinion as to question 4 has in the overall context of the case. *See* FED. R.

EVID. 403.

Sixth, this is a multi-count and multi-defendant case with only one of the four codefendants seeking to introduce polygraph evidence at trial. In this Court's opinion, if such evidence is believed, it is likely that the jury may overvalue the existence of polygraph evidence as to Smith, bolstering his credibility on the other charges against him to which the polygraph evidence offers no defense including the charges of conspiracy to commit money laundering and failure to file tax returns. *See Gilliard*, 133 F.3d at 816 ("If the jurors heard one to two days of evidence on a polygraph examination pertaining to only one of the three categories of charges against Gilliard, they may have viewed the obstruction of justice and perjury charges as secondary in nature. Moreover, the three categories of charges in this case were so intertwined it is possible, if not probable, that if the jurors believed the Honts Polygraph evidence, they would have determined Gilliard also was not guilty of the obstruction of justice and perjury charges without looking at the evidence specifically addressing those two counts."); *see United States v. Evans*, 469 F. Supp. 2d 1112, 1115 (M.D. Fla. Aug. 14, 2006) ("the questions posed relate only to the first two counts (continuing criminal enterprise and a conspiracy to distribute crack cocaine) of the fifty-eight count indictment, which, in toto, charges a panoply of other offenses. […] Because of the discrete and dubious nature of the questions as they relate to the allegations in the case, I find that any probative value attendant to the polygraph evidence is substantially outweighed by the danger that it could confuse or mislead the jury inasmuch as the jury could easily conclude that 'passing' the polygraph test has more significance than is justified."). It is also possible that if the jurors credit the polygraph evidence as to Smith, they would likely discount the lack of polygraph evidence as to his codefendants, undermining their credibility and convicting them of offenses based on the fact that they did not submit to a similar polygraph

examination and present it at trial.   *Cf. id.*   Although neither Kubini nor Rathckauskas have

objected to Smith's introduction of the polygraph evidence,[7] the Court nonetheless feels that it

must consider the possible prejudice that may inure to them if the expert opinion as to question 4

is admitted.   To this end, reasonable jurors will contemplate why Kubini and Ratchkauskas did

not submit to polygraph examinations in order to exonerate themselves as Smith has done.   Such

risk of prejudice is undoubtedly heightened by the fact that Smith is a lawyer and they are not.

And, if such evidence is believed, the jury could be persuaded to convict them on the conspiracy

count, causing them substantial prejudice.

Seventh, the admission of polygraph evidence would result in a mini-trial of sorts,

opening the door to wide cross-examination of Mr. Barrett and Smith, to the extent that he

testifies.   Again, the polygraph questions put Smith's understanding of the legal terms of art

directly at issue.   A preview of the potential areas which are ripe for cross-examination is set

forth in the Grand Jury transcript of Smith:

> AUSA Conway:   And did they ask you in the polygraph examination whether you willingly failed to file your tax returns?
>
> Smith:  This had to do with fraud.
>
> AUSA Conway:  That wasn't my question, sir.
>
> Did they ask you in the polygraph examination, "Did you willfully fail to file your tax returns?"
>
> Smith:  There was [sic] no questions to that effect.
>
> AUSA Conway:  And this is all arranged by your defense counsel; right?
>
> Smith:   Yes, and from a source that is highly reputed here in Western Pennsylvania, who deals with law enforcement agencies, and the U.S. Attorney's Office and the FBI.

---

[7]      It is also likely that counsel for Kubini and Ratchkauskas may believe that the Court will exclude the polygraph evidence, as the majority of such courts have done in other cases, and have focused their efforts on defending the cases against them rather than intervening in this dispute.

(Docket No. 154-11 at 56-58). Given the breadth of the charges and the limited nature of the questions posed during the polygraph examination, as well as the need for the typical voir dire of Mr. Barrett and his methods, the introduction of such evidence by the parties could easily lengthen the trial by two days, needlessly extending a trial that is already projected to take up to six weeks and involve a substantial amount of the parties and the Court's time. *See Gilliard*, 133 F.3d at 815 ("Although the actual number of hours and minutes it would take to put on expert testimony should not ordinarily be a controlling factor, a court may consider whether the amount of time needed to present the evidence would shift the focus of a criminal trial from determining guilt or innocence to determining the validity of the scientific method at issue.").

