**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Crim. No. 11-14 |
| | ) | Judge Nora Barry Fischer |
| GEORGE KUBINI, DOV | ) | |
| RATCHKAUSKAS, ARTHUR SMITH, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

### I.     INTRODUCTION

This complex mortgage fraud case returns to the Court once again to resolve contested issues related to the timing and propriety of the Government's disclosures under *Brady*, *Giglio*, the Jencks Act, and this Court's prior Orders, as they relate to ongoing sentencing enhancement and restitution proceedings involving Defendants George Kubini, Dov Ratchkauskas, and Arthur Smith.[1]  (Docket Nos. 614; 617; 620; 624).  At the behest of the assigned prosecutor, Assistant United States Attorney Brendan T. Conway, ("AUSA Conway"), the Court held lengthy evidentiary hearings with sessions on October 7, 2015, October 27, 2015, November 10, 2015, January 27, 2016, February 23, 2016, May 13, June 1, 2016 and June 2, 2016.[2]  Prior to the commencement of the proceedings, Defendants, particularly Smith, repeatedly requested that *Brady/Giglio* and Jencks materials as to the sentencing proceedings be made available to Defendants.  (Docket No. 614).  AUSA Conway ignored these requests for several months, until

---

[1]     The Court notes that Defendant Sandra Svaranowic and the Government reached a stipulation as to the advisory guidelines range in her case which was filed with the Court on August 4. 2016.  (Docket No. 626).  The parties agreed that Svaranowic's total offense level is 25, which based on a criminal history category of I, results in an advisory guidelines range of 57-71 months' incarceration. The Court has tentatively accepted such stipulations but Svaranowic's sentencing has been continued until further order of court. (Docket No. 628).

[2]     The Court also held numerous telephone conferences, including on: May 18, 2015, (Docket No. 424); June 3, 2015, (Docket No. 435); October 26, 2015, (Docket No. 494); November 4, 2015, (Docket No. 507); November 23, 2015, (Docket No. 518); February 2, 2016, (Docket No. 540); and, March 29, 2016, (Docket No. 567).  On May 24, 2016, the Court attempted to convene a session of the evidentiary hearing but had to cancel that session as counsel for Kubini became ill.  *See Text Minute Entry* 5/24/16.

he finally assured all that the required disclosures had been made in both an email sent a few days prior to the commencement of the proceedings and then reiterated the same orally at the outset of the October 7, 2015 session. *See 10/4/15 email*; *Hr'g Trans. 10/7/15*. In light of these disputes, the Court ordered that "fundamental fairness dictates that all witnesses must be disclosed to the defense in a timely fashion and that all relevant discovery documents as to such witnesses must be made available for review by defense counsel." (Docket No. 494).

The proceedings were contentious, to say the least, with numerous objections to the admission of evidence during the course of same. Most pertinent here, the Court overruled several objections lodged by Smith to the admission of hearsay statements of a cooperating witness, Rochelle Roscoe ("Roscoe") of Riverside Mortgage, through the case agents, Secret Service Special Agent Daniel Fisher, ("SA Fisher"), and IRS Special Agent Amanda Avoilia, ("SA Avolia"). After the evidentiary record closed, AUSA Conway admits that he failed to disclose to the defense that he had decided not to call Roscoe as a witness at trial because, as he wrote in a sealed 5K1.1 motion[3] he filed on her behalf, he believed she was not "particularly reliable" as a witness and the Government felt that calling her at trial would do "more harm than good" to the Government's case. (Docket Nos. 614-6; 620; 620-13). The Government also concedes that it failed to disclose that its counsel sought input for the 5K motion from the entire prosecution team, noting himself that he was "not sure" Roscoe was credible and in response SA Fisher stated that Roscoe was "completely not credible." (Docket No. 620).

Presently before the Court for disposition are a number of matters including: Smith's motion to supplement the record which is joined by Ratchkauskas and is opposed by the

---

[3]     The Court notes that the 5K1.1 motions referenced in this decision were filed on the public docket as an attachment to Smith's motion, (Docket Nos. 614-1:614-6), the parties have not lodged any objections to them being revealed publicly and have argued the import of same freely throughout their various briefs in this matter. (*See* Docket No. 614-10 ("The government has no objection to making reference to these documents in your pleadings or supplementing the record with these documents should you see fit.")).

Government, in part, (Docket Nos. 614; 617; 620; 624); and the parties' proposed findings of fact and conclusions of law on the various objections to the sentencing enhancements and restitution, (Docket Nos. 629; 630; 631; 671); their respective responses, (Docket Nos. 640; 641; 644; 647); and replies, (Docket Nos. 651; 657; 660; 669). For the following reasons, the Court grants Smith's Motion [614] and will write separately to address the parties' objections to the various sentencing enhancements and the restitution claims.

II.     BACKGROUND

A. *Brief Overview of Sentencing Disputes*

All four of the codefendants in this action pled guilty to criminal charges pursuant to plea agreements with the Government in February of 2015, but they have not yet been sentenced as numerous disputes as to applicable sentencing enhancements and restitution remain. Relevant here, the Government is seeking several sentencing enhancements against Kubini, Ratchkauskas and Smith including: increases of sixteen (16) levels for alleged lender losses under Guideline § 2B1.1; an additional two (2) levels under Guideline 2B1.1 attributable to purported borrower losses (in addition to the lender losses); at least a four-level enhancement under Guideline § 2B1.1(b)(2)(B) as the Government contends that the number of victims (lenders plus borrowers) is in excess of 50[4]; a two-level enhancement under Guideline § 3A1.1(b)(1) because the criminal conduct allegedly targeted vulnerable victims, i.e., the borrowers who were first time home buyers with little or no experience in the financing process; and, a two-level enhancement for gross receipts in excess of $1,000,000.00. (Docket No. 630). The Government also seeks enhancements of two-levels for sophisticated means against Kubini and Ratchkauskas and two-levels for obstruction of justice against Smith and Ratchkauskas. (*Id.*). The Government further

---

[4]     The Government alternatively argues that under the 2015 version of the Sentencing Guidelines, a 6-level enhancement would be applicable as the offenses resulted in a substantial financial hardship to 25 or more victims. (Docket No. 630).

contends that Ratchkauskas should not be granted a two-level downward adjustment for acceptance of responsibility given his bond violations and obstruction of justice. (*Id.*). Naturally, the application of all of these enhancements to the offense level computations has an impact on the advisory guidelines ranges for each of these Defendants, significantly increasing their sentencing exposure under the advisory sentencing guidelines. Defendants contest, in whole or part, the application of all of these enhancements. (Docket Nos. 629; 631; 640; 647; 660).

The Government presented a series of charts listing 109 real estate transactions with real estate closings that took place between November 23, 2005 and December 15, 2008. (*See* Govt. Ex. E). At the hearings, the Government admitted that it did not have sufficient evidence to conclude that two of the transactions involved fraud, with buyers Hubert Smith on Rosyln Street on 5/23/2006 and Zachary Engler on Northumberland Street on 7/25/2007. (*SA Fisher Testimony, 1/27/16*, Docket No. 574 at 80-1). According to the Government, the remaining 107 transactions included some type of bank fraud, including that:

- No down payments were made by any of the buyers, despite indications on the settlement statements that down payments were being made at the closings;
- The buyers' income and assets were often overstated on mortgage applications, supported by fake verification of deposits made by bank insiders;
- The buyers listed on the mortgages were sometimes not the true purchasers of the properties, with older relatives serving as straw buyers;
- Cash back was paid to many of the buyers but not disclosed to the lenders;
- Agreements to make repairs on properties were entered into at the closing between several of the buyers and sellers but not shared with the lenders;
- Silent second mortgages were taken out on the properties by the sellers and agreed to by a few buyers but same were not provided to the lenders;
- Double closings were sometimes conducted which involved the

sellers purchasing the properties from third parties and then selling to the buyers immediately (or, even prior to the initial sale).

(Govt. Ex. AA). The Government seeks to hold each of the Defendants responsible for any losses to victims that occurred after the date that they joined the mortgage fraud conspiracy. In this regard, the Government asserts that:

- Kubini is responsible for losses resulting from all 107 fraudulent transactions because he joined the conspiracy on the date of its inception, i.e., November 23, 2005. (Govt. Ex. E);

- Ratchkauskas joined the conspiracy on March 22, 2007 and is responsible for any losses in 95 transactions, (Govt. Ex. F);

- Finally, Smith may be responsible for losses in any of the 83 transactions that occurred after he joined on July 12, 2007. (Govt. Ex. G).

With that said, no losses are claimed for a number of these properties by either the lender or the borrowers. (Govt. Ex. E).

Another of the core disputes between the parties that has been at issue throughout these proceedings is whether the borrowers are properly classified as victims of the offenses under the Guidelines and restitution statutes, as maintained by the Government, or if they are participants to the fraud, as the Defendants have advocated. These arguments present legitimate questions because the borrowers signed the relevant loan applications submitted to the lenders overstating their respective assets and the settlement statements from the real estate closings indicating that they had made down payments on the properties when they had not put any money down as part of the transactions. (Govt. Ex. AA). The borrowers likewise endorsed checks made out to them during the closings that were generated by the closing attorney and were utilized to misrepresent to the lender that a down payment had been made; however, the reality of the transaction was that no down payment was made by any of the borrowers. (*Id.*). Other borrowers received cash

back at the closings and still others were straw buyers as the purchasers did not intend to live at the home as their relatives, mostly sons or daughters, were the real buyers but their credit was too poor to obtain a mortgage. (*Id.*). Several borrowers have been prosecuted by the Government as part of this scheme and the related ones, i.e., Daniel Hoey; Robert McCully; and, Jason Moreno. *See* Crim. Nos. 09-200 (Hoey); 09-201 (McCully); and 10-117 (Moreno). JP Morgan Chase has advanced a restitution claim against Defendants related to many of the properties at issue. (Govt. Ex. H). Some of the individual borrowers – or their relatives -- have also submitted victim-impact statements with corresponding restitution claims. (Govt Exs. 150-213).

With a single exception, i.e., Moreno, the Government has not pursued the victim-related enhancements against any of the participants in this wire fraud conspiracy.[5] This would include, among others: real estate brokers: Robert Arakelian, Eric Hall, Rhonda Roscoe, and Rochelle Roscoe; closing attorneys: James Steiner and Daniel Sporrer; closing agent, Karen Atkison; appraisers: Joel Reck and Howard Reck; and bank employees: Bartholomew Matto, Cynthia Pielin and Crystal Spreng. *See* Crim. Nos. 09-198 (Arakelian); 09-202 (Spreng); 09-223 (Atkison); 09-311 (Sporrer); 10-106 (Hall); 10-232 (Howard Reck); 11-15 (Matto); 11-16 (Rhonda Roscoe); 11-17 (Rochelle Roscoe); 11-221 (Joel Reck); 11-255 (Pielin). The Government has also not sought to hold any of these individuals responsible for the "relevant conduct" of the entire conspiracy. By comparison, each of these coconspirators faced relatively nominal advisory guidelines ranges when compared to the advisory guidelines ranges proffered by the Government in this matter, i.e., Ratchkauskas, total offense level of 41 and criminal

---

[5] Moreno did not object to any sentencing enhancements and they were not litigated before this Court. *See* Crim. No. 10-117, Docket No. 135 at 1 ("Defendant filed his Position With Respect to Sentencing Factors on December 12, 2013, wherein he states that he has no objections, additions or modifications to the PIR."). On appeal, he argued that the borrowers were not victims and the Court of Appeals found that it was not plain error to conclude that the buyers were victims of his offenses. *See United States v. Moreno*, 809 F.3d 766, 767 (3d Cir. 2016).

history category of I, resulting in 324 months to life imprisonment; Kubini, total offense level of 37 and criminal history category of I, resulting in 210-262 months' imprisonment; and Smith, total offense level of 35 and criminal history category of I, resulting in 168-210 months' imprisonment. (Docket No. 630).

### B. Relevant Background Concerning Government's Disclosures

During pretrial litigation of this case, AUSA Conway represented to the parties and the Court in public filings on the CM/ECF System that Rochelle Roscoe of Riverside Mortgage would be called as a government witness at trial, with the earliest of such public disclosures appearing to have been made on <u>August 30, 2013</u> and <u>September 5, 2013</u> and the last one being on <u>February 19, 2015</u>. (*See e.g.*, Docket No. 180 at 2 ("both Rhonda and Rochelle Roscoe, pleaded guilty and are likely witnesses at the trial."); *see also* Crim. No. 11-17, Docket No. 40 at 1 ("The defendant [Rochelle Roscoe] is scheduled to testify at the upcoming trial of the United States v. George Kubini, et al., Criminal No. 11-014, in the Western District of Pennsylvania.")). The expectation of Rochelle Roscoe's trial testimony was referenced multiple times throughout the course of the extensive litigation in this case, and as a result, was noted by the Court several times in written decisions ruling on various motions. For example, in deciding a pre-trial *Brady* dispute between Smith and the Government on May 13, 2014, the Court noted that:

> [a]t this point of the case, the roles of both [Rochelle] Roscoe and [James] Steiner are clear because both have pled guilty to participating in the instant mortgage fraud scheme and will testify as key prosecution witnesses at trial consistent with their admissions that they acted with intent to defraud in conjunction with the real estate transactions.

*United States v. Kubini*, 19 F. Supp. 3d 579, 632 (W.D. Pa. 2014). Later, in a January 5, 2015 decision, the Court commented that "Government counsel has previously advised that it intends to call certain witnesses at trial, including Robert Arakelian (Pittsburgh Home Loans); Rochelle

Roscoe (Riverside Mortgage); and James Steiner (Hergenroeder, Rega & Sommer)." *United States v. Kubini*, 304 F.R.D. 208, 218 (W.D. Pa. 2015).

As noted, there have been regular disputes between AUSA Conway and counsel for Smith regarding the Government's disclosures throughout the case. Smith's counsel filed his first motion seeking the disclosure of *Brady/Giglio* materials on the date of Smith's arraignment, April 16, 2013, (Docket No. 115), and has repeatedly and persistently made similar requests throughout the course of these proceedings. (*See e.g.*, Docket Nos. 251; 256). The Government made certain of these materials, (including some related to Rochelle Roscoe), available for review by Defendants and their counsel on a computer terminal in the U.S. Attorney's Office as early as the fall of 2013. This procedure engendered disputes between the Government and Smith, leading the Court to prospectively define the scope of *Brady* material as to Rochelle Roscoe prior to trial, as follows:

> the Court agrees with Smith that the prior statements to the agents by Roscoe and Steiner, which are consistent with Smith's position that he was advised that the lenders were made aware of the "gifts of equity," are material evidence on the central issue of whether he acted with intent to defraud in this case. In this Court's opinion, this information "is particularly solid impeachment evidence because it goes against the thrust of the prosecution's case." *Starusko*, 729 F.2d at 261. Although the Government proffers that Roscoe and Steiner later retracted those statements, the fact that the prior statements may be used to impeach the witnesses does not alter the character of the evidence under *Brady* if it is material to the determination of defendant's guilt or innocence at trial, as is the case here. *See Friedman*, 658 F.3d at 358. To the extent that Smith's counsel's summary of the information in the agents' memoranda is accurate, which the Court has no reason to doubt, the same is the type of information which should be produced under *Brady* in accordance with the Court's deadline for same which will be set in its Pretrial Order.