Lastly, and importantly, the Court believes that the probative value of the evidence is substantially undermined by the fact that the jurors are the arbiters of the truthfulness of the witnesses in the case and can perform their sworn duties without the assistance of the proffered expert opinion, as they have done in every other case that this Court has presided over to date. *See Bennett*, 161 F.3d at 182 ("the trial judge has broad discretion to admit or exclude expert testimony, based upon whether it is helpful to the trier of fact."). The jurors will be instructed as such by the Court and expected to follow their instructions. *See* Third Circuit Model Criminal Jury Instruction § 3.04 "Credibility of Witnesses" ("You are the sole judges of the credibility of the witnesses. Credibility refers to whether a witness is worthy of belief: Was the witness truthful? Was the witness' testimony accurate? You may believe everything a witness says, or only part of it, or none of it."). As the Supreme Court of the United States has held:

> A fundamental premise of our criminal trial system is that the jury is the lie detector. Determining the weight and credibility of witness testimony, therefore, has long been held to be the part of every case that belongs to the jury, who are presumed to be fitted for it by their natural intelligence and their practical knowledge of men and the ways of men.

> By its very nature, polygraph evidence may diminish the jury's role in making credibility determinations. The common form of polygraph test measures a variety of physiological responses to a set of questions asked by the examiner, who then interprets these physiological correlates of anxiety and offers an opinion to the jury about whether the witness—often, as in this case, the accused— was deceptive in answering questions about the very matters at issue in the trial. Unlike other expert witnesses who testify about factual matters outside the jurors' knowledge, such as the analysis of fingerprints, ballistics, or DNA found at a crime scene, a polygraph expert can supply the jury only with another opinion, in addition to its own, about whether the witness was telling the truth.

*Scheffer*, 523 U.S. at 313 (internal citation and quotation omitted).

For all of these reasons, the Court finds that the probative value of the proffered expert evidence is substantially outweighed by the danger of unfair prejudice to the Government and the codefendants; the potential for such evidence to confuse the jurors who will already be tasked with resolving the complex issues at stake in this case; will cause delays and waste time attendant to the presentation of such evidence. *See* FED. R. EVID. 403. These concerns substantially outweigh the probative value of the evidence regardless of how such evidence is presented, (i.e., during Smith's case-in-chief; on cross-examination; or rebuttal), and through any witness. *Id.*

The Court further believes that Smith's counsel's offer to the AUSA that he (Smith) submit to a polygraph examination should be excluded for many of the same reasons. *See United States v. Piccinonna*, 885 F.2d 1529, 1541 (11th Cir. 1989) (concurring opinion noting succinctly that "all offers of polygraph evidence should be analyzed under Rule 403"). Neither counsel for the Government nor Smith's counsel is ethically permitted to be a witness in this case and the jurors will be instructed that their statements are not evidence. *See* Third Circuit Model Criminal Jury Instruction § 1.08 "Evidence (What is; is Not)" ("The following are not evidence:

(1) Statements and arguments of the lawyers for the parties in this case").  In addition, the introduction of the polygraph offer in a vacuum without corresponding expert testimony during the trial would cause substantial prejudice to the Government and the codefendants as the jurors would be left to weigh the evidence without any corresponding explanation of the scientific principles underlying polygraph examinations.  The jurors would also be left to question why the Government – which is under no obligation to grant such a request – did not take Smith up on his offer and why the codefendants – who are likewise under no compulsion to submit to a polygraph – did not also make such an offer.   Undue weight may be placed by the jury on Smith's offer because he is a lawyer, to the detriment of the codefendants who are not.  Overall, confusion, delays and wasted time would necessarily result from the introduction of such evidence.  *See Mare*, 668 F.3d at 42 ("polygraph evidence, even that dealing with matters other than the actual results of an examination, is usually more trouble than it is worth.").

Accordingly, the proffered polygraph evidence is alternatively excluded under Rule 403.  *See* FED. R. EVID. 403.

IV. Conclusion

Based on the foregoing, the Government's Motion in Limine [307] is GRANTED.  An appropriate Order follows.


*s/Nora Barry Fischer*
Nora Barry Fischer
U.S. District Judge

Date:   February 2, 2015

cc/ecf:  All counsel of record.

cc:     All Defendants c/o their counsel of record.