*Kubini*, 19 F. Supp. 3d at 632-33. The Court also issued a Memorandum Order and corresponding Pretrial Order on September 18, 2014. (Docket Nos. 282, 283). In the

Memorandum Order, the Court noted the distinction between Jencks materials and *Brady/Giglio* materials and the differences in the Court's authority to order pretrial production of these types of materials. The Court reasoned that:

> [t]he parties do not dispute the generally applicable legal principles which permit the Government to withhold pure Jencks Act materials until after a witness testifies on direct examination, 18 U.S.C. § 3500(b), and precludes the Court from ordering production until that time. *United States v. Maury*, 695 F.3d 227, 247-48 (3d Cir. 2012). They also recognize that courts have long promoted and encouraged early disclosure of Jencks Act materials by the Government in order to avoid delays at trial. *See id.* at n.18 ("Despite this limitation, many federal prosecutors routinely turn over Jencks material a few days before the witness testifies."). They further concur that the Court retains the general discretionary authority to order pretrial disclosure of *Brady* and *Giglio* impeachment materials. *See United States v. Higgs*, 713 F.2d 39, 42, n.6 (3d Cir. 1983); *United States v. Starusko*, 729 F.2d 256, 261 (3d Cir. 1984) ("[t]he district court may dictate by court order when *Brady* material must be disclosed").

(Docket No. 282 at 11). In light of this distinction, the Court's Pretrial Order established a deadline of February 2, 2015 for the Government's production of "any *Brady/Giglio* impeachment materials not previously disclosed." (Docket No. 282). The Court also strongly encouraged the Government to produce its Jencks Act material by the same deadline. (*Id.*).

As the March 2, 2015 trial date approached, AUSA Conway took various steps to reinforce the previously stated position that Rochelle Roscoe would be called as a trial witness by the Government. To this end, AUSA Conway listed Rochelle Roscoe as a witness on the Government's witness list, filed under seal with the Court, on February 2, 2015. (Docket No. 333 at 7). To the Court's knowledge, the Government's witness list was neither shared with Defendants nor their counsel at that time.[6] Additionally, information concerning Rochelle

---

[6]    The Government's sealed witness list, signed by AUSA Conway, states in pertinent part, as follows:

> [T]here were two mortgage broker firms associated with the fraud, Pittsburgh Home Loans and Riverside Mortgage. Robert Arakelian and Eric Hall will

Roscoe (including several interview reports and her plea agreement) was forwarded to defense counsel on a computer disk on February 2, 2015 as part of what AUSA Conway described as the Government's "Jencks/Brady materials." (Docket Nos. 614-7 (listing materials as to Rochelle Roscoe disclosed to defense); 620-7, Ex. G (AUSA Conway letter to defense counsel dated 2/2/15 "Enclosed herein please find Jencks/Brady materials in the above-entitled case. We are providing these materials prior to trial under" a number of listed conditions.)). In the same correspondence, AUSA Conway advised the defense attorneys that "[i]f additional Jencks/Brady materials become known, they will be made available to you." (Docket No. 620-7).

AUSA Conway and the case agents reportedly met with Rochelle Roscoe in a trial preparation session on February 16, 2015. (Docket No. 620). The interview was not recorded and the agents were instructed not to take notes.[7] On the next day, February 17, 2015, AUSA Conway appeared at a preliminary pretrial conference hosted by the Court's Law Clerk, which was also attended by trial counsel for Ratchkauskas, Svaranowic and Smith. (*See* Docket No. 283). During the conference,[8] AUSA Conway advised that he had neglected to include Rochelle Roscoe's Presentence Investigation Report along with the Government's other disclosures and his paralegal forwarded same to counsel later that afternoon by email, stating "[e]nclosed please find the Presentence Investigation Report for Rochelle Roscoe, which we inadvertently omitted

---

> testify from Pittsburgh Home Loans, and Rhonda and Rochelle Roscoe are
> potential witnesses on behalf of Riverside Mortgage. It is unlikely that Rhonda
> Roscoe will testify. These witnesses will admit their role in the conspiracy and
> identify all of the defendants as co-conspirators. They will describe the scheme
> similarly to how the government described it above.

(Docket No. 333 at 7). The Government was also granted leave of court to file a supplemental witness list and did so on February 9, 2015. (Docket No. 365). The Supplemental Witness List was likewise filed under seal but makes no mention of the Roscoes or Riverside Mortgage. (*Id.*).

[7]     AUSA Conway took notes and attached same to his response. (*See* Docket No. 620). Upon review, the notes appear unremarkable.

[8]     Also during the preliminary pretrial conference, the Court, through its Law Clerk, was informed for the first time that there had been plea negotiations that were likely to resolve the cases against Kubini, Ratchkauskas, and Svaranowic short of trial. Counsel for Smith advised that his client intended to go to trial but that he was interested in and would consider a reasonable plea offer from the Government.

from the previously provided Jencks Act material." (Docket No. 624-1). AUSA Conway also sent a letter to counsel on February 17, 2015 disclosing some aspects of the meeting with Rochelle Roscoe earlier in the week which affected the evaluation of her credibility as a witness, i.e., mental health treatment she was receiving. (Docket No. 620-11). Then, two days later, on February 19, 2015, AUSA Conway wrote a letter to all counsel stating, in part, "[i]n meeting with Rochelle Roscoe, Special Agent Daniel Fisher paid for her lunch at Jimmy Johns." (Docket No. 620-12).

Also, on February 19, 2015, AUSA Conway stated the following in a filing he made on the Court's CM/ECF System at 8:55 a.m.:

### 6. **Riverside Mortgage (RM-1 through RM-633)**

In addition to the other objections related to exhibits described above, defendant Smith also objects to the admission of the records from Riverside Mortgage on authenticity grounds. **At trial, the government intends to present the testimony of Rochelle Roscoe, who will testify that the Riverside Mortgage records are her original business records that she provided to the investigators during the course of the investigation.** It is the government's view, therefore, that the Court will be unable to resolve the authenticity objection until trial.

…

Respectfully submitted,
DAVID J. HICKTON
United States Attorney

/s/ Brendan T. Conway _____
BRENDAN T. CONWAY
Assistant United States Attorney

(Docket No. 382 at 9 (emphasis added)). In this brief, AUSA Conway also noted that "certain developments" had occurred in the cases against Kubini, Ratchkauskas and Svaranowic, i.e., they had reached plea agreements, but continued that Smith was likely to proceed to trial and set forth the Government's position on exhibit objections. (*Id.*). The Court was forwarded plea

agreements as to Kubini, Ratchkauskas and Svaranowic on the afternoon of February 19, 2015. (Docket Nos. 383; 384; 386). The Court's staff was also made aware by co-counsel for the Government that he and Smith's counsel planned to meet on the afternoon of February 19, 2015 for the purpose of a Court ordered "meet and confer" on trial issues, (*see* Docket No. 368), and that he would also make a final plea offer to Smith at that time.[9] In anticipation of a trial against Smith only, the Court's law clerk circulated drafts of voir dire and initial instructions to counsel for the Government and Smith at the close of business on February 19, 2015. The next morning, February 20, 2015, at 9:17 a.m., counsel for Smith responded that his client would plead guilty and asked that the plea be set for Monday, February 23, 2015, a request the Court honored. (Docket No. 385).

It is undisputed that AUSA Conway did not retract any of his prior statements that Rochelle Roscoe would be called as a witness at trial prior to the entry of the guilty pleas by any of the Defendants. Relevant here, Smith entered his guilty pleas to counts of bank fraud, money laundering conspiracy and failing to file tax returns on Monday, February 23, 2015 in a proceeding starting at 9:00 a.m. and ending at 10:05 a.m. (Docket No. 388). AUSA Shaun Sweeney handled this hearing on behalf of the Government and SA Avolia attended in person. (Docket No. 387). (AUSA Conway did not attend). Ratchkauskas and Svaranowic changed their pleas to guilty in separate hearings held on February 24, 2015 – both pled guilty to bank fraud and Ratchkauskas also pled guilty to money laundering conspiracy. (Docket Nos. 391;

---

[9]         A staff note entered on CMF/ECF on Wednesday, February 18, 2015 at 12:08 p.m. indicates that:
          [Law Clerk] spoke to Shaun Sweeney who said that he has reached acceptable
          language with the defendants on the plea letters and is awaiting approval on the
          plea letters from his office; He also said that we will definitely be able to set the
          pleas early next week; I asked about Friday and he said that he hoped to have
          them done but was still making sure he got approval from his office and final
          approval from the defense attorneys; He also said that he will make a final pitch
          to Stallings during their meeting tomorrow for his client to plead but does not
          expect that he will agree to plead.
*Staff Note 2/18/15*, No Docket No.

394).  Kubini pled guilty to bank fraud, money laundering conspiracy and filing false tax returns the following day, February 25, 2015.  (Docket No. 397).

### C.  *Relevant Sentencing Related Proceedings*

At the conclusion of the change of plea proceedings for each Defendant, the Court issued standard presentence orders, scheduling their respective sentencings on different dates/times during July of 2015.  (Docket Nos. 389 (Smith sentencing set for July 10, 2015); 392 (Ratchkauskas sentencing set for July 17, 2015); 395 (Svaranowic sentencing set for July 24, 2015); 398 (Kubini sentencing set for July 31, 2015)).  However, during the change of plea proceeding for Ratchkauskas, AUSA Conway advised the Court that he would be requesting that multiple days of joint hearings be scheduled for the purpose of resolving anticipated sentencing enhancement disputes between the parties.  (Docket No. 402 at 26 ("I think with all four of these defendants, we should have probably two days' worth of hearings on the applicability of enhancements where we anticipate presenting evidence related to, among other things, loss, and victim-related enhancements that are potentially applied here that I anticipate there being dispute about.")).  The Court did not immediately act on this request deferring until it received and reviewed the presentence investigation reports as to each of the Defendants and the parties' positions in response.

In the interim, Ratchkauskas was charged with criminal contempt and falsification of a passport form via a criminal complaint filed at Magistrate Case No. 15-240.  He was arrested and detained on March 4, 2015.  (Docket Nos. 399; 401).  This Court held revocation proceedings at Crim. No. 11-14 on March 9, 2015, at which time Ratchkauskas' bond was revoked, after the Court found that he had violated the conditions of his bond.  (Docket Nos. 403; 404; 405).  To this end, Ratchkauskas had traveled outside of the jurisdiction on multiple occasions without

leave of court and he appeared to be a flight risk given his procurement of an Israeli passport during 2012 and his more recent attempt to obtain an expedited United States passport. (Docket Nos. 404; 405). Ratchkauskas has been in custody since that time.

As part of the presentence investigation process, AUSA Conway sent a lengthy submission to the Probation Office on March 11, 2015 setting forth its factual proffer of the offense conduct, relevant conduct and the sentencing computations for the Defendants, including information relevant to Roscoe. (Govt. Ex. AA). Upon receipt of this pleading, Smith's counsel renewed his discovery requests once again, stating:

> Please consider this our request for all information, statements, materials, documentation or evidence that could support a defense position that any of the enhancements sought by the government may not apply to Mr. Smith, as required by internal DOJ guidelines, statutes, the U.S. Constitution, and case law including *Brady*, *Giglio*, and their progeny (all of which apply with equal force to factors that affect sentencing). This request includes a request that the government specifically identify such materials even if the government contends that it previously made such materials available.

(Docket No. 614 at 9). AUSA Conway did not respond to this request. (*Id.* at 9, n.3).

On May 12, 2015, Smith moved to continue his sentencing hearing and related due dates for presentencing submissions as his counsel was scheduled to take a medical leave. (Docket No. 416). In response, AUSA Conway reiterated his request that the Court schedule joint hearings on disputed sentencing enhancements and restitution. (Docket No. 419 ("The government, however, would make one request in that regard. Many of the sentencing issues – loss and restitution amounts, the vulnerable victim enhancement, and other enhancements – may require lengthy hearings and are common among many of the defendants. Thus, the government anticipates requesting joint hearings on those enhancements to allow for the most efficient presentation of that evidence.")). Svaranowic joined Smith's motion to continue and the Court

held a status conference to discuss the matter. (Docket Nos. 424; 425). Ultimately, the Court agreed to schedule the requested hearing and entered an Order on May 19, 2015, setting this matter for a joint-hearing on October 7, 2015 and October 8, 2015.[10] (Docket No. 425). Ratchkauskas later objected to this procedure; but the Court overruled his position during a telephone conference. (Docket Nos. 431; 435).

Smith renewed his requests for *Brady*, *Giglio* and Jencks information several times in advance of the hearing on September 1, 2015; September 30, 2015; and October 3, 2015 and also requested a corresponding list of the witnesses that would be testifying. (Docket No. 614 at 9, n.3 ("As you know, Brady obligations apply in full to sentencing procedures. We also demand that you produce any and all information showing or tending to show that Mr. Smith did not have knowledge of the other alleged conspirators' actions."); September 30, 2015 ("When may we expect a witness list and production of Jencks Act/Brady/Giglio materials for the witnesses?"); October 3, 2015 ("While we continue to hope that stipulations will be reached that will avoid the need for a hearing as to Mr. Smith altogether, at this point if a hearing is necessary we will not be able to be prepared without the government identifying who its witnesses will be and producing updated Jencks/Giglio/Brady information for such witnesses.")). On September 30, 2015, the Court's Law Clerk also requested that the Government provide a list of the witnesses that it planned to call in email correspondence. The Government responded on October 1, 2015, advising that it planned to call the case agents, SA Fischer and SA Avolia; Kathleen Val of JPMC; and, coconspirator Joel Reck. The prosecutor also stated that "[w]e will then call various borrowers. We are not sure how many or who they are at this point. We will be requesting that

---

[10] In a subsequent order, the Court joined the cases of Roscoe, Atkison and Reck to resolve their objections to restitution. (Docket No. 451). However, they each agreed to stipulations on restitution that obviated a need for the hearing in their respective cases. (Docket No. 481). Atkison was sentenced to 2 years' probation on July 15, 2016 and ordered to pay over $1 million in restitution. (*See* Crim. No. 09-223, Docket No. 63). Roscoe and Reck have yet to be sentenced by the Court given these ongoing proceedings. (*See* Crim. Nos. 11-17, 11-221).

the Court allow many of them to testify over the telephone as well."

AUSA Conway followed up on October 4, 2015, stating:

> Counsel - we do not yet know who the borrower witnesses will be. I will let you know when we have that information. I estimate that we will call about five of them. Certainly, Tomieka Jackson is a likely witness. **In terms of updated Jencks / Giglio information, we are aware of our obligations and intend to fully comply. The only incremental Jencks Act/Giglio material is the material related to Ms. Val, which was already provided.**
> Please confirm whether you received government exhibits IRS-70 through IRS-183, which are the summary exhibits of the individual transactions. We were completing those as the change of pleas occurred and my records are unclear about whether those exhibits were provided.

> Brendan Conway

At 7:30 p.m. on the eve of the hearing, October 6, 2015, the AUSA explained that "[i]n terms of borrower witnesses, we are still contacting them, but we expect to present at least Theresa Osborne, Marissa Aversa, Vipporah Moses (daughter of Vanessa Moses), Theresa Osborne (now known as Theresa Ward), and Jaqueline Clancy. The agents are still trying to contact Tomieka Jackson, Steven Pressley, and Stephanie Parker Jones. The borrowers will not be testifying until Thursday." On the same evening, Smith filed a motion to continue the hearing, citing, among other things, the Government's failure to timely identify witnesses among the potential 100 plus borrowers and the corresponding failure to provide related *Brady* and Jencks Act materials in advance of the hearing.[11] (Docket No. 484). At the commencement of the October 7, 2015 hearing, the Court heard oral argument from counsel on the motion to continue at which time AUSA Conway challenged defense counsel for, among other things, complaining about the Government's disclosures and repeatedly maintained that all Jencks Act

---

[11] Smith's counsel also argued that "the government has produced no additional Jencks materials other than a few hand-scratched notes of agents since the pre-trial Jencks production. It is inconceivable that the government has neither identified nor interviewed its witnesses in the many months it has known this hearing was scheduled for October 7th." (Docket No. 484 at ¶ 9). It appears that counsel has now been proven correct in these assertions.

materials had already been made, commenting that the Defendants and their counsel had access to this material for many "months" or "years." *10/7/15 Hr'g Trans.* at 15-6 ("But we've provided -- in terms of the material needed to cross-examine these witnesses, Your Honor, they've had, as Mr. Stallings noted, access to loan files, literally for years, access to the Jencks Act material for years, and there are only potentially seven of them. So we're not talking about a monstrous undertaking in order to cross-examine these witnesses about whether they knew about the fraud."). AUSA Conway admitted that he refused to communicate with Smith's counsel,[12] and claimed that the Government was not trying to conceal information from the Defendants. *10/7/15 Hr'g Trans.* at 14 ("We've made a good faith effort to try as best we can to provide you with information so that you can make an informed decision about this important matter. But we certainly haven't made any effort to conceal anything from the Court or from the parties. We've made every effort to provide them the information as soon as we get it, frankly, and provide that information in a timely manner. The motion ought to be denied. The notion that we have to prepare for a borrower witness that has been – the Jencks Act material has been provided years ago is just not well taken.").

The hearing did not proceed as scheduled; rather, the Government presented its witness

---

[12]

> MR. CONWAY: Whatever proposal Mr. Stallings is referring to, it's absurd; and if it needs a formal response, it's rejected by the Government.
>
> In terms of the reasons why this communication with Mr. Stallings -- I think the record is replete that frankly, you know, Mr. Stallings, when the Government communicates with him, does not accurately represent what those communications are – […] MR. CONWAY: -- which is why we had limited our communications with him when other people are copied, other people are on the phone with him or it's in a formal letter. So that's why we've done what we have done. As the record is replete with that, you've mentioned it in some of your Orders.
>
> So there are reasons why the Government – the Government is in regular communications with the rest of the counsel here, picks up the phone when they call. I call them back. When they call me, I pick up the telephone. There's a reason why Mr. Stallings is treated the way he is. And I think your recitation earlier is another example of why he's treated the way he is.

*10/7/15 Hr'g Trans.* at 14-15.

on lender loss and restitution, JP Morgan Chase representative Kathleen Val, because she had traveled from Florida. (Docket No. 486). The matter was continued as to all other witnesses for the following reasons. (*Id.*). The Court granted the continuance to the Defendants as result of the AUSA's failure to timely identify potential borrower-witnesses for the hearing and to make necessary disclosures pertaining to their respective testimony. (*Id.*). The Government also agreed to the continuance because counsel and staff had located errors in the various summary exhibits that were to be introduced through the other witnesses. (*Id.*). As a result of the disputes at and before the October 7, 2015 session, the Court ruled that "fundamental fairness dictates that all witnesses must be disclosed to the defense in a timely fashion and that all relevant discovery documents as to such witnesses must be made available for review by defense counsel." (*Minute Entry, 10/26/15*, Docket No. 494). In addition, "[t]he Court ordered the Government to make available all loan origination and workout files and Mr. Smith's closing files as to all of the alleged victim buyers who have been disclosed as Government witnesses and for the Government to timely disclose any additional buyer witnesses to the defendants as soon as they are known." (Docket No. 486).

The Court set the matter for a continued hearing on October 27, 2015. (Docket No. 486). The Government sent a series of emails setting forth continuing changes to its witness list. On the evening of Friday, October 23, 2015, the Government forwarded a list that included in excess of 30 possible borrower witnesses. (*See* Docket No. 492). Given same, upon returning to Chambers on Monday, October 26, 2015, the Court entered an order continuing the matter to November 10, 2015 and added that "[n]o further supplementation of the Government's exhibits or witness list will be permitted in advance of the proceeding set for November 10, 2015, absent a motion showing good cause for the failure to timely provide same." (Docket No. 492). The

Government moved for reconsideration, upon which, the Court held a telephone status conference with counsel and granted the motion, ordering the Government to submit a complete list of borrower witnesses who would be appearing to testify at the proceeding. (Docket No. 494). The Court also raised the issue of whether the borrower witnesses should be appointed counsel given expected cross-examination would potentially implicate them in the offense conduct. (Docket No. 497). After hearing from the parties, and over the Government's objections, the Court advised that it would be "prepared to instruct all testifying witnesses concerning their rights to counsel as a witness being questioned about potential criminal activities. To the extent that any individual requests counsel, the Court will permit them the opportunity to consult with counsel and defer their testimony to some other time." (Docket No. 494).

Unfortunately, between the Court's issuance of the initial order and then the later vacation of same, Ratchkauskas' then-counsel accepted a court appointment and agreed to appear in the Court's Johnstown division on October 27, 2015. (Docket No. 497). The Court heard an oral motion to continue via telephone conference which was granted, in part, as the Court limited the October 27, 2015 proceeding to conducting the colloquy with the borrower-witnesses and heard oral argument on legal disputes raised by Smith and Kubini that did not involve Ratchkauskas. (*Id.*). The attorneys spent significant time debating the questions to be posed to the borrowers and the Court made clear that it would conduct the colloquy individually with each of them. (*Id.*). During a break in the proceedings, and without alerting the Court, AUSA Conway and the case agents asked all of the Government's subpoenaed witnesses to sit in the courtroom, filling the jury box and the gallery. The Court returned to the bench and instructed these individuals to leave the courtroom as the above described legal dispute had not

been finally resolved. Upon their departure, the Court then proceeded to conduct the colloquy with several individuals but did not allow substantive questioning given that Ratchkauskas did not have counsel present. (*Id.*).

The Court set the next session for November 10, 2015 and directed the Government to file a witness list and to provide the criminal histories of the borrower witnesses to Defendants. The Government placed 17 individuals on this witness list and the criminal histories were forwarded a few days later. (Docket No. 499). Another contentious telephone status conference was held on November 4, 2015. (Docket No. 507). Government counsel suggested that he could present the testimony of 12-13 witnesses at the hearing. (*Id.*). On November 10, 2015, the Court heard the complete testimony of 3 borrower witnesses. (Docket No. 512). The examination of one additional witness, Jaqueline Clancy, was not finished and her examination was held over to the next session. (*Id.*). At the conclusion of this proceeding, the attorneys advised that they would like to meet and confer in an effort to limit the scope of the borrower-witness presentations. (*Id.*). The Court acquiesced.

After numerous emails and yet another status conference, (Docket No. 518), the parties advised that they had reached a stipulation, which was filed of record on December 9, 2015. (Docket No. 520). Essentially, the parties agreed that aside from concluding the examination of Clancy, that the Government would defer calling any additional borrower witnesses. (*Id.*). With respect to Clancy, the parties agreed that "[t]he government shall insure that Ms. Clancy is present at said hearing to be subjected to cross-examination by defendants" and that "[f]or purposes of determining whether or not the defendants' guideline sentencing ranges should be enhanced pursuant to the provisions of U.S.S.G. [§§ 3A1.1 and 2B1.1(b)(2)], the Court may consider the testimony of witnesses Ward, McCabe, Jackson and Clancy (if Clancy appears for

cross-examination), as well as all of the exhibits admitted in connection with their testimony." (*Id.* at ¶¶ 1-3). However, they also agreed that "[n]othing in this stipulation is intended to limit the parties' rights to call witnesses or introduce other evidence directed to other disputed sentencing issues." (*Id.* at ¶ 6). In light of the parties' stipulation, the Court entered an order scheduling the matter for a continued hearing on January 27, 2016; setting a deadline for the parties to file witness and exhibit lists by January 20, 2016; and once again ordering them to meet and confer in an effort to reach stipulations on the application of the guidelines enhancements. (Docket No. 525). The witness and exhibit filings were made, as the Court had directed. (Docket Nos. 535, 536, 537, 538).

At the January 27, 2016 session, Clancy retook the stand. (Docket No. 536). But after some questioning, she decided that she no longer wanted to testify and was excused prior to completing her testimony. (*Id.*). SA Fisher was next called by the Government. (*Id.*). His testimony was completed at the session on February 23, 2016. (Docket No. 549). During that session of the hearing, the Government also presented the testimony of paralegal Diane Wikert and commenced the examination of SA Avolia. (*Id.*). SA Avolia's testimony concluded on May 13, 2016. (Docket No. 576). The Government rested its presentation, reserving the right to call additional borrower witnesses per the parties' stipulation. (Docket No. 576).

Rathckauskas called his wife, Amit, who testified on May 13, 2016 and June 1, 2016. (Docket No. 576, 589). He also testified on June 1, 2016.[13] (Docket No. 589). Smith offered the testimony of James Fellin, as an expert witness, on June 1, 2016. (*Id.*). Kubini testified on June 2, 2016. (Docket No. 590). The proceedings finally concluded after brief rebuttal testimony from SA Avolia. (*Id.*).

---

[13] The Court notes that it conducted colloquies with both Ratchkauskas and Kubini in light of the Court of Appeals' decision in *United States v. Moreno*, 809 F.3d 766, 767 (3d Cir. 2016), and they each agreed to provide testimony at this hearing and be subject to cross-examination from the Government.

*D.  Evidentiary Presentations*

        1.  <u>Relevant Portions of Case Agents' Testimony</u>

The case agents, SA Fisher and SA Avoila provided wide-ranging testimony.  (Docket Nos. 574; 575; 603).  They discussed the general nature of the scheme, identified the key players and their roles, reviewed various spreadsheets and explained their involvement in preparing same.  (*Id.*).  As expected, much of the case agents' testimony was in the form of hearsay,[14] relating information that was provided to them during the course of their investigation from cooperating witnesses, the Defendants, other coconspirators, lender representatives and borrowers on several of the properties.  (*Id.*).  Among other things, the agents offered some very general assertions regarding pre-trial interviews that were conducted with some of the borrowers in the case and were summarized in memoranda of interview ("MOI") reports that they had prepared, including their opinions that the borrowers were not aware of the fraud, and were victims of the fraud.  However, they admitted that they had not spoken to any of the borrowers about the Victim Impact Statements ("VIS") that they submitted to the U.S. Attorney's Office and did not verify anything that was contained therein.  (Docket No. 475 at 45-52).  They also did not conduct a detailed investigation into the borrowers' backgrounds, including their criminal histories, prior to making the assessment that they were victims and did not re-interview them after obtaining such information.  (*Id.*).  Notably, the case agents were not sequestered during these proceedings and attended every session of the hearings.  (Docket No. 574 at 9 ("THE COURT: … has there been any discussion about sequestering witnesses or not? MR. CONWAY: We are sequestering Diane Wikert and Miss Clancy.  Obviously the case agents are not sequestered.")).

---

[14]      Hearsay may be admitted at sentencing proceedings, provided that it has a sufficient indicia of reliability to support its probable accuracy.  For a more detailed discussion, *see* U.S.S.G. § 6A1.3(a); § III, *infra*.

SA Fisher and SA Avoila also offered lengthy testimony relating hearsay information that was provided to them by Rochelle Roscoe. Specifically, on January 27, 2016, AUSA Conway elicited testimony from SA Fisher seeking to introduce hearsay statements of Rochelle Roscoe. (Docket No. 574 at 161-66). The area of inquiry was Smith's testimony before the grand jury and was presented for the purpose of establishing that Smith lied to the grand jury in support of the obstruction of justice enhancement that the Government is pursuing against him. At issue once again was a letter signed by Roschelle Roscoe directed to Smith's contact at the title insurance carrier he used, Alfred V. Watterson, Jr., Esq. dated May 15, 2008, wherein she advises that "[p]lease be advised for each of the above closings [involving Real Estate Closing Investments, LLC, from 2007-2008] a gift of equity was provided by the seller. These loans were approved by the Investor on this basis. Accordingly, the gift of equity was not shown on the settlement sheet, or is it ever shown on the settlement sheet." (AJS-200). Smith's counsel objected to the introduction of such hearsay testimony by the case agent.

The entirety of the exchange follows:

> Q. Page 56, line 16, "A letter has been given to me, and a letter has been given to the U.S. Attorney's Office that I received from the lender that these types of gifts of equity were okay." Do you recall the letter that they're talking --Mr. Smith's talking about there?
> A. I do. And that's inconsistent with that statement.
> Q. Was the letter actually from any lender?
> A. It was not. It was from Rochelle Roscoe of Riverside Mortgage, a mortgage broker.
> Q. Now, in terms of that letter, what was the sort of genesis of that letter?
> A. The genesis of that letter seemed to arise from the audit of Mr. Smith's files, and his explanation -- he needed an explanation to give to his title company about the transactions that they had uncovered. Mr. Smith had stated that he requested one from Miss Roscoe. Miss Roscoe stated that Mr. Smith instructed her to fill one out. And she wrote -- according to Miss Roscoe, she wrote the letter, FAXed it to Mr. Smith, and he corrected it, which Mr. Smith also stated that he did revise the letter, and Miss Roscoe FAXed it

back to Mr. Smith.

MR. STALLINGS: Judge, we have an objection to that testimony and move to strike it. It's different with Miss Roscoe for a number of reasons. Miss Roscoe gave, as the Court is probably aware, several inconsistent statements to the Government regarding various issues related to this particular letter.

She is a Defendant in a separate case and, as a result, is not available to us to cross-examine on that matter. She is available to the Government. The Government has not made her available to us. And this witness ought not to be permitted to give hearsay testimony of some of the things she said. It's inherently unreliable. We have no ability to test it, given the nature of Miss Roscoe in the matter --

MR. CONWAY: Of course, Mr. Stallings has the subpoena power and can subpoena Miss Roscoe to appear here. She's completely available to him. So that is complete common sense. He's able to cross-examine Mr. Fisher with regard to the various statements. So that's common sense.

And hearsay is admissible, as you've ruled repeatedly here.

THE COURT: And as Miss Roscoe is also in front of me, I think I have been privy to her various statements and the like. So I'm going to overrule the objection.

MR. CONWAY: Just for the record, Your Honor, the defense has marked this as AJS-200, the second page --

THE COURT: AJS-200.

MR. CONWAY: So we'll go ahead and move for admission of this letter.

MR. STALLINGS: No objection.

THE COURT: Okay. AJS-200 is admitted.

BY MR. CONWAY:

Q. That's the letter we've been talking about; is that correct?

A. Correct.

Q. You've talked to Miss Roscoe repeatedly; is that correct?

A. I have.

Q. And in your estimation, is she capable of writing complete sentence in any way like the letter that we have here?

MR. STALLINGS: Same objection, Your Honor. In addition, he's not qualified to opine on Miss Roscoe's ability to write.

THE COURT: Sustained. I'll make my own judgment about the Roscoes.

Q. But in terms of -- according to Miss Roscoe, who was the person who really drafted this letter?

MR. STALLINGS: Same objection, Your Honor.

THE COURT: AJS-200?

MR. CONWAY: AJS-200.

MR. STALLINGS: Same objection, Your Honor. I want to make

sure --

THE COURT: I understand you made that objection.

A. According to Miss Roscoe --

THE COURT: And to that end, the objection – wait a minute. You're going to say according to -- okay. So you're relying on what she told you?

THE WITNESS: Yes, ma'am.

THE COURT: Okay. All right. The same objection is there. The Court overruled the objection. As I said, I'm well familiar with the ladies Roscoe.

Q. And according to Miss Roscoe, who was the person who really drafted this letter?

A. According to Miss Roscoe, it was Mr. Smith.

Q. And is that what he told the Grand Jury?

A. Who? Mr. Smith? What Mr. Smith told the Grand Jury?

Q. Right.

A. Mr. Smith told the Grand Jury that he directed her to write the letter -- or asked her I believe.

Q. Now, if we go to page 57, lines 9 through 11, "I deal directly through the broker, and the broker made it very clear, I asked the question, 'Is the lender aware of this?'"

The answer is "Yes."

A. That's inconsistent with my interviews of both Rhonda and Rochelle Roscoe. It's also inconsistent with all of the lender files.

Q. If we go to 103, at the top, the four lines there, "The letter was originally drafted by Miss Roscoe, and she sent it over to me to take a look at, and I helped her revise it because it was grammatical mistake. There were typos in there, and I figured, you know, it should be cleaned up."

Again is that, according to Miss Roscoe, an accurate description of the drafting process in connection with that letter?

MR. STALLINGS: Same objections, Your Honor.

THE COURT: Overruled.

A. Per my interviews with Miss Roscoe, that's inconsistent to some degree. The letter was revised, and it was sent back and forth, but it was not originally drafted by Miss Roscoe, per Miss Roscoe.

(Docket No. 574 at 161-66). SA Fisher's examination continued for the balance of the day and carried over into February 23, 2016. (Docket Nos. 574; 575). Additional objections were lodged to certain hearsay statements of Roscoe and once again overruled. On cross, Smith's counsel essentially went through all of the interview reports that were prepared by the agents after the various interviews with Roscoe and SA Fisher admitted that the only evidence he had supporting

the notion that Smith wrote this by himself letter was from his interview with Roscoe. (Docket No. 575 at 22). Although SA Fisher conceded that Roscoe had made inconsistent statements, at no time did he reveal that he thought that she was "completely not credible." AUSA Conway likewise did not share his impressions of Roscoe nor do anything to correct the record.[15]

On May 13, 2016, upon cross-examination by counsel for Kubini, SA Avoila testified as to the following:

> Q. Now, if there is an impropriety as you sit there today because you've already told us you don't know when the HUD-1 was possibly signed by Mr. Kubini, you don't know how much he knew or didn't know with regard to the actual financial end of it; is that right?
> A. Testimony and information we had received was that Mr. Kubini, Mr. Ratchkauskas, Mr. Smith and Miss Roscoe all attended a meeting together in which it was discussed that the funds from the buyer would come out of the proceeds from the seller. So he was -- based off of that testimony,
> Mr. Kubini was aware that that was going to be occurring.
> **Q. Where did you get this information?**
> **A. From Miss Roscoe.**
> **Q. The co-Defendant?**
> **A. Yes.**
> **Q. Did she get a 5K1?**
> **A. I am not familiar with the details of her plea.**
> **Q. Did she tell you who it was that was speaking there and how long this meeting lasted?**
> **A. No.**
> Q. So we don't know if Mr. Smith at this meeting as an attorney was saying, this is what -- this is how it's done, exactly how you just set forth? Is that fair to say?
> A. I do not know who was doing the talking. But I do know prior to the scheme, which most of the testimony in this case is related to with Mr. Smith, Mr. Kubini was operating and assisted as part of a similar scheme with Mr. Daniel Sporrer and Robert Arakelian in which funds from the buyer were not coming from the buyer.

(Docket No. 603 at 140-41 (emphasis added)). SA Avolia offered additional testimony regarding Roscoe's out-of-court statements during her cross-examination. (*Id.* at 201-11).

---

[15] The Court discusses the duty to correct the record *infra* at § IV.C.

2. <u>Information Withheld from Defendants Until After Conclusion of Proceedings</u>

It is uncontested that several related documents were withheld from the defense in this case until after the record closed on <u>June 2, 2016</u> in the sentencing enhancement and restitution proceedings, i.e., a chain of emails dated February 23, 2015 between AUSA Conway, SA Fisher, SA Avoila and SA Keith Heckman of the Secret Service; and 5K motions filed by the Government on behalf of Rochelle Roscoe; Bernard Matto; Eric Hall; Robert Arakelian; Joel Reck; and Karen Atkison at or around early March of 2015. (*See* Docket Nos. 614-1:614-6; 620-13). "The government acknowledges that it should have provided the 5K motions, [and] the e-mail [...] prior to SA Fisher and SA Avolia testifying." (Docket No. 620 at 11).

These materials reference the pre-trial decision by AUSA Conway that Rochelle Roscoe would not testify at trial as a government witness and also contain various comments by the prosecutor and SA Fisher regarding their opinions that she lacked credibility. (Docket Nos. 614-6; 620-13). AUSA Conway filed a lengthy response to Smith's motion, wherein he admits, among other things, that he made the decision to not call Rochelle Roscoe as a witness during or shortly after the last trial preparation meeting they had with her on <u>February 16, 2015</u>. (*See* Docket No. 620 at 3 ("[d]uring or shortly after [meeting with Rochelle Roscoe on February 16, 2015], undersigned counsel made the determination, absent some change in circumstances, not to call Roscoe in its case-in-chief.")). The 5K1.1 Motions were not disclosed to the defense until June 27, 2016, well after the record for the sentencing enhancement proceeding had closed.[16]

---

[16]    AUSA Conway emailed the motions to defense counsel at 2:59 PM on June 27, 2016, stating the following:

> Counsel-Since the latest Jencks Act/Giglio/Brady disclosure shortly before trial, the government filed a number of 5K motions for its cooperating defendants that you may find useful in your pleadings. Specifically, enclosed please find the signed 5K motions for Robert Arakelian, Karen Atkison, Eric Hall, Bart Matto, Joel Reck and Rochelle Roscoe. Of particular note is the Roscoe filing in which the government indicates its view that it did not view Roscoe as a "particularly reliable witness." The government has no objection to making reference to

(Docket No. 614-10). This disclosure was apparently made in response to this Court having issued a Rule to Show Cause on June 24, 2016 at Misc. No. 15-164.[17] The email chain and corresponding proffer were not disclosed until AUSA Conway filed the Government's Response to Smith's Motion on August 2, 2016. (*See* Docket No. 620 at 5 ("The government … only discovered this e-mail in preparing this pleading.")).

The record before the Court demonstrates that AUSA Conway never revealed to

---

these documents in your pleadings or supplementing the record with these documents should you see fit.

Best regards,
Brendan Conway.

(Docket No. 614-10). To this Court's knowledge, AUSA Conway has not advised Defendants that this information was only disclosed <u>after</u> the Court ordered him to show cause why he had not produced the information to them.

[17] The Court's Order, to which no response was filed by the Government, states that:

AND NOW, this 24th day of June, 2016, upon consideration of the sentencing enhancement and restitution proceedings in the related matter of Criminal Number 11-14, during which the Government introduced numerous out-of-court hearsay statements by Rochelle Roscoe through its testifying witnesses, and after conducting a further review of the Sealed "Government's Motion for Downward Departure Pursuant to § 5K1.1 of the United States Sentencing Guidelines" filed on March 9, 2015 at this Miscellaneous Case Number 15-164, wherein Assistant United States Attorney Brendan T. Conway and U.S. Attorney David J. Hickton have made certain representations to the Court, it appears to the Court that such Motion must be disclosed to counsel for Defendants Kubini, Ratchkauskas, Svaranowic, and Smith as part of the proceedings at Criminal Number 11-14, given the Government's obligations under *Brady*, *Giglio*, and the Jencks Act, as well as the principles of due process and fundamental fairness guaranteed to the Defendants as part of their respective sentencing proceedings, *see Betterman v. Montana*, No. 14-1457, 2016 WL 2903423, at *5, --- S.Ct. --- (U.S. May 19, 2016) ("After conviction, a defendant's due process right to liberty, while diminished, is still present. He retains an interest in a sentencing proceeding that is fundamentally fair."), particularly in light of the requirement that hearsay evidence presented at sentencing must have a "sufficient indicia of reliability to support its probable accuracy," see U.S.S.G. § 6A1.3 ("In resolving any dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy."),

IT IS HEREBY ORDERED that the Government shall either disclose the Motion to counsel for Defendants Kubini, Ratchkauskas, Svaranowic and Smith or show cause why such disclosure should not be ordered by the Court by July 5, 2016. Failure to timely respond to this Show Cause Order will result in the Court entering an Order at Criminal Number 11-14 directing that the Motion to be served on counsel for Defendants Kubini, Ratchkauskas, Svaranowic and Smith.

Defendants Kubini, Ratchkauskas, Svaranowic, Smith nor their respective trial counsel that he (AUSA Conway) had decided to not call Rochelle Roscoe as a witness at trial prior to the defendants' entry of their guilty pleas. AUSA Conway also never retracted his statements set forth in the filing on CM/ECF dated February 19, 2015 that "[a]t trial, the government intends to present the testimony of Rochelle Roscoe…" (Docket No. 382 at 9). Indeed, AUSA Conway's August 2, 2016 Response neither acknowledges his February 19, 2015 statements nor provides any explanation as to same vis-à-vis his admission that he made the decision not to call Rochelle Roscoe three days earlier, on February 16, 2015. (*See* Docket No. 620). Rather, AUSA Conway states the opposite:

> Certainly, if that (sic) government intended to call Roscoe as a witness [at trial], it would have disclosed SA Fisher's e-mail indicating his belief that she was not credible and the information from Roscoe's PSIR. The government, at least at the time of the defendants' pleas of guilty, however, did not intend to call Roscoe as a witness. There is no requirement to produce impeachment material -- which is the information at issue -- of non-witnesses. As contemplated by the government at the time of the defendants' guilty pleas, Roscoe was not a trial witness and her credibility was therefore not at issue, alleviating the government of its obligation to provide that material prior to the change of plea.

(Docket No. 620 at 12). The email chain produced by the Government follows:

| From: | DANIEL FISHER (PIT) <daniel.fisher@usss.dhs.gov> | Date: | 02/23/2015 11:00:04 |
|---|---|---|---|
| To: | Conway, Brendan (USAPAW) <BConway@usa.doj.gov>, KEITH HECKMAN (PIT) <keith.heckman@usss.dhs ... | Cc: | Avolia Amanda (Amanda.Avolia@ci.irs.gov) <Amanda.Avolia@ci.irs.gov> |
| Folder: | | | |
| Subject: | RE: 5K Motions | | |
| Attachments: | | | |

Print the page

**From:** Conway, Brendan (USAPAW) [mailto:Brendan.Conway@usdoj.gov]
**Sent:** Monday, February 23, 2015 10:46 AM
**To:** KEITH HECKMAN (PIT)
**Cc:** DANIEL FISHER (PIT); Avolia Amanda (Amanda.Avolia@ci.irs.gov)
**Subject:** 5K Motions

Judge Fisher wants to schedule sentencings for

Arakelian (testified at Moreno trial; would have testified at Kubini; led to guilty pleas of Spreng, Sporrer, Kubini, Ratchkauskas, Atkison; led to search warrants at Pittsburgh Home Loans; really the catalyst that led to a lot of cases) Keith's Boy!
Atkison (testified at Moreno trial; would have testified at Kubini) Nothing
Roscoe (would have testified at Kubini; led to guilty pleas of Pielin and Matto (NO, Matto came clean the minute I showed up at his door; Pielin was developed without RR help.); had decided not to call her as a witness; not sure credible) Completely not credible. She gave us documents and minimized her testimony every time we spoke.
Reck (testified at Moreno; would have testified at Kubini) Credible.
Matto (would have testified against Kubini) and DR, would have testified against RR and RR if necessary. Came clean without prompting.

Please add your thoughts for insertion into the 5k motions

(Docket No. 620-13). AUSA Conway proffers that his initial email of 10:46 a.m. on February 23, 2015 to Special Agents Fisher, Heckman and Avolia included his own comments about Rochelle Roscoe that he "had decided not to call her as a witness; not sure credible." (Docket No. 620 at 5). AUSA Conway attributes to Special Agent Fisher's responsive email at 11:00 a.m. the statements that Roscoe is "Completely not credible. She gave us documents and minimized her testimony every time we spoke." (*Id.*). Notably, the timestamps on these emails indicate that they took place 51 minutes and 1 hour and 15 minutes after the conclusion of the change of plea hearing in Smith's case and were prior to the guilty pleas of Ratchkauskas, Svaranowic, and Kubini that occurred over the next two days. (*Id.*; Docket No. 387). In addition, any responses or other comments to AUSA Conway's email which may have been provided by

SA Avolia, SA Heckman or SA Fisher have not been produced to date.

On March 9, 2015, AUSA Conway filed a 5K1.1 motion on behalf of Rochelle Roscoe under seal at Miscellaneous Case No. 15-164. (Misc. No. 15-164, Docket No. 1). This Motion was not acted on by the Court as Rochelle Roscoe's sentencing was continued and taken off the Court's docket until further order of court. (*See* Crim. No. 11-17, Docket Report). Among other things, AUSA Conway states the following in the 5K1.1 motion:

> **Rochelle Roscoe was a critical cog in the scheme because she was the mortgage broker on most of the transactions.** She arranged for the submission of fraudulent loan applications that overstated the assets of the borrowers, fraudulent Verifications of Deposit that falsely verified that the loan applicants had bank accounts with sufficient money in them to qualify for the loans and make the purported substantial down payments associated with the purchases of the properties, and other paperwork that falsely represented that the borrowers intended to make down payments associated with the purchase of the properties. **She also arranged for fraudulent appraisals and was one of the primary contacts with the borrowers, who were often unsophisticated people who had never purchased property before.**

> Although Rochelle Roscoe initially denied culpability in connection with these transactions, she eventually admitted her role and implicated others, including Kubini, Ratchkauskas and Smith. After her indictment, she pleaded guilty pursuant to a plea agreement in which she agreed to cooperate in the government's mortgage fraud investigations.

> Since that time, law enforcement interviewed the defendant and met with her to discuss her potential testimony approximately eight times. **From the government's perspective, she provided evidence that was often contradictory. Even during a single meeting, the defendant would say things that seemed completely inconsistent. She did, however, consistently implicate Kubini, Ratchkauskas, and Smith.** At times she implicated Svaranowic, and at other times she would indicate that Svaranowic provided accurate appraisals. She did voluntarily provide the government with her broker files for most of the transactions, which were helpful, and she testified before the grand jury that indicted Kubini, Ratchkauskas, Smith and Svaranowic.

> **At trial, Rochelle Roscoe was prepared to testify against Kubini, Ratchkauskas, Smith and Svaranowic, and those defendants may have been influenced in their decisions to plead guilty because of the prospect of Rochelle Roscoe testifying against them.** The government believes, however, that the prospect of Rochelle Roscoe testifying against them had little if anything to do with their decisions to plead guilty. In fact, **the government, for strategic reasons, had decided it was in the best interests of the government not to call Rochelle Roscoe as a witness in the trial, fearing that she would do more harm than good.** Particularly problematic from the government's perspective was the defendant's tendency to downplay her own involvement in the scheme, and to claim false altruistic motives for her crimes.
>
> …
>
> **In the government's view, the defendant occasionally provided truthful information throughout the course of her cooperation, but some of that information was contradictory. Thus, the government did not view her as a particularly reliable witness.** Perhaps the most useful portion of her cooperation was providing her mortgage broker files for the relevant transactions.

(Docket No. 1 (emphases added)).

As noted, the Government also failed to disclose 5K1.1 motions that it filed on behalf of coconspirators Arakelian, Atkison, Hall, Reck, and Matto. (Docket Nos. 614-1:614-5). These motions were all filed in the same time period but none of them contain the type of adverse credibility assessments that are present in the Roscoe 5K1.1 Motion.[18] (*Id.*).

---

[18]    It is not clear to the Court if the 5K1.1 motion filed on behalf of James Steiner was ever disclosed to these Defendants as the same is not referenced on the Jencks Chart attached to Smith's motion. (*See* Docket No. 614-7 at 19 (listing materials as to Steiner including "1. MOI dated 5-6-11 with notes; 2. Grand Jury Transcript dated 3-26-13; 3. Correspondence dated 9-23-13; 4. Plea Agreement; 5. Presentence Investigation Report.")). With that said, the Government did disclose on February 2, 2015 that:

> [w]ith regard to James Steiner, counsel for the government has been supportive of Mr. Steiner with regard to the disciplinary action against Mr. Steiner. In telephone calls between counsel for the government and disciplinary counsel, counsel for the government explained the relatively modest scope of his fraudulent conduct, his truthful admission of culpability, and his cooperation with the government. In addition, the government concurred with the defense counsel's request for a non-incarceration sentence at the time of his sentencing.

(Docket No. 620-7 at 3). Steiner was sentenced to probation on May 23, 2014 and Defendants were plainly aware of this fact.

III.     RELEVANT LEGAL STANDARDS

"The sentencing guidelines and Federal Rules of Criminal Procedure **do not** require that a district court conduct an evidentiary hearing in addition to a sentencing hearing at which the parties can be heard. Thus, '[a]n evidentiary hearing need not be afforded on demand because there is no right to a hearing.'" *United States v. Kluger*, 722 F.3d 549, 563 (3d Cir. 2013) (quoting *United States v. Cantero*, 995 F.2d 1407, 1413 (7th Cir. 1993) (citations omitted)) (emphasis added).   Section "'6A1.3 of the Guidelines requires the district court to provide a procedure—but not necessarily an evidentiary hearing—in which the parties may argue contested sentencing issues.'" *Id.* (quoting *Cantero*, 995 F.2d at 1413 (citation omitted)).   It is committed to the sound discretion of the District Court to determine if an evidentiary hearing should be held and the scope of any such proceedings.  *See* Fed. R. Crim. P. 32(i)(2) ("The court *may* permit the parties to introduce evidence on the objections.") (emphasis added); *see also Kluger*, 722 F.3d at 563.

The Court is tasked with weighing the credibility of the evidence presented by the parties at sentencing.  *See United States v. Perez*, 386 F. App'x 301, 304 (3d Cir. 2010) (citations omitted). As such, the Court can accept some parts of the evidence and reject other portions of the evidence.  *United States v. Shumaker*, 2011 WL 13176084, at *16 (W.D. Pa. Mar. 28, 2011), *aff'd*, 475 F. App'x 817 (3d Cir. 2012) (citation omitted)). The Court may also "assess credibility in light of the maxim, falsus in uno, falsus in omnibus ... defined as 'false in one thing, false in everything.'" *Bennun v. Rutgers State University*, 941 F.2d 154, 179 (3d Cir. 1991) (quoting Black's Law Dictionary 543 (5th ed. 1979)); *see also* 3d Cir. Model Crim. Jury Instr. § 4.26 ("If you believe that a witness knowingly testified falsely concerning any important matter, you may distrust the witness' testimony concerning other matters. You may reject all of the

testimony or you may accept such parts of the testimony that you believe are true and give it such weight as you think it deserves.").

The resolution of factual disputes is governed by the preponderance of the evidence standard. *See United States v. Fisher*, 502 F.3d 293, 304-05 (3d Cir. 2007); *see also* U.S.S.G § 6A1.3, comm. n. ("use of a preponderance of the evidence standard is appropriate to meet due process requirements and policy concerns in resolving disputes regarding application of guidelines to the facts of a case."). Further, "the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, *provided that the information has sufficient indicia of reliability to support its probable accuracy.*" U.S.S.G. § 6A1.3(a) (emphasis added). Thus, hearsay may be admitted during sentencing proceedings but such evidence must meet the reliability standards set forth in § 6A1.3 to be admitted. *United States v. Smith*, 751 F.3d 107, 116 (3d Cir. 2014). It is the Government's burden to prove the challenged sentencing enhancements and the restitution claims by a preponderance of the evidence. *Id.* at 117-18.

IV.   DISCUSSION

In this case, the Court exercised its discretion to conduct evidentiary hearings at the Government's request, with the parties and the Court expending significant time, energy and resources litigating numerous disputes concerning the application of the various sentencing enhancements and restitution claims, holding evidentiary hearings on eight days over the course of seven months and several status conferences throughout that time period. The Court likewise exercised its discretion to establish rules for the evidentiary presentations, ordering at the outset that "fundamental fairness dictates that all witnesses must be disclosed to the defense in a timely fashion and that all relevant discovery documents as to such witnesses must be made available

for review by defense counsel." (Docket No. 494). The Government now admits – as it must – that it failed to <u>timely</u> produce 5K motions of cooperating witnesses as well as emails between counsel and the case agents prior to the testimony of SA Fisher and SA Avoilia. (*See* Docket No. 620 at 11 ("The government acknowledges that it should have provided the 5K motions, [and] the e-mail, […] prior to SA Fisher and SA Avolia testifying.")). The Government additionally concedes that "defense counsel should have had the opportunity to cross-examine SA Fisher and SA Avolia about these materials." (*Id.*).

Defendants argue that their due process rights were violated because the withheld documents relating to Rochelle Roscoe constitute exculpatory *Brady/Giglio* materials that should have been produced by the Government by the Court's pretrial deadline and/or in advance of the sentencing proceedings. (Docket Nos. 614; 615). They contend that by withholding such information, the Government precluded their ability to effectively counter the Government's sentencing arguments, including the need for such extensive evidentiary hearings, as well as inhibited their ability to cross-examine the Government's summary testimony provided by the case agents during the sentencing proceedings. (*Id.*). Defendants advocate that the Court admit the untimely disclosed exhibits into the record, strike any evidence presented by the Government during the sentencing proceedings that relies upon hearsay information proffered by Rochelle Roscoe, explicitly or implicitly, and impose any further sanctions that the Court deems appropriate.[19] (*Id.*). Government counsel claims that the withheld information is not *Brady* evidence, his non-disclosure of same was inadvertent, and advocates that the Defendants have

---

[19]    Smith also suggests that his due process rights were violated because the information was withheld prior to his entry of his guilty pleas. He has not, however, moved to withdraw his guilty pleas and has continued to litigate the myriad of sentencing issues in this case. *See United States v. Piper*, 525 F. App'x 205, 209 (3d Cir. 2013) (noting that a defendant may be able to withdraw a guilty plea upon proof of misconduct by government agents that fraudulently induced him to plead guilty). Hence, the Court focuses on the claimed prejudice sustained by the defense given the Government's withholding of such information vis-à-vis the sentencing enhancement and restitution proceedings.

not demonstrated that they were prejudiced by the non-disclosure of such information because the Court has not yet sentenced the Defendants. (Docket Nos. 620; 624). In this regard, the Government proposes that the Court admit the exhibits and strike certain identified testimony of SA Fisher and SA Avoilia where they explicitly testified as to out-of-court statements that they attributed to Rochelle Roscoe. (*Id.*). The Government alternatively suggests that the Court reopen the record and permit the Defendants to further cross-examine SA Fisher and SA Avolia. (*Id.*). In essence, the Government advocates that if the Court finds that a violation of the Defendants' due process rights occurred, that such non-disclosure constitutes harmless error. (*Id.*).

"After conviction, a defendant's due process right to liberty, while diminished, is still present. He retains an interest in a sentencing proceeding that is fundamentally fair." *Betterman v. Montana*, 136 S.Ct. 1609, 1617 (2016). A defendant's due process rights at sentencing hearings include the rights afforded under *Brady*, *Giglio* and their progeny, and require the prosecution to produce exculpatory evidence known to the prosecution to the defendant, in accordance with any deadlines established by the Court. *See e.g., Brady v. Maryland*, 393 U.S. 83, 87 (1963). Similarly, the Jencks Act, which is codified in Rule 32(i)(2), applies to sentencing proceedings and requires the prosecution to produce witness statements at the conclusion of direct testimony of the witness. *See e.g., United States v. Rosa*, 891 F.2d 1074, 1079 (3d Cir. 1989). In addition, a criminal defendant enjoys due process rights to not have his sentence enhanced based on "inaccurate information," *United States v. Reynoso*, 254 F.3d 467, 473 (3d Cir. 2001) (citing *United States v. Nappi*, 243 F.3d 758, 763 (3d Cir. 2001)), "clearly erroneous facts," *United States v. Wise*, 515 F.3d 207, 218 (3d Cir. 2008); *Gall v. United States*, 552 U.S. 38, 51, 128 S.Ct. 586, 169 L.Ed.2d 445 (2007), "materially false information," *United*

*States v. McDowell*, 888 F.2d 285, 290 (3d Cir. 1988), and/or "unsupported speculation," *United States v. Berry*, 553 F.3d 273, 281 (3d Cir. 2009). Finally, a District Court's computation of a higher sentencing range resulting from a due process violation "too seriously affects the fairness, integrity, or public reputation of judicial proceedings to be left uncorrected." *United States v. Saferstein*, 673 F.3d 237, 244 (3d Cir. 2012); *United States v. Tai*, 750 F.3d 309, 320 (3d Cir. 2014) (citing same).

The Court has carefully considered the parties' arguments on the disclosure issues in light of the entirety of the record that has been developed during the course of these proceedings as well as the parties' submissions of proposed findings of fact and conclusions of law, responses thereto, and replies. For reasons that are more fully detailed below, it is this Court's opinion that the prosecutor withheld material evidence in violation of the Jencks Act and *Brady/Giglio*; misrepresented facts to the Court; has taken inconsistent positions in this and related litigation; and failed to <u>timely</u> correct the record, despite numerous opportunities to do so. The Court believes that the most appropriate sanctions for such behavior include denying the Government's expected request to reopen the record on the challenged enhancements and to not consider the testimony of the case agents as to the challenged enhancements on issues that are not independently verifiable by other evidence in the current record or otherwise admitted by the Defendants.

Before addressing the application of the various legal principles supporting the Court's decisions, some important considerations are worth noting. First, SA Fisher and SA Avolia are crucial prosecution witnesses upon whose testimony the Government relies to establish nearly all of the disputed sentencing enhancements, the application of which would more than double the Defendants' sentencing exposure under the advisory sentencing guidelines. (*See e.g.*, Docket

No. 630).  Their testimony was, in large part, summary in nature, relating information that they learned during the "investigation," without specifically identifying their source(s) in all instances. At the same time, the Court is well-familiar with the facts and circumstances of the mortgage fraud scheme, having presided over this matter (and the related cases) for a number of years and the lengthy sentencing enhancement proceedings involved many matters that were cumulative to the Court's understanding of the scheme and the players.  Second, the prosecutor asserted several times on the record that he had satisfied his obligations under *Brady* and the Jencks Act and that he had made all of the required disclosures but he clearly did not do so. (*See 10/4/15 email*; *Hr'g Trans.* 10/7/15).  Third, the Court ordered the Government to produce such information at the outset of the proceedings and the Government failed to do so, violating this Court's Order.  (Docket No. 494).  Fourth, the prosecutor had actual knowledge of the withheld information, having drafted the sealed 5K1.1 motion in Rochelle Roscoe's case and authored the initial email request to which SA Fisher responded, none of which was disclosed.  (Docket Nos. 614-6; 620-13).  Fifth, the record as to the sentencing enhancement and restitution proceedings has closed, as the Court has recounted in several Orders and the Court interprets the parties' stipulation to preclude any further testimony from the case agents.  (Docket No. 520 at ¶ 6 ("The Court's resolution of these issues … will … greatly assist the government in determining whether it will be necessary to call additional borrower-witnesses")).  With that background, the Court turns to its analysis.

### A.  Jencks Act/Rule 32(i)(2) violation

The Court initially explains how the prosecution violated the Jencks Act, as codified in Rule 32(i)(2), by withholding the February 20, 2015 email from SA Fisher to the entire prosecution team where he stated that Rochelle Roscoe was "completely not credible."  (Docket

No. 620-13). The Jencks Act requires the prosecution to disclose witness statements in its possession that relate to the subject matter of the witness's testimony after the direct examination of the witness. *See e.g., United States v. Merlino*, 349 F.3d 144, 155 (3d Cir. 2003); 18 U.S.C. § 3500(b); FED. CRIM. P. 32(i)(2) ("If a witness testifies at sentencing, Rule 26.2(a)-(d) and (f) applies."). The Court of Appeals has rightly recognized that:

> the sentence imposed on a defendant is the most critical stage of criminal proceedings, and is, in effect, the "bottom-line" for the defendant, particularly where the defendant has pled guilty. This being so, we can perceive no purpose in denying the defendant the ability to effectively cross-examine a government witness where such testimony may, if accepted, add substantially to the defendant's sentence.

*Rosa*, 891 F.2d at 1079. In the context of this case, the sentencing enhancement litigation is certainly a critical juncture of the proceedings, particularly given that each of the Defendants has waived his/her appellate rights as part of their respective plea agreements. Hence, not only will this Court's imposition of sentences be the "bottom line" for these Defendants, such pronouncements may be the final judicial ruling in their cases.

Returning to the evidence, SA Fisher was asked a direct question by the prosecutor seeking to elicit out-of-court statements by Roscoe made to him pertaining to whether she or Smith was the real author of the "Roscoe Letter." (Docket No. 574 at 161-66). Such out-of-court statements by a hearsay declarant are only admissible at sentencing proceedings <u>if they have sufficient indicia of reliability to support their probable accuracy</u>.[20] *See* U.S.S.G. § 6A1.3; *see also Smith*, 751 F.3d at 116 (an agent's recitation of information from a <u>credible source</u> is

---

[20] The seasoned prosecutor is plainly aware of this standard, having acknowledged same in the Government's Response to Defendant Smith's Bench Memorandum of Law Regarding Admissibility of Witness Statements filed with the Court on October 22, 2015. (*See* Docket No. 491 at 1 ("The Sentencing Guidelines place a caveat on the use of information that the Court may use in resolving disputes related to the sentencing factors: 'In resolving any dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy.' U.S.S.G. § 6A1.3(a).")).

admissible at sentencing). In this Court's estimation, the fact that SA Fisher opined in email that Roscoe was "Completely not credible. She gave us documents and minimized her testimony every time we spoke," plainly relates to the subject matter of his testimony at the sentencing enhancement proceedings. (Docket No. 620-13). The Government has not advocated otherwise. (*See* Docket Nos. 620; 624). Hence, SA Fisher's email constituted Jencks material and should have been disclosed at least by the conclusion of his direct examination. *See* 18 U.S.C. § 3500(b). Such email was not produced despite the fact that the prosecutor asserted that his Jencks and *Brady* obligations had been met months prior to SA Fisher testifying on January 27, 2016.

Prior to imposing a sanction for a Jencks Act violation, the Court must "'analyze the prejudice resulting from the nondisclosure of the evidence in terms of its potential usefulness to the defense.'" *United States v. Zomber*, 299 F. App'x 130, 135 (3d Cir. 2008) (quoting *United States v. Hill*, 976 F.2d 132, 141 (3d Cir. 1992)). However, "the harmless error doctrine must be strictly applied in Jencks Act cases." *Goldberg v. United States*, 425 U.S. 94, 111 n. 21, 96 S.Ct. 1338, 1348 n. 21, 47 L.Ed.2d 603 (1976). With respect to sentencing proceedings, Rule 32(i)(2) provides, in relevant part:

> **(2) Introducing Evidence; Producing a Statement.** The court may permit the parties to introduce evidence on the objections. If a witness testifies at sentencing, Rule 26.2(a)-(d) and (f) applies. **If a party fails to comply with a Rule 26.2 order to produce a witness's statement, the court must not consider that witness's testimony.**

Fed. R. Crim. P. 32(i)(2) (emphasis added). The potential sanction of striking or not considering a witness's testimony set forth in Rule 32(i)(2) is not mandatory, but rather, discretionary with the Court. *See United States v. Jackson*, 649 F.2d 967, 972 n. 6 (3d Cir. 1981) ("it has been held that the statutory alternatives of striking the witness' testimony or declaring a mistrial are not

mandatory, and whether to follow a different course rests with the discretion of the trial judge").

Having considered the matter, the Court believes that Defendants have sustained significant prejudice as a result of the Government's withholding of the email communication by SA Fisher. *See Rosa*, 891 F.2d at 1078. The Court ordered the Government to produce this type of information prior to the testimony of all witnesses because the Court believed that fundamental fairness required same given the numerous disputes that have pervaded this litigation. (Docket No. 494). Nothing has changed from the Court's perspective as it still believes that providing Defendants with necessary information to cross-examine the Government's witnesses was critical to their defense given the significant number of enhancements and the lengthy advisory guidelines ranges that the Government is seeking against them. Without the email, Defendants were not able to fully and fairly cross-examine SA Fisher on his expansive summary testimony concerning the investigation prior to the closure of the record, including the statements he attributed to Roscoe, who was neither called as a witness nor made available for cross-examination.[21] Further, as is explained in the sections below, the email contains particularly useful information from the perspective of Defendants because it is exculpatory within the scope of *Brady/Giglio*, directly contradicts the testimony of the case agents and undermines their credibility, and further demonstrates that the prosecutor misrepresented key facts to the Court when arguing evidentiary objections. *See Zomber*, 299 F. App'x at 135.

Accordingly, the Court holds that the Government violated the Jencks Act by failing to disclose this email and that an appropriate sanction for such violation is for the Court to not rely

---

[21]     As the Court discusses in the next section, *see* § IV.B, *infra*, calling Roscoe as a witness would not have revealed the information that was suppressed, i.e., the assessments of her credibility by the prosecutor and the case agent. In addition, as the disclosures were not made until after the evidentiary record closed, Defendants were prevented from evaluating this information prior to determining whether to list her as a witness by the Court's deadline of January 20, 2016. (*See* Docket No. 525).

upon SA Fisher's testimony to enhance Defendants' sentences, as per the text of Rule 32(i)(2). *See* FED. R. CRIM. P. 32(i)(2). With that said, the Court will permit Defendants to rely upon any admissions made by SA Fisher during his testimony[22] and will separately issue rulings based on the testimony of other witnesses as well as on the purely legal disputes presented by the parties on the various objections, of which there are many.

### B. *Brady/Giglio violation*

The Court next explains how the withheld materials related to Roscoe, i.e., both the email and the sealed 5K1.1 motion, are covered by *Brady/Giglio* and should have been timely produced by the Government. (Docket Nos. 614-6; 620-13). "Under *Brady*, the government has an obligation to disclose all evidence that is favorable to the accused and material either to guilt or punishment." *United States v. Suastegui*, 529 F. App'x 129, 131-32 (3d Cir. 2013), *cert. denied*, 134 S. Ct. 353 (2013). "Evidence is 'material' if there is a reasonable probability that, 'had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *United States v. Maury*, 695 F.3d 227, 249 (3d Cir. 2012) *cert. denied*, 133 S. Ct. 1600 (2013) (quotation omitted). "Material evidence can include evidence that may be used to impeach a witness." *United States v. Friedman*, 658 F.3d 342, 358 (3d Cir. 2011) (citation omitted). "[I]nadmissible evidence may be material if it could have led to the discovery of admissible evidence." *Johnson v. Folino*, 705 F.3d 117, 129 (3d Cir. 2013), *cert. denied*, 134 S. Ct. 61, 187 L. Ed. 2d 253 (2013). "Materiality is determined by viewing the cumulative effect of the evidence instead of considering the value of each individual piece of evidence in isolation." *Bonfilio v. United States*, No. 09-205, 2016 WL 6124487, at *3 (W.D. Pa. Oct. 20, 2016) (citing *Kyles v. Whitley*, 514 U.S. 419, 433 (1995)). "[T]he constitutional obligation [to produce

---

[22] These admissions include, among other things, that he could not prove that the transactions with borrowers Hubert Smith and Zachary Engler involved fraud and that he did not conduct an investigation into the losses claimed by the borrowers set forth in the various VIS and incorporated into Govt. Ex. Q.

evidence] is [not] measured by the moral culpability, or the willfulness, of the prosecutor. If evidence is in his file, he should be presumed to recognize its significance even if he has actually overlooked it." *United States v. Higgs*, 713 F.2d 39, 42, n.3 (3d Cir. 1983) (quoting *Agurs,* 427 U.S. at 110, 96 S.Ct. at 2400 (footnote omitted)); *Brady*, 373 U.S. at 87 ("the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.").

The Government raises several curious arguments in opposition to the defense assertion of *Brady* violations, none of which the Court finds to have any merit and overrules each with dispatch. (Docket Nos. 620; 624). The Government contends initially that *Brady* was not violated because the withheld information was cumulative or otherwise available to Defendants with due diligence since they were provided with the various reports of the agents' interviews of Rochelle Roscoe and could have called her as a witness at the hearings but did not do so. (*Id.*). These assertions are both legally and factually erroneous. As a legal matter, the United States Court of Appeals for the Third Circuit has recently clarified that there is no "due diligence" exception to *Brady*. *See Dennis v. Secretary, Pa Dept. of Corrections*, 834 F.3d 263, 292 (3d Cir. 2016). Indeed, the Court of Appeals held that "[t]he government must disclose all favorable evidence. Only when the government is aware that the defense counsel already has the material in its possession should it be held to not have 'suppressed' it in not turning it over to the defense. Any other rule presents too slippery a slope." *Id.* As a factual matter, the exculpatory information that was withheld contained the assessments by AUSA Conway, and SA Fisher regarding Rochelle Roscoe's lack of credibility/reliability. (Docket Nos. 614-6; 620-13). Defendants had no access to this information and could not have discovered it absent disclosures

from the Government, or – as occurred here with respect to the sealed 5K1.1 motion – intervention by the Court requiring the Government to make the disclosures. Further, calling Roscoe as a witness, as the Government suggested Defendants could have done to counter the objection, would not have provided the credibility assessments of SA Fisher and AUSA Conway. This type of information that is squarely within the control of the Government and its agents cannot be considered cumulative for *Brady* purposes. *See Ferrara v. United States*, 456 F.3d 278, 296 (1st Cir. 2006) (citation omitted) (withheld evidence cannot be considered cumulative if it provides a new method to impeach a witness).

The Government also contends that the withheld evidence does not meet the materiality standard under *Brady*, suggesting that there is "certainly a question about whether these items were 'material' under a *Brady* analysis." (Docket No. 620 at 11). The Government focuses on the disputes where it admits counsel intended to use the hearsay information in support of specific sentencing enhancements, but the Court finds all of this information, viewed cumulatively, to be material as to the testimony of the case agents, SA Fisher and SA Avolia, both as it pertains to their credibility as witnesses and the reliability of the evidence that they allegedly gathered during the course of their investigation in this matter. It is this Court's opinion that the withheld evidence is "obviously of such substantial value to the defense that elementary fairness require[d] it to be disclosed." *United States v. Higgs*, 713 F.2d 39, 41-42 (3d Cir. 1983). In fact, during pretrial litigation in this case, the Court defined the parameters of *Brady*, explicitly holding that prior statements of Roscoe denying culpability were exculpatory to the defendants in this case, even if she later retracted those statements in subsequent interviews. *See Kubini*, 19 F. Supp. 3d at 632-33. Hence, counsel should have recognized that this was the

type of information that the Court would deem *Brady* materials.[23]

The Court likewise believes that the Government's adverse credibility assessments are certainly exculpatory to Defendants with respect to these sentencing proceedings and the various enhancements the Government is pursuing. In this regard, the Court finds helpful the discussion by the United States District Court for the District of Columbia in *United States v. Bagcho*, *United States v. Bagcho*, 151 F. Supp. 3d 60, 67 (D.D.C. 2015), *reconsideration denied in part*, No. CR 06-00334 (ESH), 2017 WL 27925 (D.D.C. Jan. 3, 2017), in a seemingly analogous situation involving the prosecution's failure to reveal an adverse credibility assessment concerning a cooperating source. On the former point regarding witness credibility, the Court reasoned that:

> [i]t is clearly favorable to defendant that a U.S. government agency characterized the most prominent witness against him as a fabricator after that witness made non-credible statements about an individual who was a subject of his testimony at trial, and then proceeded to notify the DEA of that assessment.

*Id.* at 67. With respect to the latter point regarding the reliability of the investigation, the Court held:

> Evidence that the DEA's Kabul office was told that Qari had been deemed a liar by another government agency, yet still it elected to use him as a witness would serve to undermine the reliability of the government's investigation and its sources.

*Id.* at 71.

Such rulings ring true in the instant case. One of the main disputes here is whether the borrowers are victims or not under the Sentencing Guidelines and/or if they are entitled to

---

[23]    Although the Rules of Evidence do not directly apply to sentencing proceedings, the Court believes that the 5K1.1 motion contains admissions by a party opponent. *See e.g.*, *United States v. Ballou*, 59 F. Supp. 3d 1038, 1073-1075 (D.N.M. Oct. 16, 2014) (Department of Justice party opponent in criminal cases); *United States v. Yildiz*, 355 F.3d 80, 82 (2d Cir. 2004) (DOJ lawyers can bind the government with Rule 801(2)(B) adoptions in filings); *United States v. Kattar*, 840 F.2d 118 (1st Cir. 1988) (same); *United States v. Ciavarella*, 716 F.3d 705, 724-25 (3d Cir. 2013) (discussing admission of party opponent against government resulting from statements by prosecutor at plea hearing for codefendant).

restitution. (*See e.g.*, Docket No. 630). In fact, the Government is seeking up to 10-levels of sentencing enhancements that rely upon a finding by the Court that the borrowers were victims of the mortgage fraud scheme. (*Id.*). It is clearly favorable to each of the defendants that Roscoe's credibility was questioned by the assigned prosecutor and the lead case agent, particularly given that she is described as a "critical cog" in the scheme, who was "one of the primary contacts with the borrowers" and arranged for the submission of fraudulent loan applications and the verification of deposits ("VOD") to lenders. (Docket No. 614-6). Upon reviewing the various interview reports attached to the Government's response, (*see* Docket No. 620), it also appears that Roscoe provided a number of leads to the agents concerning the behavior of certain of the borrowers and their knowledge of the scheme, including, among others, her former Riverside Mortgage employees, Cynthia Scalise and Ebony Thomas, with Thomas taking thousands of dollars in cash back on the deal and bragging about it; Kelly Lucot, whose mother, Toni North allegedly prepared the VOD supporting her transaction; and Julie and Charles Meissner, who were aware of the fraud. (Docket Nos. 620-3; 620-4 at 4-5; 620-5 at 2). Despite this information, and Scalise's subsequent admission that she knew there was an inflated appraisal associated with her purchase, (Docket No. 620-7 at 3), the Government continues to advocate that all of these individuals are victims under the Guidelines, downplaying all of Roscoe's information because of her asserted "altruistic motives" for participating in the offense conduct. (*See* Docket No. 644 at 49 (Thomas); 71 (Lucot); 79 (Scalise)).

As the Defendants have pointed out repeatedly, there were no victim-related enhancements in the computations of the advisory guidelines range in Roscoe's case, (or many other coconspirators), despite the fact that SA Fisher admitted that there was no discernable difference in his belief of the status of the borrowers as victims vis-à-vis the remaining

defendants and Roscoe. (Docket No. 575 at 24-5). Indeed, the Government stipulated with Roscoe as part of its plea agreement with her that such enhancements would not apply. (Docket No. 620-9 at ¶¶ C.3-C.7). Additionally, Roscoe not only avoided the application of these enhancements but also received the benefit of the Government's 5K1.1 motion for a downward departure in her case, again, despite the lead case agent stating she is "completely not credible" and the fact that the prosecutor felt that she would have damaged the prosecution's case if called at trial. (Docket Nos. 614-6; 620-13). As is more fully described in the next section, the prosecutor has made several inconsistent statements about whether the Government intended to use Roscoe as a witness at trial of this matter, but there is no dispute that Roscoe was called before the grand jury that returned the Superseding Indictment and the agents and prosecutor had only one substantive meeting with Roscoe after the grand jury appearance. (Docket No. 620-8). In this Court's estimation, all of this evidence serves to undermine the reliability of the Government's investigation and its sources.

The Court further finds that the withheld evidence also significantly weakens the credibility of SA Fisher and SA Avolia as witnesses, particularly when viewed in the context of their actual testimony during these proceedings. Despite SA Fisher's statement in the email that Roscoe was "completely not credible" and "minimized" her testimony "every time" they spoke, he testified to the following on cross-examination during the hearing:

> Q. In fact, is it fair to say that much of what Miss Roscoe told you at various stages of the interviews turned out not to be true?
> A. A number of things that she stated were untrue.
> Q. And right now her interest is in cooperating with the Government to reduce her sentence; correct?
> A. I don't know what her interest is.
> Q. When she met with you most recently, that probably was her interest?
> A. No. When she met with me most recently, she was very angry and upset about the entire ordeal and said some very unkind things.

Q. She received -- has she been sentenced?
A. I don't believe so.

(Docket No. 574 at 190-91).   Given this exchange, one could find SA Fisher downplayed Roscoe's cooperation or that she expected to receive some benefit for doing so.   While SA Fisher admitted that a "number of things" Roscoe said to him during interviews turned out to be untrue, that is a far cry from his emailed assessment that she was "completely not credible." In response to a simple question about whether the Government filed a 5K1.1 motion on Roscoe's behalf, SA Avolia claimed that she was not aware of the contents of Roscoe's plea agreement.   (Docket No. 603 at 140-41).   But, the withheld email plainly demonstrates that SA Avolia was aware that the Government was filing a 5K1.1 motion for Roscoe, as the prosecutor elicited feedback from all of the case agents regarding her veracity to include in the motion and SA Avolia also knew that the prosecutor and SA Fisher explicitly stated that they had issues with Roscoe's credibility. (Docket No. 620-13).   In addition, the case agents sat in the courtroom throughout all of these proceedings, hearing each other's testimony as well as the prosecutor's arguments regarding defense objections and his response that the Court <u>should</u> credit Roscoe's statements.   Overall, the Court finds that the withheld information is particularly strong impeachment evidence because it blunts the Government's theories in support of the various enhancements in this case, including whether the borrowers are victims under the Guidelines or not.   *See Starusko*, 729 F.2d at 261.   Such evidence also generally undermines the case agents' credibility since they each testified contrary to the facts set forth in the withheld information.   *See United States v. Leekins*, 493 F.3d 143, 150 (3d Cir. 2007) ("We give great deference to a presiding judge's credibility determinations in sentencing proceedings because she is able to directly observe a testifying witness's tone and demeanor.").

Additionally, the withheld evidence is material for *Brady* purposes in these proceedings

for the simple reason that numerous objections were explicitly lodged to the admission of hearsay statements allegedly made by Roscoe, such objections were overruled by the Court and the statements were admitted into evidence. It is elementary that if the testifying witness believes that his source is "completely not credible," then the Court should not admit the out-of-court statements of that source in a sentencing proceeding. *See, e.g.,* U.S.S.G. § 6A1.3(a); *Smith, 751 F.3d at 116* ("We have long accepted an agent's recitation of information obtained from a third party who appears credible, and the District Court was presented with no reason to doubt [the individual's] credibility"). Here, the Court's rulings were made without the benefit of SA Fisher's assessment because it was withheld by the prosecution and not provided until months after the proceedings ended. (Docket No. 601-13). Hence, such rulings were made in error and the defense's objections should have been sustained.

For all of these reasons, the Court finds that the Government violated *Brady/Giglio* by withholding the email and 5K1.1 motion as to Roscoe. Prior to determining the appropriate sanction for same, the Court must address additional due process problems which the Court discusses.

### C. Misrepresentations/Duty to Correct the Record/Inconsistent Statements

As the Court has held previously in this case, this Court expects candor from counsel when making representations to the Court.[24] *See United States v. Kubini, 304 F.R.D. 208, 225 (W.D. Pa. 2015)* ("The Court's inquiry does not end here as attorneys also owe a duty of candor to the Court to not knowingly: make a false statement of material fact or law to the Court; fail to

---

[24] The same is set forth in this Court's Practices and Procedures as well as pertinent caselaw. *See e.g., Practices and Procedures of Judge Nora Barry Fischer* at § I.I "Conduct of Attorneys" (citing Code of Professional Conduct of Academy of Trial Lawyers of Allegheny County, which provides at § II.7 ("[Attorneys] will accurately represent and cite facts or authorities and be candid and truthful in any oral or written communication with the Court.")); *United States v. Casas, 425 F.3d 23, 40 (1st Cir. 2005)* ("Prosecutors have a duty of candor to the court.").

correct any false statements previously made; or offer evidence that the lawyer knows to be false. Pa. R. Prof. C. 3.3(a)(1), (3).").  This is because "'[a]n attorney's obligation to the court is one that is unique and must be discharged with candor and with great care. The court and all parties before the court rely upon representations made by counsel.'" *United States v. Piper*, No. CRIM. 09-218, 2012 WL 2367397, at \*7 (M.D. Pa. June 20, 2012), *aff'd*, 525 F. App'x 205 (3d Cir. 2013) (quoting *Baker Industr., Inc. v. Cerberus Ltd.*, 764 F.2d 204, 212 (3d Cir.1985)).  "Thus, an 'attorney's word is his bond.'" *Id.* (quoting *LaSalle Nat'l Bank v. First Connecticut Holding Grp., LLC*, 287 F.3d 279, 293 (3d Cir. 2002)).  In the discovery context,

> [t]he fact that the government partially complied with its automatic discovery obligations does not show that it engaged in no impermissible conduct. When the government responds incompletely to a discovery obligation, that response not only deprives the defendant of the missing evidence but also has the effect of misrepresenting the nonexistence of that evidence.

*Ferrara v. United States*, 456 F.3d 278, 293 (1st Cir. 2006) (citing *United States v. Bagley*, 473 U.S. 667, 682-83, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) (suggesting that an incomplete response could "represent[ ] to the defense that the evidence does not exist" and cause it "to make pretrial and trial decisions on the basis of this assumption")).

It is this Court's opinion that the withheld evidence clearly demonstrates that a series of representations made by the prosecutor during the course of this litigation were untrue.  To this end,

> a.  In an email dated October 4, 2015, AUSA Conway stated to counsel and the Court that "[i]n terms of updated Jencks / Giglio information, we are aware of our obligations and intend to fully comply.  The only incremental Jencks Act/Giglio material is the material related to Ms. Val, which was already provided."

> b.  In open court on October 7, 2015, AUSA Conway stated several times that the Government had complied with its

Jencks and *Brady* obligations. AUSA Conway also represented that the Government had acted in good faith to meet its discovery obligations and had not concealed any materials from the Defendants, *see Hr'g Trans.* 10/7/15;

c. In open court on January 26, 2016, AUSA Conway elicited testimony from SA Fisher on direct examination and advocated that the Court admit hearsay testimony of Rochelle Roscoe in response to several defense objections, including that such testimony was "inherently unreliable," instead advocating that such information should be accepted by the Court which requires that it have sufficient indicia of reliability to support its probable accuracy, *see* Docket No. 574 at 161-66.

But, the reality was that additional Jencks and *Brady* materials were created by the prosecution team, including the prosecutor, on February 23, 2015 and March 9, 2015 and such information was suppressed by the prosecution. (Docket Nos. 614-6; 620-13). This evidence was not produced despite the fact that Smith explicitly requested that the Government update its prior trial production of Jencks and *Brady* materials only two days after the 5K1.1 motion was filed by the prosecutor under seal and renewed this request several times, including on the eve of the proceedings. (Docket No. 614). Several requests by Smith's counsel for updated Jencks and *Brady/Giglio* materials were simply ignored by the prosecutor, who failed to respond until the Court made a similar request prior to the proceedings at which time the prosecutor declared to everyone that there was no incremental Jencks material in the case in an email and reiterated this position in open court. *See 10/4/15 email*; *Hr'g Trans. 10/7/15*.

The potential introduction of false testimony during sentencing proceedings also implicates the ethical responsibilities of prosecutors. In this regard, the United States Court of Appeals for the Third Circuit has recognized that:

the prosecution's duty to disclose false testimony should not be "narrowly and technically limited to those situations where the prosecutor knows that the witness is guilty of the crime of perjury." Rather, "when it should be obvious to the Government

> that the witness' answer, although made in good faith, is untrue," it
> has an obligation to correct that testimony.

*United States v. Stadtmauer*, 620 F.3d 238, 268 (3d Cir. 2010) (quoting *United States v. Harris*, 498 F.2d 1164, 1168-69 (3d Cir. 1974)). Further, "the Government's obligation to correct that statement is as compelling as it is in a situation where the Government knows that the witness is intentionally committing perjury." *Harris*, 498 F.2d at 1169; *cf. Prosdocimo v. Sec'y, Pennsylvania Dep't of Corr.*, 458 F. App'x 141, 147 (3d Cir. 2012) ("some precedent suggests due process can be violated under *Napue* even when the witness does not commit perjury. […] In at least some factual circumstances, it may be nonsensical to hold otherwise.") (internal citations omitted).

Here, it cannot be reasonably argued that SA Avolia's testimony denying that she was aware of the 5K1.1 motion in Roscoe's case was truthful or accurate. The Court simply cannot credit such testimony in light of the email evidence.[25] (Docket No. 620-13). Notably, the Government criticized the Court's prior holding that AUSA Conway should have known that borrower-witness Tawnya Anthony McCabe's testimony about the character of her loan changing from a fixed to a variable rate was untrue, claiming that the Court was holding him to too high a standard by permitting his witness to testify directly contrary to all of the documentary evidence that had been admitted in the case without conducting any investigation of the facts. (*See* Docket No. 661). But, no such argument is advanced here, where the prosecutor obviously knew that SA Avolia's testimony was untrue – he sent her an email titled "5K motions," he told her that he was "not sure" that Roscoe was credible and asked SA Avolia to provide her own opinion as to Roscoe's veracity. (Docket No. 620-13). As the email states, this information was

---

[25] The MOI's also indicate that SA Avolia was part of the debriefing of Roscoe that occurred immediately following her change-of-plea hearing on June 2, 2011. (Docket No. 620-5 at 1). SA Fisher writes in his report that "Ms. Roscoe had just attended a change of plea hearing at which time she had plead guilty in accordance with a plea agreement signed at the hearing." (*Id.*).

requested so that the prosecutor could then incorporate it into the 5K motion he was preparing. (*Id.*). Even if SA Avolia never read the email, the prosecutor had a responsibility to immediately correct this testimony given his own knowledge of same. *See Stadtmauer*, 620 F.3d at 268. Of course, the proceedings never should have advanced to the point where SA Avolia was even asked this question on May 13, 2016 because the prosecutor should have: (1) disclosed the 5K1.1 motion and email as he told everyone had been accomplished, on October 4, 2015, prior to the commencement of the proceedings; (2) disclosed these materials prior to the testimony of SA Fisher on January 27, 2016, as this Court had ordered; (3) corrected the record immediately upon the objection lodged by Smith's counsel during SA Fisher's testimony at the January 27, 2016 session; and/or (4) disclosed the email at the conclusion of SA Fisher's direct examination, insofar as the prosecutor was adhering to a strict interpretation of the Jencks Act. Hence, the prosecutor's lack of action demonstrates a persistent failure to meet his obligations to produce this material and to timely correct the record.

A thorough review of the record further demonstrates that AUSA Conway has taken inconsistent positions in this litigation and the case against Rochelle Roscoe. Courts have frowned upon the practice of prosecutors taking inconsistent positions in two separate criminal cases given that the prosecutor's role is to see that justice is done and that truthful information is provided to the Court.[26] *See Jacobs v. Scott*, 513 U.S. 1067, 115 S. Ct. 711, 712, 130 L. Ed. 2d

---

[26] Although non-binding, ABA Standard 3-6.2, Information Relevant to Sentencing, provides that:

(a) The prosecutor should assist the court in basing its sentence on complete and accurate information for use in the presentence report. The prosecutor should disclose to the court any information in the prosecutor's files relevant to the sentence. If incompleteness or inaccurateness in the presentence report comes to the prosecutor's attention, the prosecutor should take steps to present the complete and correct information to the court and to defense counsel.

(b) The prosecutor should disclose to the defense and to the court at or prior to the sentencing proceeding all unprivileged mitigating information known to the

618 (1995) (Stevens, J.) (dissenting) ("I have long believed that serious questions are raised when the sovereign itself takes inconsistent positions in two separate criminal proceedings against two of its citizens.") (quotation and citations omitted). As the Court of Appeals for the First Circuit explained:

> This [type of] inconsistency is troubling where its source is the prosecutorial arm of the federal government. It is one thing for private counsel to characterize events in contrasting ways in two separate litigations, because the counsel there is required under our adversary system to defend its clients in the most vigorous fair manner possible—counsel is expected to put the best possible gloss on a client's case. The function of the United States Attorney's Office, however, is not merely to prosecute crimes, but also to make certain that the truth is honored to the fullest extent possible during the course of the criminal prosecution and trial. If it happens that the government's original perspective on the events in question is proven inaccurate, such revelation is in the government's interest as well as the defendant's. The criminal trial should be viewed not as an adversarial sporting contest, but as a quest for truth. *See Brennan, The Criminal Prosecution: Sporting Event or Quest for Truth?*, 1963 Wash.U.L.Q. 279. *See also Agurs*, 427 U.S. at 104, 96 S.Ct. at 2397 (use of perjured testimony involves "a corruption of the truth-seeking function of the trial process"). This principle and this ideal are reflected in the constitutional requirement that the government make available to the defendant all material evidence favorable to the accused. *See Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215 (1963). Thus, it is disturbing to see the Justice Department change the color of its stripes to such a significant degree, portraying an organization, individual, or series of events variously as virtuous and honorable or as corrupt and perfidious, depending on the strategic necessities of the separate litigations.

*United States v. Kattar*, 840 F.2d 118, 127 (1st Cir. 1988). Likewise, this Court believes that it is inappropriate for a prosecutor to take inconsistent positions concerning the same facts against different defendants during sentencing proceedings, particularly when the apparent purpose in

---

prosecutor, except when the prosecutor is relieved of this responsibility by a protective order of the tribunal.

*ABA Standards for Criminal Justice, Prosecution Function* § 3-6.1, Information Relevant to Sentencing.

doing so is to seek longer sentences for all of those defendants, i.e., by tempering the extent of a downward departure under Guideline § 5K1.1 in Roscoe's case due to the opinion of the prosecution team that she was unreliable and seeking various enhancements against the instant Defendants based in part upon her out-of-court statements.

The Court has already discussed the inconsistent positions that the prosecutor has taken as to Roscoe's credibility, or lack thereof, telling the Court in her case that she was not "particularly reliable" and then opposing an objection that her statements were "inherently unreliable" when he sought to admit them in this case, while simultaneously advocating that information she provided to the case agents had sufficient indicia of reliability to support its probable accuracy. In addition, the prosecutor has made several inconsistent statements about whether he intended to call Roscoe as a witness at the trial and when he made such decision. The 5K1.1 motion states unequivocally that "the government, for strategic reasons, had decided it was in the best interests of the government not to call Rochelle Roscoe as a witness in the trial, fearing that she would do more harm than good."[27] (Docket No. 614-6). The Government's response to Smith's motion states that the decision not to call her as a witness was made on February 16, 2015. (Docket No. 620). However, in a contemporaneous filing with the Court dated February 19, 2015, the prosecutor stated that "[a]t trial, the government intends to present the testimony of Rochelle Roscoe" along with a proffer of how she would authenticate hundreds of documents.[28] (Docket No. 382 at 9). The Government also continued to make its Jencks

---

[27]     The prosecutor similarly states in his February 23, 2015 email that he "had decided not to call [Roscoe] as a witness; not sure credible." (Docket No. 620 at 5).

[28]     The Court notes that the February 19, 2015 filing by the prosecutor was also the subject of the Court's Order of May 23, 2016, denying the motion to supplement exhibits based on the Kubini Search Warrant documents. (Docket No. 583). The Court admonished counsel for failing in his duty of candor by arguing in these enhancement proceedings that those exhibits were stipulated to in advance of trial both orally and in a written motion filed a week later, without reviewing his pleadings from earlier in the case. Presumably, the Court's Order would have caused the prosecutor to re-read this filing, (Docket No. 583), wherein he states, unequivocally, that Roscoe would be called as a witness at trial.

disclosures in advance of the expected trial, forwarding Roscoe's PIR on February 17, 2015; another disclosure of her mental health condition on February 17, 2015; and even informing the defendants on February 19, 2015 that SA Fisher bought her a sandwich at Jimmy Johns when they spoke. (Docket Nos. 620-11; 620-12; 624). The prosecutor also added an additional caveat in his August 2016 pleading stating that "[i]t was possible, however, that the government could have called Roscoe as a witness in its case-in-chief or in rebuttal depending on how the trial proceeded." (Docket No. 620 at 4).

In light of these numerous inconsistencies, it is unclear what the true facts are with respect to Roscoe's veracity and whether the Government intended to use her as a witness or not. What is more troubling to this Court is that the fairness of these proceedings has been undermined. In that vein, the prosecutor made no real effort to comply with its *Brady/Giglio* and Jencks obligations during the pendency of these proceedings and has responded by producing these materials only in response to a Show Cause Order issued by the Court, (Misc. No. 15-164, Docket No. 2, n.14, *supra*), and the subsequent motion filed by Smith, (Docket No. 614). Additionally, the Court has received no subsequent assurances from the prosecutors that additional materials of this type have been searched for, reviewed, analyzed or produced to Defendants. As the Court has already noted, pertinent email responses from SA Avolia and/or SA Heckman have not been provided to date.

### D. Prejudice & Appropriate Sanctions

It is well established under *Brady* and due process principles that a defendant must demonstrate prejudice to justify the imposition of sanctions, including, among other options, the declaration of a mistrial or the exclusion of evidence, or to order no sanctions at all. But, "[e]ven where there is not a due process violation, a court may fashion a remedy for governmental

misconduct from its supervisory power." *United States v. Trombetta*, No. CR 13-227-01, 2015 WL 7289407, at *2 (W.D. Pa. Nov. 16, 2015) (citing *United States v. Nieves*, No. 97-46, 1997 WL 447992, at *6 (E.D. Pa. July 24, 1997), *which cited*, *United States v. Hasting*, 461 U.S. 499, 505 (1983) and *United States v. Santana*, 6 F.3d 1, 9-10 (1st Cir. 1993)). "One purpose of the court's supervisory power is 'to secure enforcement of 'better prosecutorial practice and reprimand of those who fail to observe it.'" *Id.* (quoting *Nieves*, 1997 WL 447992, at *6, *which cited*, *United States v. Osorio*, 929 F.2d 753, 763 (1st Cir. 1991)).

The Government suggests that no prejudice has been sustained because the withheld information has been disclosed prior to the sentencing hearings and it has no objection to the Court admitting the withheld materials and striking any testimony directly derived from Rosoce prior to making its rulings on the parties' objections. (Docket No. 620). Defendants argue that they were prejudiced as they were not able to fully and fairly cross-examine the case agents who testified at the hearing and to effectively counter the Government's myriad arguments on the sentencing disputes. (Docket No. 614). After considering all of the parties' submissions, including their proposed findings of fact and conclusions of law, the responses thereto and the replies, the Court agrees with Defendants' position that they were prejudiced by the withholding of this information and that the imposition of sanctions in addition to those suggested by the Government is fully warranted and appropriate both under due process principles and the Court's supervisory power.

Our Court of Appeals has characterized a similar situation as a "serious due process violation" when a prosecutor failed to turn over a cooperator's plea agreement prior to his trial testimony, bolstered the reliability of the witness by claiming he had nothing to gain by testifying and then days later sent an email supporting a sentence reduction for the witness. *United States*

*v. Lashley*, 524 F. App'x 843, 846 (3d Cir. 2013). Here, the Court finds that the prosecutor committed a serious due process violation by withholding information covered by Jencks and *Brady/Giglio* in violation of this Court's order; misrepresented the facts contained therein to the Court; and in so doing took irreconcilably inconsistent positions in separate litigations in an effort to increase the sentences of all of the affected defendants.

Given all of the facts and circumstances, the Court further holds that such behavior caused significant prejudice to Defendants. Initially, now that this information has been revealed, it appears to the Court that Defendants could have made a highly persuasive argument that the Court should not have exercised its discretion to hold the joint-hearings or to at least limit the scope of those matters that would be the subject of the proceedings. *See Kluger*, 722 F.3d at 563. With that said, it stands to reason that counsel for the Defendants – each of whom are represented by highly skilled and experienced defense lawyers – could have used the withheld material to more effectively cross-examine the case agents than the record now reveals if they had been provided with such information, as was required. It is abundantly clear that the Government's position in this entire proceeding would have been met with a flurry of objections if the prosecutor had adhered to the Jencks Act and supplied the withheld information after the conclusion of SA Fisher's direct examination.

Beyond this, Defendants relied upon the assertions by the prosecutor that he had met the Government's *Brady*/Jencks obligations, acted in good faith, and had not concealed anything from Defendants in order to develop their legal strategy in defending the enhancements. Indeed, each of them entered into the stipulation concerning the borrower-witnesses with the Government and then presented evidence during the sentencing enhancement proceedings, based upon a good faith belief that the required materials had been produced. After waiving their

rights to not be cross-examined by the prosecutor at sentencing,[29] Ratchkauskas and Kubini took

the stand and testified themselves during the course of these proceedings, despite having an

absolute Constitutional right not to do so. These decisions may not have been made if the

disclosures had been provided but the Government seeks to utilize information gathered from

Defendants during these proceedings to enhance their sentences. In this regard, the Government

suggests that Kubini admitted that the borrowers were victims during his own testimony.

(Docket No. 630). Similarly, the Government cites the testimony of Smith's own expert witness

against him to demonstrate that he lied to the grand jury and claims that Ratchkauskas lied

during the sentencing enhancement proceedings. (*Id.*).

Unfortunately, these are not the first indiscretions committed by the prosecutor during

these proceedings but must be viewed as part of a continuing pattern of inappropriate behavior.

To recount some of the Court's prior rulings:

- despite acknowledging that it lacked the authority to dismiss the charges against Smith for AUSA Conway's conduct during his grand jury appearance, the Court noted that the prosecutor engaged in inappropriate questioning and made "condescending remark[s]," which may have warranted a reprimand had they been made at trial;
- the Court ordered the borrower witnesses who filled the courtroom at the prosecutor's behest during a break in the proceedings on October 27, 2015 to leave the courtroom, in what is best described as an improvident "stunt" by counsel to show up the Court for permitting extensive argument on the issue of whether the borrowers should be informed of their right to counsel or not;
- the Court struck inappropriate comments made by the prosecutor during the enhancement proceedings, such as his exclaiming "Oh, God" and laughing at opposing counsel, (Docket No. 574 at 185); and,
- the Court admonished the prosecutor for failing to honor his duty of candor to the Court by misrepresenting, both in open court and a week later in a motion, that certain exhibits had been stipulated to

---

[29]     *See* n.13, *supra.*

> prior to trial, when no such stipulations were ever reached, as
> evidenced by his brief filed earlier in this case, (Docket No. 583).

It is likewise this Court's opinion that AUSA Conway's behavior during the course of these sentencing enhancement proceedings constitutes a deviation from the high standards of professional and ethical behavior that has consistently been displayed by prosecutors from the Office of the United States Attorney for the Western District of Pennsylvania throughout the past 10 years that the undersigned has had the privilege to serve on this Bench. In short, the actions of the prosecutor in this case plainly undermined the fairness of the sentencing enhancement and restitution proceedings and the Court – which exercised its discretion to schedule the hearings – is now exercising its discretion to set aside evidence presented during those proceedings which may have been undermined by the untimely disclosed evidence. Given the Court's ruling setting aside SA Fisher's testimony due to the Jencks Act violation and the Government's admission that the withheld materials should have likewise been available prior to SA Avolia's testimony, the most appropriate sanction is for the Court to disregard her testimony as well and not enhance Defendants' sentences unless otherwise supported by the evidence in the record or with respect to purely legal objections lodged by the defense. The Court believes that to use the testimony of SA Fisher or SA Avolia would not only violate fundamental fairness but would leave any sentences based upon such evidence open to collateral attack – appellate review having been waived by Defendants as part of their respective plea agreements.

Finally, the Court sees no basis to reopen the record in order to permit further cross-examination of the case agents by Defendants – none of whom have requested that the Court do so after the Government's invitation – or to convene additional hearings to permit the Government to introduce additional evidence regarding the disputed sentencing enhancements related to the borrowers. The Court of Appeals has articulated the legal standard as follows:

When determining whether to reopen a proceeding, the paramount factor for a district court to consider is whether reopening, if permitted, would prejudice the party opposing it. *United States v. Kithcart*, 218 F.3d 213, 220 (3d Cir.2000). Timing is key to this analysis. "If [reopening] comes at a stage in the proceedings where the opposing party will have an opportunity to respond and attempt to rebut the evidence introduced," the possibility of prejudice is greatly lessened. *Coward*, 296 F.3d at 181 (quoting *United States v. Blankenship*, 775 F.2d 735, 741 (6th Cir. 1985)). In addition, a party that seeks to reopen a proceeding must provide a reasonable explanation for its failure to initially present the evidence. *Kithcart*, 218 F.3d at 220. In this regard, "[c]onsideration should be given to whether the law on point at the time was unclear or ambiguous." *Coward*, 296 F.3d at 182.

*Smith*, 751 F.3d at 114. Again, it is purely a matter of the Court's discretion as to whether to conduct an evidentiary hearing on disputed sentencing objections or not and the scope of any such proceedings. *See Kluger*, 722 F.3d at 563. The Court is simply required to provide a procedure for the parties to resolve objections. *Id.* In addition to all of the above facts, Defendants have sustained prejudice by the considerable delays in these proceedings, most of which were caused by the Government, including the time taken by the Court to review the extensive record in this case and resolve this important motion. *See Betterman*, 136 S.Ct. at 1617. The parties' stipulation permitting the Government to possibly call additional borrower witnesses is not controlling on this Court. *See e.g.*, FED. R. CRIM. P. 32(i)(2) ("The court may permit the parties to introduce evidence on the objections."); U.S.S.G. § 6B1.4(d) ("The court is not bound by the stipulation, but may with the aid of the presentence report, determine the facts relevant to sentencing"). Otherwise, it was entered into by Defendants with an understanding that the Government had complied with the basic rules established by the Court to govern these proceedings. Since the Government did not act in good faith and violated this Court's Order, (Docket No. 494), the sentencing enhancement and restitution proceedings will close after the Court issues its rulings on their disputes.

V.     CONCLUSION

In conclusion, "the responsibility confronting a district court judge when he or she sentences a convicted defendant is an awesome one." *United States v. Faulks*, 201 F.3d 208, 213 (3d Cir. 2000). Such decisions are the most important ones that the undersigned must make, sitting in judgment of another individual, with their liberty at stake, and being the one person who decides if and how long that individual must serve in prison for the crimes they have committed. This responsibility is heightened when the individuals have waived their rights to appellate review, as these Defendants have in their plea agreements with the Government. It is this Court's duty to ensure that sentencing proceedings are fundamentally fair and that the Government adheres to its obligations under Jencks, *Brady/Giglio* and Orders of the Court. When the Government fails in this regard, the Court must act to remedy the violations for several reasons, including: to level the playing field for these particular Defendants; to deter future violations; and to encourage better prosecutorial practice in the future.

Overall, it is extraordinarily disappointing to this Court that members of the prosecution team knew mere hours after Smith pled guilty – and before his codefendants' change-of-plea hearings – that neither AUSA Conway nor SA Fisher believed that Roscoe was credible but they all proceeded to take no action to provide Defendants with those obviously exculpatory assessments during the course of these proceedings, despite numerous opportunities to do so. It is further troubling to the Court that it has received no assurances from the U.S. Attorney's Office that the Government's obligations under Jencks, and *Brady/Giglio* have now been met in this case. Instead, it continues to seek the highest sentencing ranges that this Court has seen in a mortgage fraud case to date, offering at most, a caveat that "[b]arring unforeseen circumstances, the government does not intend to recommend that the Court impose a sentence, as to any

defendant, within his applicable advisory guideline range as set forth" in its Proposed Findings of Fact and Conclusions of Law.  (Docket No. 630 at 1, n.1).

For all of these reasons, Smith's Motion [614] is granted and the Court will admit Docket Nos. 614-1:614-6 and 620-13, (i.e., the 5K1.1 motions and the email), into the record for these proceedings.  The Court will not enhance Defendants' sentences based upon testimony by SA Fisher or SA Avolia on issues that are not independently supported by other record evidence or pertain to objections on purely legal matters.  However, the Court will permit Defendants to rely upon the admissions by these case agents during their testimony, including that two of the transactions on Govt. Ex. E did not involve fraud and that they did not investigate the claims made by the borrowers in their VIS or the loss figures set forth in Govt. Ex. Q.  An appropriate Order follows.

/s Nora Barry Fischer
Nora Barry Fischer
U.S. District Judge

Dated: June 14, 2017

cc/ecf:  All counsel of record.